UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRUCE HENSON,

                                    Plaintiff,
                                                        9:13-CV-0590
v.                                                      (GTS/TWD)

GAGNON, *et al.*,

                                    Defendants.
_____

APPEARANCES:                        OF COUNSEL:

BRUCE HENSON
Plaintiff *pro se*
09-A-1436
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953

HON. ERIC T. SCHNEIDERMAN          MELISSA A. LATINO, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT AND RECOMMENDATION

Plaintiff Bruce Henson commenced this *pro se* civil rights action under 42 U.S.C. § 1983

asserting claims arising out of his incarceration at Upstate Correctional Facility ("Upstate").[1]

---

[1] Edward Saldano was also initially named as a Plaintiff in the action. (Dkt. No. 1.) However, Saldano was dismissed from the action without prejudice early on for failing to comply with an order regarding payment of the filing fee. (Dkt. Nos. 9-10.)

(*See generally* Dkt. No. 1[2].)  A number of originally named defendants and the majority of the claims asserted by Plaintiff in his complaint were dismissed from the case by the Hon. Glenn T. Suddaby, Chief United States District Judge, on initial review done pursuant to 28 U.S.C. §§ 1915(e) and 1915A.  (Dkt. No. 10.)  The sole remaining claims are: (1) First Amendment retaliation claims against Defendant Sergeant Brian Gagnon ("Gagnon") and Corrections Officer Eric DuFrane ("DuFrane") for allegedly planting evidence in his cell during a cell search and filing a false Misbehavior Report against Plaintiff based upon the planted evidence, and including a factually unsupported smuggling claim in retaliation for grievances he had filed against Upstate staff; (2) a First Amendment retaliation claim against Hearing Officer Don Haug ("Haug"), incorrectly sued as "Hough," based upon Haug's decision and the penalty imposed by him in Plaintiff's disciplinary hearing on the Misbehavior Report ; and (3) a claim for deliberate indifference against former Upstate Superintendent David Rock ("Rock") for failing to correct misconduct by his staff after receiving reports disclosing it.  *Id.* at 34-35.

This matter is now before the Court on the remaining Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 40.)  Plaintiff has opposed the motion.  (Dkt. No. 43.)  For the reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted.

---

[2]  Because the paragraphs in Plaintiff's complaint are not numbered consecutively throughout the pleading, and there are instances of the same number being used for more than one paragraph, references to the complaint herein are to the page number assigned by the Court's CM/ECF electronic docketing system.

# I.    BACKGROUND

## A.    Random Cell Frisk/Search Procedure at Upstate

According to Defendant Gagnon, he receives a list of randomly selected cells to be frisked/searched for security purposes on a daily basis and, in his role as Sergeant, often directs corrections officers under his supervision to conduct the cell searches and to report any concerns to him.  (Dkt. No. 40-4 at ¶¶ 4-5.)  Gagnon receives the list of cells to be searched in a memorandum from the Captain's Office to the Watch Commander.  *Id*. at ¶ 6.  The day and time of the searches is varied to prevent predictability, which would be counterproductive to the searches.  *Id*. at ¶ 5.  Plaintiff acknowledged in his deposition testimony that random searches are done at every facility.  (Dkt. No. 40-5 at 13.)

Defendant Corrections Officer DuFrane has been trained to do cell searches by the Department of Corrections and Community Supervision ("DOCCS").  (Dkt. No. 40-3 at ¶¶ 3-4.) DuFrane, who conducts multiple routine cell searches a week at the direction of his supervisor, described the routine cell frisk/search procedure in his Declaration.  *Id*. at ¶ 7.  In accordance with DOCCS policy, DuFrane examines the cell for contraband, including drugs, and weapons or items.  *Id*. at ¶ 9.  DuFrane also examines State and personal property of the inmate for damage. *Id.* at ¶ 10.

For security purposes, DuFrane is required to examine the bars, windows, locks/locking mechanisms, interior and exterior walls, secure cabinets, vents, and lighting and plumbing fixtures in the cell, because an inmate could hide contraband in the lighting and plumbing.  *Id*. at ¶¶ 11-12.  As a part of the inspection, DuFrane looks at the security screws in the cover of the

light in the cell and the screws in the doors. *Id*. at ¶ 13.

According to DuFrane, Special Housing Unit ("SHU") inmates have an exercise area outside of their cell which is controlled by DOCCS, and only a DOCCS official can open or close the exercise door. *Id.* at ¶¶ 14-15. The control panel to open and close the exercise door is covered by a steel plate secured by security screws, which are difficult to unthread in order to prevent an inmate from opening the panels to hide contraband or escape to the outside area. *Id*. at ¶¶ 16-17. Loosening of the screws generally requires a special security screwdriver. *Id*. at ¶ 17. However, DuFrane knows of many inmates who have removed the screws, despite the difficulty, and many more who have attempted to do so by unthreading them. *Id*. at ¶ 18. The integrity of the security screws is important to facility security, not only because if an inmate were to remove the screws he could open the exercise door, but because the inmate could gain access to the cavity behind the steel plate and use the space for contraband, and the screws could be used as a weapon or part of a weapon. *Id.* at ¶¶ 19-22.

**B.      Random Cell Frisk/Search of Plaintiff's Cell on November 29, 2012**

Plaintiff was transferred from the SHU at Coxsackie Correctional Facility to the SHU at Upstate on September 24, 2012. (Dkt. No. 43-1 at 4.) Plaintiff's cell, B-14 in SHU 8 Building, which he shared with his cellmate Edward Saldano ("Saldano"), was randomly selected to be frisked/searched for security purposes on November 29, 2012. (Dkt. No. 40-4 at ¶¶ 9-10.) Plaintiff and Saldano had been moved into the cell on October 25, 2012. (Dkt. No. 40-8 at 37.)

Gagnon was working the 2:00pm to 10:00pm shift on 8-Block on November 29, 2012, when he received the memorandum identifying the cells to be searched that day. (Dkt. No. 40-4 at ¶¶ 7-9 and 8.) Plaintiff's cell was included on the list. *Id*. at 8. Although according to

Gagnon, he directed Defendant DuFrane to conduct the cell frisk/search that included Plaintiff's cell, (Dkt. No. 40-4 at ¶ 11), Plaintiff claims that there were seven corrections officers, as well as Gagnon, present during the search.[3] (Dkt. No. 1 at 27-28.)

DuFrane informed Plaintiff and Saldano that he was going to search their cell and, in accordance with DOCCS policy, removed them from the cell to conduct the search. (Dkt. Nos. 1 at 27; 40-3 at ¶¶ 32-33.) During the search, DuFrane discovered that the steel plate covering the electronic mechanism that controlled the exercise door was missing a screw and that three other screws were loose. (Dkt. No. 40-3 at ¶ 34.) DuFrane was concerned with what he perceived to be a serious violation that threatened the safety and security of staff, inmates, and the public. *Id.* at ¶ 35. DuFrane was most troubled by the missing screw, which could have been used as an anchor for a dragline to pass contraband from one cell to another, or passed to another inmate who might have used it to make a weapon. *Id.* at ¶ 36.

DuFrane also found ripped up State sheets which had been formed into draglines in the corner of Plaintiff's cell. *Id.* at ¶ 37. According to DuFrane, draglines are used to drag, fish, or throw contraband from one cell to another. *Id.* DuFrane, who given both the missing screw and the draglines, was concerned that Plaintiff had been passing contraband, or was intending to pass or receive contraband, immediately notified his area Supervisor Gagnon. *Id.* at ¶¶ 38-39. Upon being notified, Gagnon went to Plaintiff's cell and saw both the draglines and the missing and loose screws in the steel plate. (Dkt. No. 40-4 at ¶¶ 13-14.) Gagnon also considered it to be a very serious violation that threatened the safety and security of the facility. *Id.* at ¶ 15.

---

[3] Plaintiff's claim that Gagnon and DuFrane conducted the November 29, 2012, search on his cell in retaliation for grievances filed by Plaintiff was dismissed by Judge Suddaby on initial review. (Dkt. No. 10 at 34-35.)

According to Gagnon and DuFrane, Plaintiff had not told either one of them about the missing and loose screws or torn sheets prior to the search on November 29, 2012, although he was required to advise staff of both of those things. (Dkt. Nos. 40-3 at ¶¶ 49-50; 40-4 at ¶¶ 26-27.)

DuFrane drafted a Misbehavior Report, dated November 29, 2012, describing what he had seen and found in Plaintiff's cell. (Dkt. Nos. 40-3 at ¶¶ 42-43; 40-8 at 46.) In accordance with DOCCS policy, DuFrane took photographs of the draglines and steel plate with the missing and loose screws and attached them to the Misbehavior Report. (Dkt. Nos. 40-3 at ¶¶ 45-46; 40-8 at 47-48.) Gagnon signed off on the Misbehavior Report and endorsed the charges of smuggling in violation of 114.10, tampering with property in violation of 116.11, and property damage or loss in violation of 116.10. (Dkt. Nos. 40-4 at ¶ 24; 40-8 at 46.)

Plaintiff claims that DuFrane planted the evidence used to support the Misbehavior Report during the November 29, 2012, cell search. (Dkt. Nos. 1 at 42-43; 43 at ¶ 24.) In addition, he claims that DuFrane and Gagnon filed a Misbehavior Report that contained a smuggling claim for which there was no factual basis for the purpose of increasing the Tier level of the Report to Tier III. (Dkt. Nos. 1 at 42-43.) Plaintiff contends that they did so in retaliation for grievances filed against other corrections officers by Plaintiff, and a grievance Plaintiff's cellmate Saldano filed against DuFrane on or about October 27, 2012, regarding Saldano's failure to receive his underclothes for forty days of his confinement at Upstate. (Dkt. No. 1 at 24, 26, 42-43.)

## C.   Hearing Before Defendant Haug on the Misbehavior Report

At the designation of the Superintendent at Upstate, Defendant Haug, Food Service Administrator at Upstate, serves as an impartial hearing officer for Tier III disciplinary hearings.

(Dkt. No. 40-8 at ¶¶ 2-3.) Haug was appointed by the Superintendent to act as the impartial hearing officer at the disciplinary hearing on the Misbehavior Report on Plaintiff prepared by DuFrane and endorsed by Gagnon  *Id*. at ¶ 8-9.  Prior to the hearing, Haug received the Misbehavior Report and attached pictures of the steel plate with the missing and loose screws and draglines found in Plaintiff's cell during the search.  *Id*. at ¶¶ 12, 17-19.

According to Haug, he commenced Plaintiff's disciplinary hearing on December 6, 2012, and the hearing was concluded on January 4, 2013.  *Id*. at ¶ 8.  The hearing was conducted on December 6, 2012, December 20, 2012, and January 4, 2013.  *Id.* at 14, 20, and 30.  On the initial hearing date, Plaintiff brought up the smuggling charge and asked Haug what it was he was supposed to have smuggled.  *Id*. at 18-19.  Haug indicated they would deal with the smuggling issue when the hearing resumed.  *Id*.  Plaintiff brought up the smuggling charge again on January 4, 2013, noting that he was charged with smuggling even though the Misbehavior Report said nothing about smuggling.  *Id*. at 36.  No witness testimony was given on December 6, 2012.  *Id*. at 14-19.

Corrections Officer Keleher testified at Plaintiff's request when the hearing resumed on December 20, 2012.  (Dkt. No. 40-8 at ¶ 25 and 20-21.)  Plaintiff claimed that no search had been conducted before he and his cellmate were moved into the cell on October 25, 2012, and he wanted Keleher to testify as the signator of the October 26, 2012, Cell Inventory Checklist, which Plaintiff claimed was a fake.  (Dkt. Nos. 1 at 17-18, 20; 43 at 4; 43-1 at ¶ 27.)  Plaintiff also claimed that his signature on the Checklist had been forged.  *Id*.  Presumably, Plaintiff was attempting to establish that there had been no search, and therefore no record of whether the screws were already missing and loose and there were already draglines made from sheets in the

cell when Plaintiff and Saldano were moved in.

Keleher testified regarding the October 26, 2012, Checklist prepared in connection with a cell search he had done on Plaintiff's cell, which indicated that there were no issues with the cell, *i.e.*, no contraband found or torn sheets. (Dkt. No. 40-8 at ¶ 20 and 49.) Keleher testified that the Checklist included both his and Plaintiff's signatures.[4] *Id*. at 20. When asked by Haug, Keleher testified that the inspection was done on October 26, 2012, because Plaintiff and his cellmate had to be in the cell at the time of the inspection. *Id*. at 22. Plaintiff disagreed, stating that the New York Code of Rules and Regulations and DOCCS Supervision Directive 4933 required that the inspection be done before inmates are moved into a cell. *Id*. at 23.

Plaintiff informed Haug that he needed the testimony of the movement officer regarding when Plaintiff had been moved into the cell, and Haug indicated he would "check on the movement thing" but would have to postpone the hearing again. *Id*. Plaintiff also requested that the SHU log and cell search logs and a videotape of the search on November 29, 2012, be provided to him. *Id*. at 26-28. Haug told Plaintiff there was no videotape that would show inside the cell. *Id*. at 28. When the hearing resumed on January 4, 2013, Haug gave Plaintiff a copy of the cell search log he had requested. *Id*. at 30. Haug also told Plaintiff that he had compared his handwriting sample with the signature on the October 26, 2012, Checklist and concluded that they were pretty close, and there was no reason to think someone else had signed it for him. *Id*. Plaintiff renewed his request that the movement officer be called to testify as to the exact date he moved into the cell in order to clarify that a cell search was not done the day he and Saldano moved in. *Id*. at 30. According to Plaintiff, the movement officer had testified at Saldano's

---

[4] Plaintiff claims that Keleher perjured himself at the hearing. (Dkt. No. 1 at 6.)

disciplinary hearing that they were moved into the cell on October 25, 2012. (Dkt. No. 40-8 at 31.) Haug, who noted that Keleher had not disputed Plaintiff's claim that he moved in on October 25, 2012, and had indicated that the inspection was not done before Plaintiff moved in but on October 26, 2012, did not call the movement officer as a witness at the hearing *Id*. at 31-32.

Plaintiff's cellmate Saldano was called to testify on January 4, 2013, at Plaintiff's request. *Id*. at 34. Saldano testified that at his disciplinary hearing, Keleher had testified that he did a cell inspection on October 26, 2012, prior to Saldano coming into the cell, and that the movement officer had testified that Plaintiff and Saldano had moved into the cell on October 25, 2012. *Id.* at 37. Saldano testified he knew for a fact that Keleher did not do a cell search before they moved in because while they were in the hallway, before they had been in the cell, Keleher opened the door and trashed up the garbage left in the cell by the former occupant and kicked it into the hall. *Id.* at 37-38.

At Haug's request, Gagnon also testified on January 4, 2013. *Id*. at 40. Haug showed Gagnon the Misbehavior Report and, presumably showing him the picture of the torn sheets, asked Gagnon if they were the sheets he took out of Plaintiff's cell. Gagnon answered in the affirmative and indicated that the sheets were piled in the corner of the cell. *Id*.

### D.     Haug's Determination and Modification on Review

Haug issued a written decision on the charges in the Misbehavior Report on January 4, 2013. (Dkt. No. 40-8 at 42-43.) Haug found Plaintiff guilty of 114.10 smuggling, 116.10 property damage or loss, and 116.10 tampering with property. *Id*. Haug relied upon the Misbehavior Report written by DuFrane and sponsored by Gagnon; the October 26, 2012, Cell Inventory Checklist showing no damage and bearing what Haug had determined to be Plaintiff's

signature; Keleher's testimony regarding a search having been done before Plaintiff entered the cell; Saldano's testimony that Keleher was in the cell before he and Plaintiff entered it; Gagnon's testimony that the sheets were found in the corner near the exercise pen; Plaintiff's failure to present evidence contradicting the testimony; and the invalidity of Plaintiff's objections. (Dkt. No. 40-8 at 42-43.)

Haug imposed a penalty of nine months in SHU, three months loss of good time, and restitution in the amount of $13.00 for the two sheets and one pillow case. *Id.* Haug's articulated rationale for the penalty was to act as a deterrent for future misconduct that could result in a more serious disposition. *Id.*

Plaintiff requested a discretionary review of Haug's determination by Defendant Superintendent Rock. (Dkt. No. 43-1 at 9.) Rock explained in his determination of January 9, 2013, that a superintendent's discretionary review looked at the charges and the penalty imposed, and that the superintendent had discretion to lower the amount of the penalty, which he declined to do. *Id.* On appeal to Albert Prack, Director SHU/Inmate Discipline, Prack modified Haug's determination by dismissing the 114.10 smuggling charge on the grounds that it could not be substantiated by the Misbehavior Report. (Dkt. No. 43-1 at 21-22.)

### E.    Plaintiff's Retaliation Claim Against Haug

The sole claim against Haug that survived initial review is Plaintiff's claim that Haug's disciplinary hearing decision and penalty, which Plaintiff claimed were not based upon the evidence, were "vengeful" and in retaliation for grievances Plaintiff submitted against Haug prior to the completion of the disciplinary hearing. (Dkt. No. 1 at 8.) The first grievance against Haug, dated December 19, 2012, complained that Haug's false statement that he had to seek an

extension on the disciplinary hearing on Plaintiff's Misbehavior Report because of an extensive witness list was retaliatory and vengeful and violated Plaintiff's constitutional rights because it kept him in SHU for a longer period of time.[5]  (Dkt. No. 43-1 at 5-7.)

In the second grievance against Haug, dated December 21, 2012, Plaintiff reiterated his previous grievance against Haug regarding the allegedly false pretenses relied upon by Haug in seeking an extension on the disciplinary hearing.  Plaintiff also complained about the escorting officers, including a claim that Haug looked to one of the escorting officers as if asking her for advice each time Plaintiff asked for pertinent pieces of evidence from the hearing officer, further showing Haug's bias and partiality.  *Id*. at 25.

There is no evidence in the record that either of the grievances was filed with the Inmate Grievance Office at Upstate or acted upon by the Inmate Grievance Resolution Committee. According to Plaintiff's complaint, as of January 17, 2013, well after Haug had issued the allegedly retaliatory decision and penalty, Plaintiff had yet to receive grievance numbers or any acknowledgment of receipt of the grievances dated December 19, 2012, and December 21, 2012, from the Inmate Grievance Program.  (Dkt. No. 1 at 13.)  Plaintiff allegedly complained to Rock that Sergeant Gravlin withheld the grievances Plaintiff filed against Haug until the conclusion of the disciplinary hearing so that he could then dismiss the grievances.  *Id*. at 8, 41.

---

[5]  Plaintiff has submitted a copy of the December 19, 2012, grievance in opposition to Defendants' motion for summary judgment.  (Dkt. No. 43-1 at 5-7.)  The grievance is not on the printout of closed grievances filed by Plaintiff that was submitted by Defendants.  (Dkt. No. 40-5 at 24.) It is unclear from the certification of Jeffrey Hale accompanying the list and Declaration of Melissa A. Latino, Defendants' counsel, whether the list purports to contain all of the grievances filed by Plaintiff.  *Id*. at 1-2 and 23.  It would appear that it may not since Grievance No. UST-51144-13, challenging the inclusion of the smuggling charge by the Review Officer, which is annexed to the Declaration of Scott Woodward submitted by Defendants, is not on the closed grievances list.  (Dkt. No. 40-7 at 6-9.)

Haug denies having had any knowledge during the hearing that Plaintiff had filed a grievance against him. (Dkt. No. 40-8 at ¶¶ 31-33.) Haug asserts that given his lack of knowledge, he was not influenced in any way by the grievance in rendering a decision and issuing a disposition in Plaintiff's disciplinary hearing. *Id*. at ¶ 34. According to Haug, he conducts numerous hearings each year, and "[t]he fact that a grievance may be filed against me by a disgruntled inmate, who is the subject of a disciplinary hearing over which I am presiding, does not affect my partiality in any manner, and in no way influences my disciplinary decisions." *Id*. at ¶ 35. Haug claims that he reasonably relied upon the hearing evidence in rendering his decision and defended his decision as supported by the evidence and the penalty imposed as reasonable and appropriate to the charges. *Id*. at ¶¶ 37-56. Haug contends that despite Prack's dismissal of the smuggling charge on appeal, it was reasonable, based on the hearing evidence, for Haug to find Plaintiff guilty of all of the charges in the Misbehavior Report. *Id*. at ¶¶ 58-61.

Plaintiff testified at his deposition that he "never grieved the hearing" because "there was no reason for [him] to file a grievance for the hearing because he appealed it." (Dkt. No. 40-5 at 14, 16.)

### F.     Supervisory Claim Against Rock

Claims that former Upstate Superintendent Rock exercised deliberate indifference by failing to take corrective action after receiving, reviewing, and responding to complaints and letters regarding staff misconduct and other matters are spread throughout Plaintiff's complaint. Plaintiff has alleged that Rock failed to take action when Plaintiff complained about the operation of the grievance procedure in connection with a September 29, 2012, grievance filed by him against Corrections Officer Sevey ("Sevey") regarding Plaintiff's medical diet food trays. (Dkt.

No. 1 at 9.)   According to Plaintiff, Rock responded but took no action.  *Id*.  On October 16,

2012, Plaintiff submitted another complaint to Rock regarding bias and the partial investigation

done on the Sevey grievance.  *Id*. at 21.  On October 26, 2012, Rock denied the grievance which,

according to Plaintiff, proved that the investigation had been suspect and biased.  *Id*.  In addition,

Plaintiff complained to Rock regarding Sevey's alleged disposal of Plaintiff's library request

forms under the direction of Sergeant Gravlin on January 5, 2013, thereby denying Plaintiff access

to courts as needed.  *Id*. at 8.  Plaintiff also complained to Rock about F.O.I.L. Officer L.

Demarse's intentional withholding of documentary evidence requested by Plaintiff regarding the

deprivation order issued as a result of the November 29, 2012, cell search findings.  *Id*.

Plaintiff has also alleged that he sent a complaint to Rock on November 16, 2012,

expressing disappointment with the Progressive Inmate Movement System (PIMS").  *Id*. at 10.

Plaintiff was interviewed by Gagnon, who allegedly made a threatening comment, and no further

action was taken.  *Id*.   On November 15, 2012, Plaintiff sent Rock another complaint regarding

his disappointment with PIMS.  *Id*. at 26.  According to Plaintiff, Rock did nothing towards

resolving the situation and advised Plaintiff to go through the grievance program.  *Id*.

Plaintiff has alleged he authored another complaint, which was sent to Rock on November

28, 2012, because Sevey was purposely not giving him toilet tissue.  *Id*. at 26-27.   Plaintiff

contends that he received the same response from Rock (presumably being told to go through the

grievance procedure) despite letting Rock know the urgency of the situation.  *Id*.

When in addition to filing a grievance, Plaintiff complained to Rock about the allegedly

retaliatory cell search by DuFrane, false Misbehavior Report, and deprivation order by Gagnon,

Rock again responded in the same way, with no resolution even after numerous complaints.  (Dkt.

No. 1 at 11-12, 28.) Plaintiff also complained to Rock about Haug's bias while the disciplinary hearing was ongoing, Haug's bias in imposing a penalty of nine months in SHU when it was not based on the evidence presented, and Sergeant Gravlin's actions in holding the grievances Plaintiff filed against Haug until the conclusion of the hearing so that he could then dismiss them. *Id*. at 8, 41.

According to Rock, inmates file numerous grievances and complaints on a daily basis, and it was not typical for him to personally review or respond to all such complaints in his role as Superintendent. (Dkt. No. 40-6 at ¶ 7.) Rock often delegated investigations surrounding complaints of staff misconduct or conditions of confinement to his executive staff and fully relied upon their investigations and findings in the matters. *Id*. at ¶ 8. Complaints received regarding staff misconduct might be referred to the Deputy of Security of the Facility for review and investigation or to the Inspector General's Office if seemed appropriate. *Id*. at ¶ 9. As Superintendent, Rock also advised inmates to seek resolution through the Inmate Grievance Program, which was designed to provide an orderly, fair, and expeditious method of resolving complaints. *Id*. at ¶ 10. Rock would review the findings of those to whom he had given a complaint for investigation, and if it was determined that no evidence existed to support an inmate complaint, Rock would have no reason to believe any further action was required. *Id.* at ¶ 13.

Rock has no recollection of ever being made aware of any violation of Plaintiff's constitutional or federal rights. *Id*. at ¶ 15.

## II.    APPLICABLE LEGAL STANDARDS FOR SUMMARY JUDGMENT MOTIONS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to be treated as an affidavit.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified

complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F.Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haynes v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id*. (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they

suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan*, 289 F. Supp. 2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[6] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)). Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v. Srivastava*, 496 F.Supp. 2d 325, 328 (S.D.N.Y. 2007) (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

## III.    ANALYSIS

### A.    Deficiencies in Plaintiff's Opposition Papers

As required under N.D.N.Y. Local Rule ("L.R.") 7.1, Defendants have filed a statement of material facts with citations to the summary judgment record. (Dkt. No. 40-1.) Although Plaintiff has responded to the statement of material facts filed by Defendants (Dkt. No. 43-1 at 34-38), he has failed to do so in the manner required under L.R. 7.1(a)(3). Under the rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3).

---

[6] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Plaintiff's "Challenge to Statement of Facts" consists of challenges to and commentary on certain of Defendants' numbered statements of material fact, with citations to the record limited to Plaintiff's challenges to statements 45, 56, 60, 63, 75-76, 86, 89, 95, and 99. (Dkt. No. 43-1 at 34-38.) As to those, Plaintiff's citations are not to admissible evidence. Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[7] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[8]  *See Champion, v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

The Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).  The Court has opted to review the entire record in this case.  However, the Court's review has revealed that Plaintiff's opposition,

[7]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[8]  Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion.  (Dkt. No. 40 at 4.)

consisting of unsigned commentary on Defendants' submissions and a number of documents, but no affidavits or declarations, contains very little in the way of admissible evidence. Moreover, since Plaintiff's complaint is not verified, it may not properly be treated as an affidavit in opposition to Defendants' motion.[9] (*See* Dkt. No. 1.)

**B.     Exhaustion of Administrative Remedies on Plaintiff's Retaliation Claim Against Haug**

Although it is not entirely clear, it appears that Defendant Haug may be arguing that he is entitled to summary judgment on Plaintiff's retaliation claim on the ground that Plaintiff failed to exhaust his administrative remedies with regard to the claim. (Dkt. No. 40-2 at 3.) Plaintiff has acknowledged that he did not file a grievance with regard to the hearing. (Dkt. No. 40-5 at 14, 16.) However, "[w]here an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing, . . . (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Correctional Facility*, 514 F.Supp. 2d 411, 413 (W.D.N.Y. 2007) (internal quotations omitted) (quoting *Rosales v. Bennett*, 297 F.Supp. 2d 637, 639 (W.D.N.Y. 2004); *see also Harvey v. Harder*, No. 9:09-CV-154 (TJM/ATB), 2012 WL 4093792, at * 4, 2012 U.S. Dist. LEXIS 132248, at * 16 (N.D.N.Y. July 31, 2012) ("Generally, exhaustion of administrative remedies

_____

     [9] 28 U.S.C. § 1746 states that a statement of verification must be in "substantially" the same form as the statement set forth in § 1746(2), which reads "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." Although Plaintiff's signature in his complaint is notarized, the complaint has not been verified under oath. (Dkt. No. 1 at 44.) A complaint cannot be considered as an affidavit where, although notarized, it was not verified under oath. *Inmates, Washington County Jail v. England*, 516 F.Supp. 132, 138 (E.D. Tenn. 1980), *aff'd without opinion*, 659 F.2d 1081 (6th Cir. 1981) (Table).

involves utilizing the facility's grievance process, however, when an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing or confinement, he exhausts his administrative remedies by presenting his objections in the administrative appeals process.").

Plaintiff pursued an administrative appeal from Haug's decision. (Dkt. No. 43-1 at 21-22.) However, since Plaintiff's submission on that appeal is not included in the record, the Court cannot determine whether Plaintiff raised his retaliation claim in the appeal. Because failure to exhaust is an affirmative defense, a defendant bears the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar. 31, 2010). Haug has not done so. Therefore, the Court recommends that summary judgment in his favor for failure to exhaust be denied.

### C. Retaliation Claims

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema,* 534 U.S. 506, 508 (2002)). "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381.

An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F.Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro*, 791 F. Supp. 2d at 371.

Because of the relative ease with which claims of retaliation can be incanted, courts have scrutinized retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, *Swierkiewicz,* 534 U.S. 506. As the Second Circuit has noted,

> [t]his is true for several reasons.  First, claims of retaliation are difficult
> to dispose of on the pleadings because they involve questions of intent
> and are therefore easily fabricated.  Second, prisoners' claims of
> retaliation pose a substantial risk of unwarranted judicial intrusion into
> matters of general prison administration.  This is so because virtually
> any adverse action taken against a prisoner by a prison official--even
> those otherwise not rising to the level of a constitutional violation--can
> be characterized as a constitutionally proscribed retaliatory act.

*Dawes,* 239 F.3d at 491.  Accordingly, claims of retaliation must be supported by specific facts;

conclusory statement are not sufficient.  *Flaherty*, 713 F.2d at 13.  Even where a complaint or

affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are]

(1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies

and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary

to credit the allegations made in the complaint.'" *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL),

2006 WL 1133247, at * 3 & n.11, 2006 U.S. Dist. LEXIS 29745, at * 14 n.11  (N.D.N.Y. Apr. 24,

2006) (quoting *Jeffreys*, 426 F.3d at 554-55), *aff'd.* 219 F. App'x 110 (2d Cir. 2007).

1.     Retaliation Claim Against DuFrane

Plaintiff claims that DuFrane planted evidence in his cell during a cell search, filed a false

Misbehavior Report against him based upon the planted evidence, and added a factually

unsupported smuggling charge in retaliation for grievances Plaintiff had filed against Upstate staff

and a grievance Plaintiff's cellmate had filed against DuFrane.  (Dkt. No. 1 at 24, 26, 42-43.)

The filing of grievances has been found to constitute protected First Amendment conduct

for purposes of a retaliation claim.  *See David v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003).

Furthermore, the planting of evidence and issuance of a false misbehavior report based upon that

evidence has been found to constitute adverse action for purposes of a retaliation claim.  *See*

*Pidlypchak*, 389 F.3d at 384 (filing a false misbehavior report constitutes adverse action); *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995) (finding adverse action where plaintiff alleged that prison officials had planted contraband in his cell); *Williams v. King*, 56 F.Supp. 3d 308, 328 (S.D.N.Y. 2014) (the alleged planting of contraband and allegedly disproportionate administrative actions that follow have been found serious enough to constitute adverse action for retaliation purposes); *Payne v. Axelrod*, 871 F.Supp. 1551, 1556 (N.D.N.Y. 1995) (valid § 1983 retaliation claim stated where prisoner alleged that corrections officers planted contraband evidence in his cell and falsely charged him with possession).

However, DuFrane has denied Plaintiff's claim that he planted evidence and filed a false misbehavior report. According to DuFrane, he was not asked by any corrections official to plant evidence in Plaintiff's cell or damage his exercise door by removing screws, and he did not have torn, ripped sheets with him or a special screwdriver to unthread the screws when he went to Plaintiff's cell to conduct a routine search. (Dkt. No. 40-3 at ¶¶ 56-57.) In addition, according to DuFrane, he had not been in Plaintiff's cell prior to the search, and he would not have had an opportunity to damage Henson's state owned property or the steel plate during the search as there is such limited access to the cell. *Id*. at ¶ 58. DuFrane contends that he acted in accordance with DOCCS policy when he found the damage in Plaintiff's cell by advising Gagnon, taking photographs, and drafting the Misbehavior Report that was approved by Gagnon. *Id*. at ¶ 59. Furthermore, while the Misbehavior Report does not appear to include facts clearly supporting the smuggling charge that was dismissed by Prack on appeal, the review officer left in the smuggling

charge and designated the Misbehavior Report as a Tier III.[10] (Dkt. No. 40-8 at ¶ 6.)

The record is devoid of evidence, admissible or otherwise, that supports Plaintiff's conclusory assertion that he was framed by DuFrane, and that the Misbehavior Report was based upon evidence planted by DuFrane. *See Jeffreys*, 426 F.3d 554 (nonmoving parties may not rely on "conclusory allegations or unsubstantiated speculation" to defeat summary judgment). In his unsigned, unverified response to DuFrane's Declaration, Plaintiff claims that inmates have no access to the special screwdrivers DuFrane claimed were generally required to unthread the security screws. (Dkt. Nos. 40-3 at ¶ 17; 43-1 at 45.) However, according to DuFrane, he has known of many inmates who have removed security screws and others who have attempted to do so by unthreading them. (Dkt. No. 40-3 at ¶ 18.)

At his disciplinary hearing, Plaintiff attempted to defend against the charges in the Misbehavior Report by attacking the validity of the October 26, 2012, Cell Inventory Checklist indicating no contraband was found in the room and his signature, and claiming that the cell was not inspected prior to the time he and his cellmate were moved there on October 25, 2012. (Dkt. No. 40-8 at 17-18, 49.) However, Keleher testified that an inspection of Plaintiff's cell was done, and the October 26, 2012, Cell Inventory Checklist was valid. (Dkt. No. 40-8 at 20-22.) Furthermore, Plaintiff's cellmate Saldano testified that when he and Plaintiff were in the hallway

_____

[10] Under N.Y. Comp.Codes R. & Regs, tit 7., § 251-2.2, the review officer is required to review misbehavior reports, classify them as a Tier I, II, or III, and refer them to the appropriate disciplinary body for action. § 251-2.2(a)-(b). The review officer has the authority to dismiss any misbehavior report which fails to state a valid charge. § 251-2.2(c). In Grievance No. UST-51144-13, filed by Plaintiff on January 8, 2013, Plaintiff complained that the review officer should have dismissed the smuggling charge on the grounds that there was no basis for the charge in the Misbehavior Report issued by DuFrane. (Dkt. No. 40-7 at 6.) In the Grievance, Plaintiff placed responsibility for the erroneous Tier III designation of the Misbehavior Report issued by DuFrane on the reviewing officer's failure to dismiss the smuggling charge. *Id*. at 8.

before being allowed in the cell, Saldano saw Keleher open the door, trash up the garbage left in the cell by the former occupant, and kick it in the hall. (Dkt. No. 40-8 at 37-38.) One could reasonably infer from Saldano's testimony that had there been draglines in the cell at the time, they would have been discovered and placed in the trash that Keleher kicked into the hall. Even if Plaintiff had been able to establish that there had been no search of the cell when Plaintiff moved in a month before the random frisk/search by DuFrane, that would not necessarily support an inference that the draglines and missing and loose screw were there when Plaintiff and his cellmate moved in. Furthermore, if they were, Plaintiff was required to report it to facility staff and did not. (Dkt. No. 40-3 at ¶¶ 49-50.)

Even if there were sufficient evidence to create an issue of material fact with regard the adverse action element of Plaintiff's retaliation claim, his claim against DuFrane falters on the third element, establishment of a causal connection between the protected conduct and the adverse action. *See Holland*, 758 F.3d at 225. There is no evidence in the record that Plaintiff himself had filed a grievance against DuFrane prior to the November 29, 2012, random frisk/search of his cell, and Plaintiff has conceded that his retaliation claim is based upon grievances he filed against other corrections officers and a grievance Saldano filed against DuFrane.

Plaintiff's exercise of his First Amendment rights was not involved in Saldano's filing of a grievance against DuFrane regarding Saldano's undergarments. Moreover, as a general matter, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another party, in this case other corrections officers. *See Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when the only alleged basis for retaliation was a complaint about an incident involving another corrections

officer); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at 18, 2014 U.S.

Dist. LEXIS 120709, at * 49 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one

defendant's retaliation for complaints against another defendant"); *Roseboro,* 791 F. Supp. 2d at

369 (failure by plaintiff to provide any basis to believe corrections counselor would retaliate for a

grievance in which she was not personally named); *Ciaprazi v. Goord*, No. 9:02-CV-915

(GLS/DEP), 2005 WL 3531464, at * 8-9, 2005 U.S. Dist. LEXIS 38232, at * 22 (N.D.N.Y. Dec.

22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's

conclusory allegations that the manifest falsity of the misbehavior report and testimony during the

disciplinary hearing indicate the disciplinary matters were motivated by retaliatory animus due to

grievances plaintiff filed against individuals other than the defendants involved in the disciplinary

hearing).

    As noted above, conclusory statements are not sufficient to support causation on

retaliation claims; the claims must be supported by specific facts. *Flaherty*, 713 F.2d at 13. The

record is devoid of evidence, admissible or otherwise, that supports Plaintiff's conclusory

assertion that DuFrane planted evidence and issued the Misbehavior Report based upon evidence

in retaliation for grievances Plaintiff had filed against other corrections officers. DuFrane states in

his Declaration that he was not the subject of any grievance filed by Plaintiff at the time of the cell

search. (Dkt. No. 40-3 at ¶ 55.) DuFrane does not work closely with the Inmate Grievance

Program and would not be aware of how many grievances Plaintiff had filed against other

corrections officers prior to November 29, 2012. *Id*. at ¶ 52. Moreover, according to DuFrane, it

was of no concern to him whether Plaintiff files grievances against other corrections officer, and

Plaintiff doing so would not motivate DuFrane to treat Plaintiff one way or another. *Id*. at ¶ 53. DuFrane was never asked by any corrections official to plant evidence in Plaintiff's cell or file a false misbehavior report against him. *Id*. at ¶ 56. There is no evidence disputing DuFrane's statement that he was unaware of grievances previously filed by Plaintiff prior to conducting the cell search on November 29, 2012, and therefore was in no way influenced by such grievances in conducting the search or filing the Misbehavior Report. *Id*. at ¶ 54.

In summary, Plaintiff's grievances were protected First Amendment conduct, and planting evidence and issuing a false misbehavior report based on the evidence constitutes adverse action. However, in light of the absence of record evidence establishing that DuFrane engaged in the alleged adverse action, and the lack of specific facts showing that DuFrane acted in retaliation for Plaintiff's filing of grievances against other corrections officers, the Court recommends that DuFrane be granted summary judgment.

2.    Retaliation Claim Against Gagnon

Plaintiff also claims that Gagnon was involved in planting evidence in his cell during the cell search, that he signed off on DuFrane's allegedly false Misbehavior Report against Plaintiff based upon the planted evidence, and that he endorsed the factually unsupported smuggling charge in retaliation for grievances Plaintiff had filed against Upstate staff. (Dkt. No. 1 at 24, 26, 42-43.) As with DuFrane, Plaintiff claims that Gagnon engaged in those acts in retaliation for Plaintiff's filing of grievances against other corrections officials prior to the November 29, 2012, cell search. (Dkt. No. 1 at 24, 26, 42-43.)

According to Gagnon, after being advised by DuFrane of the results of the search of

Plaintiff's cell, he went to the cell and personally saw the sheets, or draglines, in the corner of Plaintiff's cell and the missing and loose screws in the steel plate. (Dkt. No. 40-4 at ¶¶ 12-14.) Gagnon signed off on the Misbehavior Report having personally seen the draglines and missing and loose screws. *Id.* at ¶ 24. Gagnon has admitted endorsing the charges, including the smuggling charge. *Id*. at ¶ 25. Gagnon has denied ever asking any corrections official to falsify a misbehavior report against Plaintiff. *Id*. at ¶ 37.

The record contains no evidence, admissible or otherwise, that Gagnon was involved in planting evidence in Plaintiff's cell or knowingly approving a Misbehavior Report based upon planted evidence. As with DuFrane, Plaintiff may not rely on his "conclusory allegations" to defeat summary judgment. *Jeffreys*, 426 F.3d at 554.

Even if Plaintiff had raised a material question of fact on the issue of adverse action, his retaliation claim against Gagnon, as with his claim against DuFrane, falters on the issue of causation. As discussed above, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against other corrections officers. *Wright,* 554 F.3d 255 at 274. Gagnon's statement that he was unaware of grievances filed by Plaintiff prior to the November 29, 2012, cell search is undisputed by record evidence. (Dkt. No. 40-4 at ¶ 39.) Plaintiff's claim that Gagnon was acting in retaliation is wholly conclusory which, as with DuFrane, is not enough to survive summary judgment. *See Flaherty*, 713 F.2d at 13 (claims of retaliation must be supported by specific facts).

In light of the foregoing, the Court recommends that summary judgment be granted in Gagnon's favor.

### 3.     Retaliation Claim Against Haug

Plaintiff's submission of grievances against Haug was protected First Amendment conduct.  However, even were the Court to assume for purposes of this motion that Haug's decision finding Plaintiff guilty on all charges and the penalty imposed by him constituted adverse action, Plaintiff has failed to raise a question of material fact on the issue of causation.  According to Haug, he had no knowledge during the hearing that Plaintiff had submitted grievances against him.  (Dkt. No. 40-8 at ¶¶ 31-33.)  Moreover, according to Haug, the fact that a disgruntled inmate who is the subject of a disciplinary hearing before him files a grievance does not affect his impartiality or influence his decisions or the penalty imposed by him.  *Id*. at ¶ 34.  Haug claims to have relied upon the evidence in rendering his decision, and he contends that despite Prack's dismissal of the smuggling charge on appeal, it was reasonable for him to have found Plaintiff guilty on the charge based on the evidence.[11]  *Id*. at ¶ 35.

Plaintiff's submissions, albeit largely inadmissible, offer support for Haug's claim that he did not know Plaintiff had filed grievances against him during the hearing.  According to Plaintiff, Sergeant Gravlin withheld Plaintiff's grievances against Haug from filing during the disciplinary hearing, and as of January 17, 2013, nearly two weeks after the hearing ended, Plaintiff had yet to receive grievance numbers or any acknowledgment of receipt of the grievances.  (Dkt. No. 1 at 8, 13, 41.)  Given Haug's denial and the absence of evidence showing that Haug had knowledge of the grievances at the time he rendered his decision and imposed penalty at the disciplinary

---

[11]  Given the lack of evidence of causation, it is unnecessary for the Court to consider whether Haug's finding of guilt on the smuggling charge was reasonable based upon the evidence presented at the hearing.

hearing, no reasonable juror could conclude that a causal connection existed between Plaintiff's grievances against Haug and Haug's decision and penalty in the disciplinary hearing.

Therefore, the Court recommends that Defendant Haug be granted summary judgment.[12]

### D.      Deliberate Indifference Claim Against Rock

Plaintiff claims that after receiving, reviewing, and responding to a number of complaints regarding staff misconduct submitted by Plaintiff, Rock failed or correct, or was deliberately indifferent to the misconduct.[13]  (Dkt. No. 1 at 9-10, 13, 21, 26-29, and 41.)  The now dismissed Defendants alleged by Plaintiff to have committed constitutional violations to which Rock was allegedly indifferent included Sevey, Gravlin, and Demarse.[14]  Plaintiff also claims indifference by Rock with regard to his claims against DuFrane, Gagnon, and Haug.  *Id*. at 11-12, 28.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat*

---

[12]  Inasmuch as the Court is recommending that Haug be granted summary judgment, it finds it unnecessary to reach his qualified immunity argument.

[13]  Plaintiff also claims that Rock wrongfully denied his September 30, 2012, grievance against Sevey regarding his medical diet food tray.  (Dkt. No. 1 at 21.)  However, Plaintiff's medical diet claim against Sevey was dismissed on initial review.  (Dkt. No. 10 at 19-20.)

[14]  Plaintiff has also claimed that Rock was deliberately indifferent to his complaints about the PIMS program but has provided no evidence of constitutional violation by any of the defendants with respect thereto.

*superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22-23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[15]

Plaintiff's supervisory liability claim appears to fall within the second and fifth *Colon* categories. However, where as in this case a plaintiff "has not established any underlying constitutional violation, [he] cannot state a claim for § 1983 supervisor liability." *Elek v. Incorp. Vill. of Monroe*, 815 F.Supp. 2d 801, 807-08 (S.D.N.Y. 2011) (collecting cases); *see also*

---

[15] The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

*Tompkins v. City of New York,* 50 F.Supp. 3d 426, 434 (S.D.N.Y. 2014) (same); *Vail v. Lashway*,

No. 9:12-CV-1245 (GTS/RFT), 2014 WL 4626490, at * 20, 2014 U.S. Dist. LEXIS 129516, at

* 50 (N.D.N.Y. Sept. 15, 2014) (same).

Plaintiff's underlying § 1983 claims against Sevey, Demarse, Gravlin, and all other

originally named Defendants except DuFrane, Gagnon, and Haug, were dismissed for failure to

state a claim on initial review. (Dkt. No. 10 at 50-51.) There is no evidence in the summary

judgment record establishing that any of the original defendants dismissed from the case on initial

review violated Plaintiff's constitutional rights. In addition, the Court is recommending summary

judgment in DuFrane, Gagnon, and Haug's favor with respect to the retaliation claims remaining

against them after initial review. If the District Court adopts this Court's recommendations,

Plaintiff will also have failed to establish underlying constitutional violations against those

Defendants. Therefore, the Court recommends that Rock be granted summary judgment on

Plaintiff's supervisory liability claim.

**ACCORDINGLY** it is hereby

**RECOMMENDED** that Defendants' motion for summary (Dkt. No. 40) be **GRANTED**,

and it is hereby

**ORDERED** that the Clerk provide Plaintiff with copies of all unpublished decisions cited

herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report. Such objections shall be filed with the Clerk of the

Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL</u>**

**<u>PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.

Dated:  December 9, 2015
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2005 WL 3531464
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Roberto CIAPRAZI, Plaintiff,

v.

Glenn S. GOORD; et al. Defendants.

No. Civ.9:02CV00915(GLS)/. | Dec. 22, 2005.

**Attorneys and Law Firms**

Roberto Ciaprazi, Clinton Correctional Facility, Dannemora, New York, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General, State of New York, The Capitol, Albany, New York, for the Defendants.

Patrick F. MacRae, Assistant Attorney General, of counsel.

### *MEMORANDUM-DECISION AND ORDER*

SHARPE, J.

### I. *Introduction*

**\*1** Plaintiff *pro se* Roberto Ciaprazi brings this action pursuant to 42 U.S.C. § 1983. Ciaprazi alleges that the defendants violated his First, Eighth, and Fourteenth Amendment rights. Pending are Ciaprazi's objections to Magistrate Judge David E. Peebles' Report-Recommendation. Upon careful consideration of the arguments, the relevant parts of the record, and the applicable law, the court adopts the Report-Recommendation in its entirety. [1]

### II. *Procedural History*

Ciaprazi commenced this action on July 15, 2002. *Dkt. No. 1.* On February 27, 2003, the defendants moved for summary judgment. *Dkt. No. 39.* On March 14, 2004, Judge Peebles issued a Report-Recommendation which recommended that the defendants' motion for summary judgment be granted in part, and denied in part. *Dkt. No. 47.* Ciaprazi objected. *Dkt. No. 48.* His objections are now before this court.

### III. *Discussion* [2]

### A. *Standard of Review*

When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."*See* 28 U.S.C. § 636(b)(1). After such a review, the court may "accept, reject, or modify, in whole or in part, the findings or the recommendations made by the magistrate judge."*Id.* Having reviewed the unobjected to portions of the Report-Recommendation, the court adopts them in their entirety because they are not clearly erroneous.

### B. *Report-Recommendation*

Although Judge Peebles examined the merits of the case and found that many of Ciaprazi's claims were meritless, this court only conducts *de novo* review of the objected to portions of the Report-Recommendation. Specifically, Judge Peebles found no evidence tending to establish that the adverse actions taken against Ciaprazi were motivated by disciplinary animus, and thereby recommended dismissing Ciaprazi's First Amendment retaliation claim. *Report and Recommendation, pp. 13-23, 45, Dkt. No. 47.* He further found that Ciaprazi lacked standing to bring a cause of action challenging the Tier III disciplinary system under the Eighth Amendment. *Id. at 27.* Lastly, Judge Peebles dismissed both of Ciaprazi's claims under international law and his personal involvement claim against defendant Goord. *Id. at 41, 43-4.* [3]

### C. *Objections*

### 1. *First Amendment Claim*

First, Ciaprazi contends that his retaliation claim under the First Amendment should not have been dismissed because the defendants did not satisfy their initial evidentiary burden. *Pl. Objs. pp. 1-7, Dkt. No. 48.* Specifically, he argues that Judge Peebles did not properly consider the falsity of a misbehavior report as evidence of retaliation by the defendants.

The court rejects Ciaprazi's argument because as Judge Peebles noted, a prisoner does not have a right to be free from false misbehavior reports.*Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). As Judge Peebles further noted, the defendants have shown sufficient evidence to establish that there is no specific link between Ciaprazi's grievances and the

defendants' actions. Accordingly, Ciaprazi's retaliation claim
is dismissed.

**2.** *Eighth Amendment*

 **\*2**  Next, Ciaprazi objects to Judge Peebles' finding that he
did not have standing to challenge the disciplinary authority
of the Tier III system. *Pl. Objs. p. 7, Dkt. No. 48.*This
objection is without merit. As Judge Peebles noted, since
the length of Ciaprazi's disciplinary confinement was within
the bounds of constitutionally acceptable levels, he has no
standing to sue. Second, as Judge Peebles further noted,
any generalized complaints Ciaprazi has against the Tier III
system are more appropriately addressed as part of his due
process claims. Accordingly, Ciaprazi's claims against the
Tier III system are dismissed.

**3.** *Human Rights Claims*

Ciaprazi also objects to Judge Peebles' finding that he did
not have claims under the Universal Declaration of Human
Rights (UDHR) and the International Covenant on Civil and
Political Rights (ICCPR). Ciaprazi's contention is without
merit. As Judge Peebles noted, Ciaprazi has failed to establish
that these treaties provide private causes of action. *See Report
Recommendation p. 41, Dkt. No. 47.*Accordingly, Ciaprazi's
claims under international law are dismissed.

**4.** *Personal Involvement*

Ciaprazi also objects to Judge Peebles' dismissal of his
personal involvement claim against defendant Goord. As
Judge Peebles noted, Ciaprazi merely made allegations
against Goord in his supervisory capacity. Accordingly, the
personal involvement claim against Goord was properly
dismissed.

### IV. *Conclusion*

Having reviewed the objected-to portions of the Report and
Recommendation *de novo,* the remainder under a clearly
erroneous standard, and Ciaprazi's objections, this court
accepts and adopts the recommendation of Judge Peebles
for the reasons stated in the March 14, 2004 Report-
Recommendation.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' summary judgment motion (Dkt.
No. 39) be GRANTED in part, and that all of plaintiff's claims
against defendant Goord, and all of plaintiff's claims against
the remaining defendants except his procedural due process
and Eighth Amendment conditions of confinement causes
of action, be DISMISSED, but that to the extent of those
claims, with respect to which triable issues of fact exist, the
defendants' motion be DENIED.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

PEEBLES, Magistrate J.

Plaintiff Roberto Ciaprazi, a New York State prison
inmate who by his own account has frequently lodged
complaints against prison officials and been openly critical
of their practices, has commenced this proceeding against
the Commissioner of the New York State Department of
Correctional Services ("DOCS") and several of that agency's
employees pursuant to 42 U.S.C. § 1983, complaining of
constitutional violations occurring during the course of his
confinement. In his complaint, Ciaprazi alleges that 1) a
misbehavior report was filed against him in retaliation for
his having previously engaged in protected activity; 2) he
was deprived of procedural due process during the course
of the hearing and resulting adverse finding associated with
that misbehavior report; and 3) the conditions which he faced
while in disciplinary confinement, following that hearing,
were cruel and unusual. Plaintiff asserts claims pursuant to
the First, Eighth and Fourteenth Amendments to the United
States Constitution, as well as under certain international
human rights accords.

 **\*3**  Currently pending before the court is a motion by the
defendants seeking summary judgment dismissing plaintiff's
complaint in its entirety. Having carefully reviewed the
record in light of Ciaprazi's claims and defendants' arguments,
I find that many of plaintiff's causes of action are devoid
of merit, as a matter of law, and thus subject to dismissal.
Because I find the existence of genuinely disputed issues
of material fact surrounding certain of plaintiff's claims,
however, including notably his due process claim against
defendants Melino, Kohl, Graham, Fitzpatrick, and Rogers,
I recommend denial of defendants' motion seeking dismissal
of plaintiff's claims against them.

## I. *BACKGROUND*

At the times relevant to his complaint, Ciaprazi was a prisoner entrusted to the custody of the DOCS. Plaintiff alleges that after having been confined within the Clinton Correctional Facility since February, 1997, he was transferred into the Coxsackie Correctional Facility in April of 1998. Complaint (Dkt. No. 1) ¶ 3. Ciaprazi asserts that while at Coxsackie he was administered more than a dozen allegedly false misbehavior reports, resulting in disciplinary cell confinement of over 200 days as well as other "deprivations" of an unspecified nature. *Id.* ¶ 3. Plaintiff contends that the issuance of those misbehavior reports was motivated by his having filed multiple complaints involving conduct of corrections workers and staff at Coxsackie.

At the heart of plaintiff's claims in this action is an incident which occurred at Coxsackie on July 31, 1999. On that date, Ciaprazi and various other prisoners were taken to an enclosed holding area to provide specimens for use in conducting drug screening urinalysis testing. As a result of an interaction occurring during the course of that testing between the plaintiff and defendant Fitzpatrick, a corrections lieutenant at the facility, plaintiff was placed in keeplock confinement and issued a misbehavior report on the following day, charging him with creating a disturbance (Rule 104.13), interference with a prison employee (Rule 107.10), harassment (Rule 107.11), refusal to obey a direct order (Rule 106.10), and making threats (Rule 102.10).[1] Defendants' Motion (Dkt. No. 39) Exh. A.

On July 31, 1999, following the underlying events and the imposition of keeplock confinement but prior to receiving the misbehavior report, plaintiff filed a grievance regarding the incident; plaintiff followed the filing of that grievance with a request on August 3, 1999 for prehearing release from confinement. Complaint (Dkt. No. 1) ¶ 19. Plaintiff received no response to that grievance. *Id.*

A Tier III disciplinary hearing in connection with the charges stemming from the July 31, 1999 incident was conducted by defendant Melino, a corrections counselor at Coxsackie, beginning on August 4, 1999, and concluding on August 10, 1999. Defendants' Motion (Dkt. No. 39) Exh. A at 2; *id.* Exh. B at 17, 152.[2] Defendant Cole, who according to the plaintiff is a civilian employee working at Coxsackie, was assigned as plaintiff's inmate assistant in connection with that hearing. The evidence adduced at that hearing included the misbehavior report, as well as testimony from

the plaintiff, Corrections Lieutenant Fitzpatrick, Corrections Officer Marshal, Corrections Counselor Cole, Corrections Officer Rogers, Corrections Officer Simonik, Corrections Lieutenant McDermott, and Corrections Officer Phillips. Defendants' Motion (Dkt. No. 39) Exh. B.

**\*4** At the conclusion of the hearing, plaintiff was found guilty on all five counts, and a penalty of ten months of disciplinary confinement within the Coxsackie Special Housing Unit ("SHU"), with a corresponding loss of commissary, telephone and package privileges, was imposed.[3] Defendants' Motion (Dkt. No. 39) Exh. A at 00. Ciaprazi was not present when Hearing Officer Melino read her decision into the record, having previously been removed from the proceeding for engaging in what the hearing officer regarded as disruptive behavior. *See* Defendants' Motion (Dkt. No. 39) Exh. B at 152. Plaintiff appealed the hearing officer's decision to Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program, who on September 27, 1999 affirmed the determination. Complaint (Dkt. No. 1) ¶ 51.

On August 20, 1999, plaintiff was transferred into the Upstate Correctional Facility, where he was apparently placed in SHU confinement to serve his disciplinary sentence. Complaint (Dkt. No. 1) ¶ 52. Plaintiff asserts that during that period, as well as while in keeplock confinement at Coxsackie, he was subjected to significant deprivations, which are described in summary fashion in his complaint, until September 16, 1999 when he was transferred into Clinton and exposed to similarly unpleasant conditions. *Id.* ¶¶ 53-55; Ciaprazi Aff. (Dkt. No. 46) ¶¶ 54-57. Plaintiff describes the keeplock confinement conditions at Coxsackie as even more unpleasant than those experienced in SHU, having included the deprivation of certain personal items such as food and snacks, toiletries, musical instruments, and other similar amenities. Ciaprazi Aff. (Dkt. No. 46) ¶ 54. The deprivations experienced by the plaintiff while in keeplock confinement at Coxsackie also entailed being subjected to "loud and non-stop noise from other frustrated prisoners yelling and banging on the doors," as well as the denial of access to the law library, books and other reading materials, and various programs available to those in general population. *Id.* ¶ 55. While at Upstate, plaintiff contends that he was exposed to cell lighting between 6:00 am and 1:00 am; he was denied reading materials; his medical requests "were ignored"; and he experienced cold conditions and the inability to participate in available recreation due to the lack of warm clothing. *Id.* ¶ 57; Complaint (Dkt. No. 1) ¶ 53. Similar conditions

were experienced by the plaintiff while at Clinton, including exposure to cold and lack of warm clothing and blankets, together with the deprivation of medical and mental health services. Ciaprazi Aff. (Dkt. No. 46) ¶ 57; Complaint (Dkt. No. 1) ¶ 54..

## II. *PROCEDURAL HISTORY*

The plaintiff, who is proceeding *pro se* and *in forma pauperis*, commenced this action on July 15, 2002. Dkt No. 1. Named as defendants in plaintiff's complaint are New York DOCS Commissioner Glenn S. Goord; Ellen J. Croche, Chair of the New York State Commission of Correction; Fred Lamey, a member of the New York Commission of Correction; Donald Selsky, the DOCS Director of Special Housing/ Inmate Disciplinary Program; Corrections Counselor Melino, whose first name is unknown; Cole, another DOCS employee whose complete name is unknown to the plaintiff; H.D. Graham, Deputy Superintendent for Security at Coxsackie; Corrections Lieutenant Fitzpatrick; and Corrections Officer Rogers. *Id.* In his complaint, plaintiff asserts nine separate causes of action, including claims 1) against defendants Rogers and Fitzpatrick, for infringement of his First Amendment right to free speech, and due process and equal protection violations under the United States Constitution, as well as under the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"); 2) against defendant Graham, for failure to investigate plaintiff's grievance and to take actions to prevent infringement of his constitutional rights; 3) against defendant Cole, for failing to properly perform his duties as Ciaprazi's inmate assistant; 4) against defendant Melino, for deprivation of due process, based upon her conduct and bias during the disciplinary hearing; 5) of retaliation against defendant Melino, asserting that her actions were taken in response to the filing of complaints and grievances by the plaintiff; 6) against defendants Goord and Selsky, based upon their failure to overturn plaintiff's disciplinary conviction and remediate the constitutional deprivations suffered by him; 7) against defendants Goord and Selsky for retaliation, based on plaintiff's prior filing of complaints and grievances; 8) against defendants Croche, Lamey and Goord, in their supervisory capacities, for failure to properly oversee DOCS employees and enact policies to prevent such abuses; and 9) against defendants Goord, Croche and Lamey, for maintaining and fostering a policy of widespread and disportionate disciplinary punishments within the state's prison system. Complaint (Dkt. No. 1) at 14-16.Plaintiff's complaint seeks both injunctive and monetary relief. *Id.*

**\*5** Following the filing of an answer on behalf of the eight defendants who have been served in the action on December 3, 2002, generally denying plaintiff's allegations and setting forth various affirmative defenses, Dkt. No. 13, and pretrial discovery, on February 27, 2004 those defendants moved seeking entry of summary judgment on various bases.[4] Dkt. No. 39.Aided only by plaintiff's complaint, the record related to the relevant internal disciplinary proceedings against the plaintiffs, and answers by plaintiff to defendants' interrogatories, and without the benefit of either a transcript of plaintiff's deposition or any affidavits, other than from their counsel, defendants have moved for summary judgment seeking dismissal of plaintiff's claims on various grounds. *Id.* In their motion, defendants argue that 1) plaintiff has failed to offer proof from which a reasonable factfinder could conclude that cognizable constitutional violations have occurred; 2) defendants Goord and Selsky lack the requisite personal involvement in the constitutional violations alleged; and 3) plaintiff should be denied the injunctive relief which he seeks. *Id.* Plaintiff has since submitted papers in opposition to defendants' summary judgment motion.[5] Dkt. No. 46.Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).*See also*Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Insurance,* 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. [6] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.*Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [nonmovant's] favor."*Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

**B.** *Plaintiff's First Amendment Retaliation Claim*

**\*6** Plaintiff's complaint asserts several claims of unlawful retaliation. In his first cause of action, plaintiff asserts that the actions of defendants Rogers and Fitzpatrick in confining him to a cell and issuing, or directing the issuance of, misbehavior reports were taken in retaliation for his having filed prior grievances and complaints regarding DOCS officials, including those working at Coxsackie. Complaint (Dkt. No. 1) First Cause of Action. Plaintiff's second claim alleges that defendant Rogers' failure to investigate plaintiff's complaint regarding the allegedly false misbehavior report, and to order his release from confinement pending a disciplinary hearing, were similarly retaliatory. *Id.* Second Cause of Action. Plaintiff further alleges in his fifth cause of action that the actions of Hearing Officer Melino, including in finding him guilty on all five counts, were motivated by Ciaprazi's filing of prior grievances and complaints. *Id.* Fifth Cause of Action. Plaintiff's seventh claim similarly attributes the failure of defendants Goord and Selsky to reverse the hearing officer's determination, on appeal, to retaliation for his having engaged in protected activity. *Id.* Seventh Cause of Action. Defendants maintain that these retaliation claims are legally deficient, and that the record contains no evidence upon which a factfinder could conclude that unlawful retaliation occurred.

Claims of retaliation like those asserted by the plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See*

*id.* at 81-83.Because of the relative ease with which claims of retaliation can be incanted, however, as exemplified by plaintiff's claims in this action, the courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for unlawful retaliation in a case such as this, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct or speech at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492). If the plaintiff carries this burden, the defendants must then show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct ."*Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*7** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct and establishment of a nexus between that conduct and the adverse action ultimately taken. In making the required analysis in this case, however, the court is somewhat disadvantaged by virtue of the fact that defendants' summary judgment motion is not particularly enlightening as to the basis for their claim that the court is positioned to find, as a matter of law, that plaintiff's retaliation claims are lacking in merit.

In their motion the defendants, in the context of the now-familiar standard governing analysis of First Amendment retaliation claims, acknowledge that the plaintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity. That plaintiff has filed an unusually large number of grievances and lawsuits, and taken other steps to complain publicly about matters associated with his confinement by the DOCS, is both apparent from the record before the court, and not controverted by the defendants. Indeed, in his response to defendants' summary judgment motion, plaintiff proudly states that he has "systematically exposed, vehemently criticized, and even ridiculed the inappropriate and arbitrary policies and actions of the staff at Coxsackie, including the actions of defendant Goord and of the Superintendent and Deputy Superintendents of Coxsackie." [7] Plaintiff's Affidavit (Dkt. No. 46) ¶ 32. Plaintiff has therefore established, at least for purposes of the instant motion, that he was engaged in protected activity sufficient to trigger First Amendment rights against acts taken in retribution for having voiced those types of complaints. *Graham,* 89 F.3d at 80; *Morello v. James,* 810 F.2d 344, 346-47 (2d Cir.1987).

Defendants argue, however, that the record is lacking in evidence to establish the requisite connection between that protected activity and the adverse actions taken against Ciaprazi by prison officials. Defendants' legal position is advanced, in part, in an affidavit from their counsel, Patrick F. MacRae, Esq., outlining the evidence relied upon by the defendants in making their motions. [8] Defendants also note, in further support of their motion, the requirement that retaliation claims rest upon more than mere conclusory allegations regarding the state of mind of prison officials. *See* Dkt. No. 39 at 8-9; *e.g., Flaherty,* 713 F.2d at 13.

As plaintiff correctly notes, the applicable pleading requirements, including Rule 8 of the Federal Rules of Civil Procedure, provide for mere "notice" pleading, and do not require that complaints contain every detail associated with a plaintiff's claims except in categories not applicable to this case. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167-69, 113 S.Ct. 1160, 1162-63 (1993). Accordingly, the mere fact that the plaintiff's retaliation claims are pleaded in non-specific, conclusory terms does not alone entitle defendants to summary dismissal of those claims.

**\*8** In this case the defendants have satisfied their initial, modest threshold burden of establishing the lack of evidentiary support for plaintiff's retaliation claims. Though conventional wisdom might dictate the submission of affidavits from the primary actors, including notably defendants Rogers and Fitzpatrick, disavowing any retaliatory motives associated with their actions, defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's retaliation claims, including through plaintiff's responses to defendants' interrogatories as well as the proceedings associated with the underlying disciplinary matter, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims. *Celotex,* 477 U.S. at 323-34, 106 S.Ct. at 2553; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. There is no requirement under Rule 56 of the Federal Rules of Civil Procedure or otherwise that a party affidavit be submitted to support such a motion, which instead can be based upon any admissible evidence. *Id.*

To demonstrate that a reasonable factfinder could discern a nexus between plaintiff's filing of grievances and the disciplinary matters associated with the incident at issue, Ciaprazi essentially makes two arguments. First, he contends that the manifest falsity of the misbehavior report as well as testimony proffered during the disciplinary hearing give rise to an inference that the disciplinary matters were motivated toward retaliatory animus. Secondly, plaintiff argues that the sheer number of grievances and formal complaints lodged by him, including some close in temporal proximity to the underlying incident, similarly gives rise to a legitimate inference of retaliatory motivation. *See* Ciaprazi Memorandum (Dkt. No. 46) at 14.

Plaintiff's argument in this regard is significantly diluted by the sheer number of complaints lodged by him over time. By his own admission, plaintiff has regularly and openly complained of prison policies and practices and

during the relevant time period prior to the July 31, 1999 incident, and indeed had filed many formal complaints regarding his treatment while at Coxsackie. Yet, plaintiff has submitted no evidence that any of those complaints related to defendants Rogers or Fitzpatrick, the two principal actors in this case, nor has he pointed to any collaboration between those named in his prior complaints and Fitzpatrick and Rogers. At best, plaintiff has argued that prior to July 31, 1999 he "filed complaints and/or grievances against Lieutenants Sweeney, Armstrong, Skrocky and McDermott, all colleagues of defendant Fitzpatrick of the same rang [sic] with defendant Fitzpatrick."*Id.* ¶ 32.

In an equally tenuous attempt to link his protected activity with the issuance of a misbehavior report, plaintiff notes that on May 26, 1999 he filed a grievance for harassment against an employee named Fitzpatrick, who was assigned to assist him in connection with another Tier III disciplinary hearing, stating his naked belief, lacking in evidentiary support, that the employee named in that complaint "may be and apparently is a relative of defendant Fitzpatrick."*Id.* ¶ 33, Exh. 39. Plaintiff also notes that on July 21, 1999 he filed a grievance accusing defendant Goord of "gross abuse of power", requesting an investigation of defendant Goord by the New York State Police and federal authorities, and that five days later, on July 26, 1999, he filed a complaint with various agencies including the United States Department of Prisons complaining of mistreatment. *Id.* ¶¶ 34, 35.

**\*9** While there is some appeal to finding the requisite fact issue to avoid the entry of summary judgment on plaintiff's retaliation claims based upon the timing of these events, that factor is undermined by the steady stream of grievances filed by him on a regular and continuing basis. Were the plaintiff someone who had rarely if ever complained about prison conditions, but shortly before being issued a misbehavior report had lodged a formal complaint against or implicating the conduct of the officer who issued the disciplinary citation, a very different set of circumstances would be presented, and summary judgment would not be warranted. In this case, however, plaintiff can point to no complaints lodged by him against or implicating the conduct of defendant Fitzpatrick, who issued the disputed misbehavior report. Accordingly, I find that the defendants have established that they are entitled to summary dismissal of plaintiff's retaliation claims based upon plaintiff's failure to establish a basis on which a reasonable factfinder could find the requisite connection between plaintiff's grievance activities and the issuance of the misbehavior report and subsequent disciplinary

hearing. [9] *E.g., Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389 (W.D.N.Y.1998).

## C. *Plaintiff's Eighth Amendment Cruel And Unusual Punishment Claim*

In his complaint Ciaprazi in, somewhat indiscriminate fashion, asserts that the actions taken against him by the various defendants resulted in his exposure to cruel and unusual punishment, in violation of the Eighth Amendment. [10] Plaintiff's cruel and unusual punishment claims appear to center upon the conditions which he faced as a result of the disciplinary proceedings against him and resulting in SHU confinement initially at Coxsackie, and later at Upstate and at Clinton. In their motion, defendants assert that these claims are similarly deficient as a matter of law.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."*Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). The Eighth Amendment does not mandate comfortable prisons, but yet it does not tolerate inhumane ones either; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".*See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Farmer,* 511 U.S. at 837, 114 S.Ct. at

1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at \*2 (same).

**\*10** Plaintiff's cruel and unusual punishment claim challenges the fact that 1) he was placed in a double bunk cell at Upstate; 2) was placed in isolation and exposed to light except for five hours each night; 3) was deprived of such amenities such as writing paper and envelopes, proper access to the law library, medical care, access to newspapers, magazines and books, access to the courts, and legal papers; 4) was exposed to loud and boisterous behavior on the part of other inmates; 5) was denied essential clothing and bedding as well as personal hygiene materials, radios or headphones, books, newspapers and magazines; and 6) was exposed to cold conditions, leading him to suffer at least one case of the flu. Complaint (Dkt. No. 1) ¶¶ 52-56; *see also* Plaintiff's Affidavit (Dkt. No. 46) ¶¶ 53-57. To counter these allegations, defendants have submitted nothing to reflect the lack of a basis upon which a reasonable factfinder could conclude that plaintiff was exposed to cruel and unusual punishment while in disciplinary isolation as a result of the Tier III determination now at issue. Instead, defendants' motion focuses upon a narrow aspect of plaintiff's Eighth Amendment claim, in which they assert that the lack of policies guaranteed to result in uniformity throughout the DOCS system of punishments to result in a Eighth Amendment violation.

As skeptical as perhaps one may be regarding plaintiff's ability to ultimately persuade a factfinder that the admittedly unpleasant conditions to which he was apparently exposed and the deprivations suffered while in disciplinary confinement rise to a constitutionally significant level, I am unable to state, based upon the record as currently constituted, that no reasonable factfinder could so conclude. I therefore recommend denial of defendants' motion to dismiss plaintiff's Eighth Amendment cruel and unusual punishment claim relating to the conditions of his confinement.[11]

Included within his Eighth Amendment claim, though more appropriately grouped with his due process cause of action, is plaintiff's contention that because the Tier III hearing officer was provided the unfettered discretion, in the event of finding of guilt, to impose a penalty of whatever magnitude seen fit, the disciplinary scheme in place at the DOCS is constitutionally infirm. In plaintiff's case, however, the imposed penalty of ten months of disciplinary confinement, 180 days of which were deferred, fell comfortably within the bounds of acceptable levels under

the Eighth Amendment. Consequently, whatever may be said about plaintiff's arguments regarding the discretion affording to hearing officers, he lacks standing to raise such a claim. *See Trammell v. Mantello,* No. 90-CV-382, 1996 WL 863518, at \*8-\*9 (W.D.N.Y. June 10, 1996) (Tier III regulations pass constitutional muster).

#### D. *Plaintiff's Procedural Due Process Claim*

In their motion, defendants also challenge plaintiff's contention that he was denied procedural due process during the course of the disciplinary hearing which resulted in his disciplinary confinement for a period of five months. In support of their motion, defendants argue both that plaintiff was not deprived of a constitutionally cognizable liberty interest, and that even assuming he was, he was afforded the requisite process due under the Fourteenth Amendment in connection with that deprivation.

**\*11** To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

#### 1. *Liberty Interest*

Addressing the first of these required showings, in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

Defendants challenge the applicability of both of these factors. Initially, defendants question whether New York has, by statute or otherwise, created a protected liberty interest in prisoners remaining free from segregation, including for disciplinary reasons, arguing that it has not. Defendants' Memorandum (Dkt. No. 39) at 14.The cases cited in support of that proposition, however, which relate to whether there is a constitutional or liberty interest in being assigned to a particular program, job assignment, or facility, are inapposite. *See, e.g., Klos v. Haskell,* 48 F.3d 81, 87-88 (2d Cir.1995)

(involving revocation of assignment to "shock incarceration" program); *Hall v. Unknown Named Agents of N.Y. State Dept. for Corr. Servs. for APPU Unit at Clinton Prison,* 825 F.2d 642, 645-46 (2d Cir.1987) (involving assignment to Assessment Program and Preparation Unit); *see also Montayne v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547 (1976) (no constitutional right of inmate to be placed in any particular facility); *Frazer v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("no protected liberty interest in a particular job assignment"). Despite defendants' assertion to the contrary, it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999); *see also LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at *6 (S.D.N .Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).

Having rejected defendants' contention that the State has not created such an interest, I next turn to examination of whether the conditions of plaintiff's disciplinary confinement, as alleged by him, rise to the level of an atypical and significant hardship under *Sandin.*Atypicality in a *Sandin* inquiry normally presents a question of law.[12] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a cognizable liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[13] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

 **\*12** Given that plaintiff has shown that he was subjected to disciplinary confinement for a period of five months, and has alleged his exposure to conditions beyond those normally associated with such SHU confinement, as described in the applicable regulations, at this juncture I am unable to conclude, as a matter of law, that he was not deprived of a constitutionally significant liberty interest as a result of the disciplinary proceeding at issue. I therefore recommend against summary dismissal of plaintiff's due process claims on this basis.

## 2. *Due Process*

The procedural protections to which a prison inmate is entitled before being deprived of a recognized liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80;*see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988).

Plaintiff's procedural due process claim is multi-faceted. In that claim, Ciaprazi maintains that 1) he was denied meaningful assistance by defendant Cole, who refused his request to interview potential witnesses identified by the plaintiff; 2) Hearing Officer Melino effectively denied the plaintiff access to witnesses since witness waiver forms, not to plaintiff's liking in form, were allegedly presented by an unknowledgeable corrections officer to those inmates whose testimony was requested by Ciaprazi, following which those inmates apparently refused to sign the waiver forms and appear to testify on his behalf; 3) the hearing officer was biased and partial, and demonstrated open hostility toward the plaintiff; 4) the hearing officer's disciplinary determination was not supported by the evidence; and 5) the hearing officer refused plaintiff's suggestion to administer polygraph tests to defendants Rogers and Fitzpatrick, as well as to Ciaprazi. Also implicit in plaintiff's due process claim is his contention that his constitutional rights were violated through the issuance of a false misbehavior report.[14]

Plaintiff's arguments relating to the sufficiency of evidence supporting the hearing officer's finding of guilt can be swiftly discounted. The Constitution, including its Due Process Clause, requires only that there be some evidence of guilt supporting a prison disciplinary determination. *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455-56, 105 S.Ct. 2768, 2774 (1985). Having reviewed the record of plaintiff's disciplinary proceeding in light of his submissions, I find that this standard has been met.

**\*13** Plaintiff's claims regarding the allegedly false misbehavior report also lack merit. It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.[15] *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,*485 U.S. 982, 108 S.Ct. 1273 (1988). The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

As for plaintiff's contention that his due process rights were violated when polygraph tests were not administered to key corrections officials, as requested by him, plaintiff has cited no cases-nor is the court aware of any-which require the administering of polygraph tests in connection with parties and witnesses in the context of an inmate disciplinary determination. *See Hinebaugh v. Wiley,* 137 F.Supp.2d 69, 79 (N.D.N.Y.2001) ("some evidence" does not require independent examination of credibility and therefore "certainly does not require" court to order personnel to submit to polygraph to ascertain if hearing testimony was truthful). This issue, then, provides no basis for finding the existence of a procedural due process violation.

Plaintiff's allegations regarding the ineffectiveness of his assigned assistant provide a greater basis for pause. While the requirements associated with the provision of such assistance are modest, they are not non-existent. Under *Wolff,* an inmate facing a Tier III disciplinary hearing is entitled to meaningful assistance in preparing his or her defense. *Eng,* 858 F.2d at 897-98. In this case, plaintiff asserts that while he was assigned an assistant, he was denied meaningful assistance from that individual. In support of this contention, plaintiff alleges that he identified certain witnesses critical to his defense, but that his assistant refused to interview those witnesses with an eye toward requesting their testimony during the hearing. Complaint (Dkt. No. 1) ¶¶ 20-21; Ciaprazi Aff. (Dkt. No. 46) ¶ 40. This, if true, could establish a due process violation based on the inadequacy of the inmate assistance provided to the plaintiff. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998).

In light of my inability to find, as a matter of law, that plaintiff did not suffer the deprivation of a liberty interest as a result of his five month period of disciplinary confinement, and additionally to conclude that no reasonable factfinder could find the existence of a due process violation associated

with that disciplinary confinement, I recommend denial of the portion of defendants' summary judgment motion which seeks dismissal of plaintiff's due process claims.

## F. *Equal Protection*
In his complaint plaintiff also complains of the alleged deprivation of equal protection. Defendants contend that this claim is also subject to dismissal as a matter of law.

**\*14** "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."*City of Cleburne, Tx. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985) (citation omitted). The general rule is that a policy is presumed to be valid and will be sustained if the classification drawn by that policy is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254. One exception to that rule, however, is when a policy classifies by race, alienage, or national origin-"[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy-a view that those in the burdened class are not as worthy or deserving as others."*Id.* For this reason, these policies are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *Id.* The essence of a cognizable equal protection claim includes a showing of "clear and intentional discrimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401 (1944) (internal quotation and citations omitted).

The apparent basis for plaintiff's equal protection claim is his contention that in light of his national origin, he was treated differently than United States citizen counterparts.[16] In the face of defendants' summary judgment motion, it was incumbent upon the plaintiff to come forward with evidence which could support a claim that he was treated differently than other inmates, and that the difference in treatment could properly be attributed to his status as a Romanian. As such evidence, plaintiff offers only a statement made to him by defendant Fitzpatrick at one point, in substance, that plaintiff had "now ... learned to speak English." *See* Plaintiff's Memorandum (Dkt. No. 46) at 29.Beyond this slender reed, plaintiff offers no evidence to support his claim that he was treated differently than inmates not of his national origin, and indeed acknowledges mere speculation on his

part as to this premise, arguing that "discrimination based on national origin *may*... have placed [sic] a role in defendants' unlawful actions[.]" Plaintiff's Memorandum (Dkt. No. 46) at 29 (emphasis added). Instead, plaintiff's equal protection claims consist of mere surmise and speculation, and are subject to dismissal on this basis. *See, e.g., Barr v. Abrams, 810 F.2d 358, 363 (2d Cir.1987)* ( "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

Despite being obligated to do so at this juncture, plaintiff has failed to adduce any evidence to show either that he was treated differently than his non-Romanian counterparts, and that the difference in treatment was based upon his national origin. I therefore recommend dismissal of plaintiff's equal protection claims as a matter of law.

### G. *United Nations Resolutions*

**\*15** Each of plaintiff's eight causes of action is based, in part, upon two international agreements, including the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"). Defendants maintain that as a matter of law, those provisions do not support claims under section 1983.

Section 1983 provides, in pertinent part, for a right of action on behalf of any person deprived of "any rights, privileges, or immunities secured by the Constitution and laws[.]"42 U.S.C. § 1983. Plaintiff argues that because the United States is a signatory to these two treaty-like provisions, they have the force of law and can be implemented, and individual treaty violations can give rise to recourse, under section 1983.

It is true that violation of a treaty entered into by the United States can serve as a basis for a claim for damages under section 1983, provided that the treaty allows for a private right of action to redress any alleged violations of its provisions. *Standt v. City of New York,* 153 F.Supp.2d 417, 422-30 (S.D.N.Y.2001) (finding private right of action under section 1983 for violation of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 101 T.I.A .S. No. 6820, 596 U.N.T.S. 261 (April 24, 1963)). To the extent that the defendants argue otherwise, and contend that treaties- as distinct from constitutional and other types of federal statutory provisions-cannot support a claim for section 1983 liability, *see* Defendants' Memorandum (Dkt. No. 39) at 17-18, that position therefore lacks support.

As can be seen, analysis of the sufficiency of plaintiff's claims under the cited treaty provisions turns upon whether those international agreements confer individual rights of action. In order to be found deserving of enforcement under section 1983 as a "law", a treaty ratified by the Senate must either be found to be self-executing or, alternatively, must have been the subject of implementing legislation by Congress. *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979).

Since plaintiff has pointed to no applicable implementing legislation, nor is the court aware of any, the availability of the ICCPR to support plaintiff's section 1983 claim depends upon whether it is self-executing. The majority of the courts addressing this issue, however, including within the Second Circuit, have concluded that it is not.[17] *See, e.g., Poindexter v. Nash,* 333 F.3d 372, 379 (2d Cir.2003); *Murray v. Warden, FCI Raybrook,* No. 9:01-CV-255, 2002 WL 31741247, at \*11 n. 10 (N.D.N.Y. Dec. 5, 2002) (Sharpe, M.J.) (citing *U.S. ex rel. Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002) and *Reaves v. Warden,* No. Civ. A3:01-CV-1149, 2002 WL 535398, at \*9 (M.D.Pa. Mar. 22, 2002). Similarly, the UDHR has been characterized by the Second Circuit as "non-binding." *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 167-68 (2d Cir.2003).

**\*16** Based upon the foregoing, and without deciding whether the evidence in the record demonstrates a genuine issue of material fact as to whether those provisions were violated by defendants' alleged actions toward the plaintiff, I find that Ciaprazi's claims under the ICCPR and UDHR are legally deficient as a matter of law. I therefore recommend dismissal of plaintiff's claims which are dependent on those two international agreements.

### H. *Personal Involvement*

Defendants claim that plaintiff's claims against defendants Goord and Selsky are legally deficient, in that the record fails to establish their requisite personal involvement in the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,*434 U.S. 1087, 98 S.Ct. 1282

(1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The basis for asserting liability against defendant Selsky arises exclusively from plaintiff's appeal from his disciplinary determination. That appeal was addressed by defendant Selsky, whose review of that appeal sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994).

Plaintiff's claim against defendant Goord is far more tenuous. Plaintiff asserts that because his appeal was mailed directly to defendant Goord who, consistent with his established practice, then referred it to defendant Selsky for review, the Commissioner "presumably read [its] contents." *See* Plaintiff's Memorandum (Dkt. No. 46) at 32.This, coupled with his contention that as the ultimate supervisor of the DOCS defendant Goord was positioned to remedy the violations which he suffered, forms the sole basis for his claims against defendant Goord. These are merely claims against defendant Goord in his supervisory capacity; to sanction them would be to allow for *respondeat superior* liability. Since it is well established that such liability does not lie under section 1983, and there is no other discernible basis to conclude defendant Goord's awareness of or involvement in the matters alleged in plaintiff's complaint, I recommend

that defendants' motion be granted and plaintiff's claims against defendant Goord be dismissed based upon lack of personal involvement. *Richardson,* 347 F.3d at 435 (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim"); *Scott v. Coughlin,* 78 F.Supp.2d 299, 312 (S.D.N.Y.2000) (Commissioner's act of forwarding appeals addressed to him to Selsky insufficient to establish personal involvement; citing, *inter alia, Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1991)).

## IV. *SUMMARY AND RECOMMENDATION*

**\*17** The plaintiff, an experienced and well-versed *pro se* litigant, has commenced this action asserting various claims arising out of the issuance of a disciplinary misbehavior report and the process which followed, including the punishment received. Upon examination of the record, I find no evidence tending to demonstrate that the adverse actions taken against the plaintiff were motivated by disciplinary animus, and thereby recommend the entry of summary judgment dismissing his retaliation claim. I do, however, find the existence of triable issues of fact regarding whether or not Ciaprazi was deprived of a constitutionally significant liberty interest, and whether the assistance provided to the plaintiff in anticipation of his hearing was constitutionally adequate, and therefore recommend against summary dismissal of plaintiff's procedural due process claims.

Addressing plaintiff's Eighth Amendment claims I find, particularly in view of the lack of any evidence to the contrary, that the conditions described by the plaintiff could lead a reasonable factfinder to conclude that they amounted to cruel and unusual punishment, and therefore recommend against the entry of summary judgment dismissing plaintiff's Eighth Amendment claim. I further find, however, no basis to conclude that a reasonable factfinder could find an Eighth amendment violation based on the Tier III regulatory scheme, a violation of the Equal Protection Clause of the Fourteenth Amendment, or that the international treaty provisions cited give rise to a private right of action. Accordingly, I recommend dismissal of those claims.

Finally, I recommend dismissal of plaintiff's claims against defendant Goord based upon the lack of his personal involvement, but against dismissal of plaintiff's claims against defendant Selsky on this basis. It is therefore hereby

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, I recommend that defendants' motion be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Fed.R.Civ.P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); Roldan v. Racette, 984 F.2d 85 (2d Cir.1993) (citations omitted); and it is further hereby

ORDERED that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 3531464

Footnotes

1   The Clerk is hereby directed to attach the Report-Recommendation to constitute a complete record of the court's decision in this matter.

2   The court adopts the factual summary in Magistrate Judge Peebles' Report-Recommendation and assumes familiarity with the facts alleged in Ciaprazi's Complaint. *Dkt. Nos. 47,1.*

3   Ciaprazi also makes several procedural objections. For instance, he asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required by FRCP 11. Second, Ciaprazi objects to the defendants' alteration of the case caption. Third, Ciaprazi objects to the defendants' use of a name that did not appear in the original complaint. These arguments are without merit and this court adopts Judge Peebles articulated reasons for the their denial. *See Report Recommendation p. 10-11 n. 5, Dkt. No. 47.*

1   Keeplock confinement is defined by regulation to include restriction to one's prison room or cell. *See, e.g.,*7 N.Y.C.R.R. 251-2.2.

2   The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,*525 U.S. 907, 119 S.Ct. 246 (1998).

3   Of those sanctions, five months were suspended and deferred for a to tal of one hundred eighty days. Defendants' Motion (Dkt. No. 39) Exh. A at 00. The record is unclear regarding the amount of disciplinary confinement actually served by the plaintiff as a result of the hearing determination.

4   There is no indication on the docket sheet that defendant Fitzpatrick has been served in the action. While plaintiff requested and obtained the entry of that defendant's default on June 20, 2003, *see* Dkt. Nos. 20, 21, his default was subsequently vacated by order issued by District Judge David N. Hurd on January 13, 2004, based upon plaintiff's failure to prove that defendant Fitzpatrick in fact been served. *See*Dkt. No. 35.

5   In his papers in opposition to defendants' summary judgment motion, plaintiff has raised several procedural objections to defendants' motion papers. In addressing those objections I am mindful of the preference that matters before the court, whenever possible, be decided on their merits rather than on the basis of technical procedural shortcomings. (*see e.g., Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993)* (McCurn, S.J.). In any event, plaintiff's procedural objections are not well-founded.

In his opposition papers, plaintiff asserts that defendants' motion is procedurally defective since one of the moving papers are signed, as required under Rule 11 of the Federal Rules of Civil Procedure. *See* Plaintiff's Memorandum (Dkt. No. 46) at 1. While not bearing signatures in the traditional sense, all of defendants' original moving papers, which were filed electronically with the court in accordance with this court's case management and electronic case filing requirements (*see* Northern District of New York Local Rule 5.1.2 and General Order No. 22), were properly signed. Plaintiff also complains of alterations by the defendants to the caption of the case as set forth in his complaint. Specifically, Ciaprazi challenges defendants' addition of the word "unknown" in relation to defendants Melino and Cole, who are identified in plaintiff's complaint only by last names. Since it is well established that the caption of a pleading

is not substantive in nature, and therefore does not control, the addition of that word does not provide a basis to reject defendants' motion papers. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil § 1321 (3d ed. 2004) ("Although helpful to the district court ... the caption is not determinative as to the identity of the parties to the action"); *see also Prisco v. State of New York,* 804 F.Supp. 518, 521 (S.D.N.Y.1992) (citing an earlier edition of Wright & Miller).

As plaintiff notes, defendants' Local Rule 7.1(a)(3) statement of uncontested, material facts, submitted along with the various other papers in support of their motion, indicates that it is submitted on behalf of a defendant Landry, even though there is no person by that name identified as a defendant in plaintiff's complaint. *See* Dkt. No. 39. Because this is an obvious typographical error, and the contents of the statement obviously relate to the facts of this case, I decline plaintiff's invitation to reject and treat the statement as a nullity on this basis.

I note that Ciaprazi, who appears to be well versed in the applicable requirements of the federal and local rules, himself has overlooked the important requirement that legal memoranda submitted in connection with motions to not exceed twenty-five pages in length. Northern District of New York Local Rule 7.1(a)(1). Plaintiff's memorandum, which is thirty-four pages in length, has been accepted by the court, without objection by the defendants, despite his failure to obtain prior permission to file an oversized brief. Plaintiff is admonished that in the future, just as he seeks to hold defendants to the requirements of the governing rules, he too must conform to those requirements.

6    A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

7    Plaintiff has referred to his efforts in this regard as a "blitz of grievances and complaints[.]" Plaintiff's Aff. (Dkt. No. 46) ¶ 52.

8    The attorney's affirmation in and of itself is, of course, of no evidentiary value in determining the motion for summary judgment since none of the facts upon which such a finding would ostensibly be based are within his personal knowledge. *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011-12 (2d Cir.1986).

9    Prior to the Second Circuit's recent decision in *Gill,* defendants perhaps could have effectively argued that defendants' actions were not likely to deter, and in fact have not chilled, plaintiff's exercise of his First Amendment rights, and therefore do not give rise to a retaliation claim. *E.g., Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002); *Curley v. Village of Suffern,* 268 F.3d 65, 72-73 (2d Cir.2001); *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992). In its recent decision in *Gill,* however, the Second Circuit clarified that such a finding does not end the inquiry, since the critical focus is not upon the subjective element, but is instead objective, examining whether the retaliatory conduct alleged "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)).

10    That amendment provides, in pertinent part, that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

11    In their motion, defendants have not argued lack of personal involvement with regard to their Eighth Amendment claims. It therefore remains to be seen whether plaintiff can establish the defendants' participation in the Eighth Amendment violations alleged.

12    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v.. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

13    While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (see *id.* at 232 n .5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

14    Among the due process violations alleged in plaintiff's complaint is the claim that by taking into account his prior disciplinary record when determining the appropriate punishment to be imposed based upon the finding of guilt, hearing officer Melino violated the constitutional guaranty against double jeopardy. Since it is well established that the double

jeopardy clause does not apply in the prison disciplinary setting, this claim lacks merit. *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, at *13 (S .D.N.Y. Oct. 15, 1993). Plaintiff's contention that the hearing officer's actions in this regard also violated an unspecified New York regulation fares no better, since such an allegation does not automatically support a claim of civil rights violations under 42 U.S.C. § 1983. *Alnutt v. Cleary,* 913 F.Supp. 160, 168 (W.D.N.Y.1996).

15      Unquestionably, a prisoner does enjoy a substantive due process right against the issuance of a false misbehavior report as retribution for having engaged in protected activity. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995). In light of my finding of no connection between plaintiff's complaints and the issuance by defendant Fitzpatrick of the misbehavior report, however, such a claim does not lie in this action.

16      Plaintiff is a Romanian citizen. Complaint (Dkt. No. 1) at 3.

17      Even in one of the cases relied heavily upon by the plaintiff, *Maria v. McElroy,* 68 F.Supp.2d 206, 231 (E.D.N.Y.1999)-a case which has since been effectively overruled on other grounds, *see Restrepo v. McElroy,* 369 F.3d 627 (2d Cir.2004)-the court recognized that the ICCPR was not "self-executing".68 F.Supp.2d at 231.

---

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.  |  Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

### MEMORANDUM & ORDER

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

### REPORT AND RECOMMENDATION

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

### Background

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993,
the plaintiff was in keeplock because of an altercation with
prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock
is confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony Annucci
dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates
in keeplock must apply for written permission to attend
regularly scheduled religious services. (Reply Affidavit of
George Schneider in Further Support of Defendants' Motion
for Summary Judgment dated September 9, 1996 ("Schneider
Aff.") ¶ 3). Permission is granted unless prison officials
determine that the inmate's presence at the service would
create a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green Haven
is for the captain's office to review all requests by inmates
in keeplock to attend religious services. (Schneider Aff. ¶ 3).
Written approval is provided to the inmate if authorization
is granted. (Affidavit of Richard Pflueger dated April 26,
1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the
appropriate form to the gate officer before being released to
attend the services. (Pflueger Aff. ¶ 5).

 **\*2**  On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),
attached as Exh. B to Schneider Aff.) On June 30, 1993, a
supervisor identified as Captain Warford signed the request

form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

**A. *Standard for Summary Judgment***

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also* *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party

must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts.Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted)."The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful."*Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *prose,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest."*McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *prose* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *prose* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See* *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work

product of *prose* litigants should be generously and liberally construed, but [the *prose'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *prose* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

Footnotes

1        In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).  |  Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

#### *MEMORANDUM DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against
numerous employees of New York State or the Central
New York Psychiatric Center ("Defendants"), are Plaintiff's
motion to proceed *in forma pauperis,* his motion for a
temporary restraining order and preliminary injunction, and
his motion for appointment of counsel. (Dkt.Nos.2, 3, 4.) [1]
For the reasons set forth below, Plaintiff's motion to proceed
*in forma pauperis* is granted; his motion for a preliminary
injunction is denied; his motion for appointment of counsel
is denied; Plaintiff's claims of deliberate indifference to his
mental health needs against Defendants Bill, Carver and
DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's
claims against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged personal
involvement in the August 8, 2011 assault are *sua sponte*
dismissed without prejudice and with leave to amend in this
action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua
sponte* dismissed without prejudice as a Defendant in this

action; the Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on Defendants
Davis, Sill, and Nicolette.

## I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.*(Dkt. Nos.1, 2.) [2]
Liberally construed, Plaintiff's Complaint alleges that the
following constitutional violations against him occurred
during his confinement at Central New York Psychiatric
Center ("CNYPC"): (1) Defendants Davis and Sill used
excessive force against him under the Eighth and/or
Fourteenth Amendments; (2) Defendant Nicolette knew of
and failed to take action to protect Plaintiff from the
assault under the Eighth and/or Fourteenth Amendments;
(3) Defendants Bill, Carver, and DeBroize were deliberately
indifferent to his mental health needs under the Eighth and/
or Fourteenth Amendments; and (4) Defendants Bill, Carver,
DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed
to "adequately train the staff under their supervision" and
to take appropriate action in response to the incident. (*See
generally*Dkt. No. 1.) For a more detailed description of
Plaintiff's claims, and the factual allegations giving rise to
those claims, the reader is referred to Part III.B of this
Decision and Order.

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the
Court finds that Plaintiff may properly commence this action
*in forma pauperis.*(Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S
COMPLAINT

In light of the foregoing, the Court must now review the
sufficiency of the allegations that Plaintiff has set forth in
his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is
because Section 1915(e)(2)(B) directs that, when a plaintiff
seeks to proceed *in forma pauperis,*"(2) ... the court shall
dismiss the case at any time if the court determines that—...
(B) the action ... (i) is frivolous or malicious; (ii) fails to state a
claim on which relief may be granted; or (iii) seeks monetary
relief against a defendant who is immune from such relief." 28
U.S.C. § 1915(e)(2)(B). [3]

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty., 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008)* (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson, 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case).* On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests."*Jackson, 549 F.Supp.2d at 212,* n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson, 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); Rusyniak v. Gensini, 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009)* (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak, 629 F. Supp .2d at 213, n. 22* (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).*

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74.The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965.More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."*Iqbal,* 129 S.Ct. at 1949."[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief."*Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully,"*id.,* it "does not impose a probability requirement."*Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice."*Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations

omitted).Rule 8"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."*Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [5] Stated more simply, when a plaintiff is proceeding *pro se,*"all normal rules of pleading are not absolutely suspended."*Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [6]

**B. Analysis of Plaintiff's Complaint**
The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners."*Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions."*Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard."*Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**
 **\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]."(*Id.*)As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to intercede [sic] or stop the brutal attack on the plaintiff."(*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

## 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated."(*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.)The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs."*Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)."[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,*970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,*513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain."*Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind."*Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an

amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Sealy,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold."(Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.)Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally*Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

### IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter."*Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted)."The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th

Cir.1994) ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

 **\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order."(Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from

being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.)Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL
 **\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d

Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel,"*Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants

have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED** **without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponteDISMISSED* **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponteDISMISSED* **without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B) (ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponteDISMISSED* **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill

and Nicolette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .**Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.**All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 651919

### Footnotes

1   This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2   At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3   The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief."28 U.S.C. § 1915A(b).

4   *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5   *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6   It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2).*Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must

still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

[7]    *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

[8]    Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain."*Chance,* 143 F.3d at 702.

[9]    Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference.*Harrison,* 219 F.3d at 138.

[10]    The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile.*John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994).*John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend."*Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

[11]    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

[12]    *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability."[internal quotation marks and brackets omitted] ); *Greenwald v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]    *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials."[internal quotation marks, brackets and ellipsis omitted] ).

[14]    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4365274
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/
ATB).    |    Signed Aug. 29, 2014.

**Attorneys and Law Firms**

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York State Attorney General, The Capitol,
Gregory J. Rodriguez, AAG, of Counsel, Albany, NY, for
Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff, an inmate currently in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"), commenced this civil rights action,
pursuant to 42 U.S.C. § 1983, on May 31, 2011. *See* Dkt.
No. 1. The remaining claims are that Defendants violated
Plaintiff's constitutional rights under the First Amendment's
Free Exercise Clause, as well as his rights under the Religious
Land Use and Institutionalized Person's Act ("RLUIPA"),
and subsequently retaliated against him for attempting to
exercise these rights by destroying Plaintiff's mail and thus
denying him access to the courts. *See* Dkt. Nos. 1, 210.

In a very thorough Report–Recommendation dated July
23, 2014, Magistrate Judge Baxter recommended that the
Court grant Defendants' motion for summary judgment and
dismiss Plaintiff's complaint in its entirety. *See* Dkt. No.
210. Specifically, Magistrate Judge Baxter first found that
in relation to the December 7, 2010 incident, Defendant
Ready acted within the bounds of his employment and
according to the documentation before him and thus, his
inadvertent denial that caused Plaintiff to miss one religious
service did not substantially burden Plaintiff's free exercise

of his religion. *See id.* at 14. With regards to the March 20,
2011 incident, Magistrate Judge Baxter found that Defendant
Ellis was not responsible for the shortened duration of the
Purim celebration, and that while the delay may have been
an inconvenience, Plaintiff was still able to participate in
the service, thus satisfying the requirements of the First
Amendment and RLUIPA. *See id.* at 19–20. Magistrate Judge
Baxter also found that neither Defendant Ellis, nor Defendant
Ready engaged in the conduct mentioned above as a way
to retaliate against Plaintiff for any grievances that he had
previously filed either against them or any other correctional
officer. *See id.* at 39–40. Moreover, Magistrate Judge Baxter
found that Defendant Kupiec did not interfere with Plaintiff's
mail as a means to either retaliate against him or to deny him
access to the courts. *See id.* 35–36. Finally, Magistrate Judge
Baxter found that Plaintiff failed to establish that he suffered
an adverse action as a result of Defendant Kupiec's alleged
conduct. On August 4, 2014, the Court received objections
to the Report–Recommendation from Plaintiff. *See* Dkt. No.
211.

**II. DISCUSSION**

**A. Plaintiff's objections**

In his objection to Magistrate Judge Baxter's Report–
Recommendation, Plaintiff states that he objects to the Report
in its entirety. *See id.* Plaintiff relays his astonishment at
Magistrate Judge Baxter's choice to "excuse Def [endant]
Kupiec's conduct" and at his finding that Plaintiff's position
is "unfounded." *See id.* Plaintiff further objects to Magistrate
Judge Baxter's Report on the grounds that he looked outside
the pleadings and "only to the Defendants Affidavits" when
making his determination to grant Defendants' motion for
summary judgment. *See id.*

**B. Standard of review**

**\*2** A court may grant a motion for summary judgment only
if it determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such
issue warrant judgment for the movant as a matter of law.
*See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d
Cir.1994) (citations omitted). When analyzing a summary
judgment motion, the court "cannot try issues of fact; it can
only determine whether there are issues to be tried." *Id.* at 36–
37 (quotation and other citation omitted). Moreover, it is well-
settled that a party opposing a motion for summary judgment
may not simply rely on the assertions in its pleadings. *See*

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations

for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

### C. Application

**\*3** In the present matter, although Plaintiff has filed objections to Magistrate Judge Baxter's Report–Recommendation, the objections that are given are mostly conclusory and "merely recite the same arguments" that were originally presented to Magistrate Judge Baxter. *See O'Diah,* 2011 WL 933846, at *1; *see generally* Dkt. No. 211.Moreover, some of the objections that Plaintiff makes are of an accusatory nature, in that he charges Magistrate Judge Baxter with excusing the behavior of Defendant Kupiec based on her race, and supporting "the Defendants [r]eckless lies." *See* Dkt. No. 211 at 1 ("I'm sure if Kupiec was black you would have treated her like all of the blacks who appear before you who are 'ignorant of the law' "). Nearly all of Plaintiff's "objections" lack the specificity needed to make a *de novo* determination. In light of his *pro se* status, however, the Court will address the arguments raised.

Plaintiff argues that Magistrate Judge Baxter improperly considered disputed facts in rendering his recommendation. *See* Dkt. No. 211 at 3. Having reviewed the Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly relied only on undisputed facts in rendering his determination or construed any disputed facts in Plaintiff's favor in finding that Plaintiff's allegations were insufficient as a matter of law to support his claims. *See, e.g.,* Dkt. No. 210 at 39 (finding that "neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an 'adverse action' under the case law"). Further, contrary to Plaintiff's allegations, Defendants' motion for summary judgment was properly supported by the record, including affidavits and deposition transcripts.

Finally, contrary to Plaintiff's assertions, Magistrate Judge Baxter correctly determined that Defendant Boll was not personally involved in the alleged conduct. The letter to which Plaintiff refers clearly establishes that Defendant Boll did not conduct an investigation into the underlying subject of Plaintiff's grievance, but was merely conducting an "investigation" into the status of Plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours."Dkt. No. 202–6 at Exhibit

"A." Defendant Boll then stated that "[t]he CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is pending, it is recommended that you await the decision."*Id.* Magistrate Judge Baxter correctly determined that Defendant Boll's response to Plaintiff was insufficient to establish her personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

The Court has thoroughly reviewed the parties' submissions and Magistrate Judge Baxter's comprehensive Report–Recommendation and finds that Magistrate Judge Baxter correctly recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

### III. CONCLUSION

**\*4** After carefully reviewing Magistrate Judge Baxter's Report–Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 210) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 202) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

### I. *Procedural History*

This case has had a long and complicated procedural history, complete with an appeal of the denial of a preliminary injunction to the Second Circuit, which dismissed plaintiff's appeal as lacking an arguable basis in law or fact. [1] (Dkt. No. 133). The court will attempt to briefly state the important aspects of the docket and outline the remaining issues. On October 31, 2012, defendants made a motion for judgment on the pleadings. (Dkt. No. 123). Plaintiff responded in opposition to that motion, but then also made a variety of other motions relating to venue, recusal, and discovery. (Dkt. Nos.119, 139, 140, 144, 145, 149).

On April 3, 2013, I issued an Order and Report–Recommendation, denying some of plaintiff's non-dispositive motions and recommending dismissal of some of his substantive claims on the pleadings. (Dkt. No. 148). On May 15, 2013, Judge D'Agostino affirmed my order and approved my recommendation. (Dkt. No. 155). Judge D'Agostino's order also disposed of plaintiff's Motion Requesting the Court to Take Judicial Notice of Plaintiff's State Court Decision (Dkt. No. 149), his "Motion for Reconsideration," (Dkt. No. 122), and ordered a response to plaintiff's discovery motion (Dkt. No. 119). (Dkt. No. 155).

After Judge D'Agostino's Order, plaintiff filed additional motions: another Motion to Compel (Dkt. No. 159) and a Motion for Sanctions (Dkt. No. 160). On July 2, 2013, I held a telephonic conference with the parties regarding the outstanding motions, denying in part and granting in part, plaintiff's motions to compel (Dkt.Nos.119, 159); denying his motion for sanctions (Dkt.Nos.160); and finding that no action was necessary on other letters submitted by plaintiff. (Dkt.Nos.161–62). On September 13, 2013, plaintiff made a motion to "stop transfer" and requested that his deposition be held at his current facility, Wyoming Correctional Facility. (Dkt.Nos.173, 175). Plaintiff's transfer to Greene Correctional Facility rendered that motion moot, and it was denied on that basis. (Dkt. No. 178).

**\*5** On October 10, 2013, plaintiff made a motion for injunctive relief and appointment of counsel, which plaintiff later clarified was only a motion for appointment of counsel.

(Dkt.Nos.182, 187). This court denied the motion on October 31, 2013, and plaintiff then sent the court a letter stating that he did not wish to be appointed counsel at the time of trial. (Dkt.Nos.189, 190). On January 7, 2014, plaintiff stipulated to the dismissal of all claims against defendants Fischer and Marlenga, which was "so ordered" by Judge D'Agostino on January 8, 2014. (Dkt.Nos.196–97). Defendants filed this summary judgment motion on February 4, 2014. (Dkt. No. 202). Plaintiff responded in opposition to the motion, and requested oral argument. (Dkt. Nos.205, 207). I denied plaintiff's motion for oral argument on April 18, 2014. (Dkt. No. 208).

Presently pending before me is the remaining defendants' motion for summary judgment, together with plaintiff's response in opposition. (Dkt.Nos.202, 205). Based upon Judge D'Agostino's order approving my recommendation on May 15, 2013 (Dkt. No. 155) and the parties' stipulation to dismiss all claims against defendants Fischer and Marlenga, the following defendants and claims remain:

1. A First Amendment Free Exercise Clause claim against defendants Ready and Ellis. (Compl.¶¶ 37–47, 65).

2. A Religious Land Use and Institutionalized Persons Act ("RLUIPA"), claim against defendants Ready and Ellis. (*Id.*)

3. A retaliation claim against defendants Ready and Ellis relating to the above First Amendment and RLUIPA issues.

4. First Amendment retaliation claims against defendant Kupiec relating to the opening, loss, or destruction of plaintiff's mail in retaliation for grievances filed against Kupiec and defendant Ready. (Compl.¶¶ 58–64).

5. A First Amendment denial of access to courts claim against defendant Kupiec. (Compl.¶¶ 67).

## II. *Facts*

Rather than engage in a lengthy discussion of the facts at the outset, the court will discuss the facts associated with each of plaintiff's claim within the relevant sections below.

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006)."Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.*Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## IV. *Religion Claims*

### A. Legal Standards

### 1. First Amendment

 **\*6** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safely,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner,* 482

U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citations omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett,* No. 02–CV–349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595.

## 2. Religious Land Use and Institutionalized Persons Act
RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

*7 42 U.S.C. § 2000cc–1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest *and* that it is the *least restrictive* means of achieving that interest. *Id* . The act defines "religious

exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs."*Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck,* 379 F.Supp.2d 550, 557 (S.D.N.Y.2005)). Furthermore, the substantial evidence test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim *'de minimis non curat lex'* " ). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

## B. Application

### 1. December 7, 2010 Incident:
Plaintiff alleges that defendant Ready denied plaintiff the right to attend Jewish Services for Lubavitch on December 7, 2010, even though he was on the call-out list for the service, and while making disparaging remarks about plaintiff's religion. (Compl.¶¶ 37–47). This court originally recommended denying defendant's motion for judgment on the pleadings, notwithstanding defendants' argument that one interference with plaintiff's religious services would not rise to the level of a constitutional violation. I found, instead, that plaintiff claimed that Ready intentionally denied plaintiff the opportunity to attend this religious service, and that this action was also in retaliation for plaintiff filing a successful grievance against defendants Johnston and Ellis. (Dkt. No. 148 at 13). Based only on the facts as stated by plaintiff, and with a very liberal review by the court, this court recommended denying the motion for judgment on the pleadings. [2] (*Id.* at 14) (this court also noted that it was "unclear" how plaintiff's claims would fare after a well-supported summary judgment motion).

Defendant Ready has submitted a declaration in support of summary judgment. He states that he has been a corrections officer ("CO") at Mid–State since September of 2010. (Ready

Decl. ¶ 2) (Dkt. No. 202–3). On December 7, 2010, he was working on Unit 7–2. (*Id.* ¶ 5). His duties included running the desk at the entrance door of Building 7—the Program Building, ensuring that inmates were where they were scheduled to be, and permitting movement as necessary pursuant to "call-out sheets." (*Id.*) When an inmate is listed on a call-out sheet, defendant Ready requires the inmate to sign out from his program, and then he is allowed to go to the "call-out." (*Id.* ¶ 6).

**\*8** Defendant Ready states that on December 7, 2010, plaintiff came to him and stated that he had to leave his program for a "call-out." However, plaintiff's name was not listed on the call-out sheets that defendant Ready was given for that day. (*Id.* ¶ 8). If an inmate's name is not on the sheet, he is not permitted to go to the "call-out," so defendant Ready informed plaintiff that he had to return to his program because his name was not on the sheet.(*Id.* ¶ 1). Defendant Ready states that he never made any comment about plaintiff's religion. (*Id.* at 11). Plaintiff did not seem upset or angry, did not ask to see a sergeant or supervisor, and "merely complied with [defendant Ready's] instructions and returned to class."(*Id.* ¶ 12).

Defendant Ready states that the only reason that he prevented plaintiff from going to the call-out (religious service) was because his name was not on any of the call-out sheets that he had been given, and defendant Ready was not authorized to allow plaintiff to attend the call-out. (*Id.* ¶¶ 10, 14). Finally, defendant Ready points out that he had just transferred to Mid–State in September of 2010, thus, he was not aware of plaintiff's September 2010 grievance when Ready did not allow plaintiff to attend the religious service on December 7, 2010. (*Id.* ¶ 13).

As Exhibit I to plaintiff's complaint, he attaches a copy of the "call-out" for Tuesday, December 7, 2010. Plaintiff's name clearly appears on that call-out. (Compl.Ex. I). Father Robert Weber [3] has filed a declaration in support of defendants' motion for summary judgment, stating that in December 2010, he was the Coordinating Chaplain at Mid–State. (Weber Decl. ¶ 3) (Dkt. No. 202–7). Father Weber states that when he arrived at work on December 7, 2010, he realized that there was no call-out for the Lubavitch Youth Organization, members of which were visiting the Jewish inmates for Chanukah.(*Id.* ¶ 6). In an attempt to rectify this error, Father Weber "caused a callout to be generated with the names of those inmates who regularly attend Jewish Services ."(*Id.* at 7). Although Father Weber states that a copy of the call-out

is attached to his declaration as Exhibit A, no such copy is attached. The court will assume that the call-out to which Father Weber refers is the one that is attached to plaintiff's complaint as Exhibit I. (Dkt. No. 1 at 46). Plaintiff's name is on that call-out.

Father Weber then states that, after Deputy Superintendent for Programs ("DSP") Phillips approved the call-out, it was "hand-delivered to the Housing Units within the correctional facility."(Weber Decl. ¶ 8)."Inadvertently, the callout was not added to the daily callout packet nor was it delivered to the program areas that day."(*Id.* ¶ 9). Although plaintiff's name certainly appears on the call-out, unfortunately defendant Ready, who was at the Program Building that day, did not have that call-out in front of him when plaintiff approached to ask about going to services, and defendant Ready was justified in refusing to let plaintiff attend the services. The Superintendent's investigation of plaintiff's grievance resulted in the same finding:

> **\*9** The facility investigation revealed that the Jewish Services call-out was not submitted with the other scheduled inmate call-outs on the day before (12/6/10), which is normal procedure; therefore, it was not included with 12/7/10 facility call-out packet. The inmate call-out packets are normally distributed to all program areas, housing units as well as other staff/ inmate areas the day before the call-outs are scheduled. On the morning of the posted call-out (12/7/10), this error was brought to the attention of the Coordinating Chaplain, who then had the Jewish Services call-out hand delivered to the housing units but not to the program areas. Although the 7–2 officer [Ready] and the grievant's general business instructor [Gruen] reviewed the p.m. call-outs to verify/ confirm the grievant's statements, neither staff member would have been aware the grievant was listed on the 12/7/10 Jewish Services call-out scheduled for 2:00 p.m. nor would they have been aware that there was an addition to the original call-out packet

because it was never delivered to their program area.

(Compl.Ex. L) (Dkt. No. 1 at 50). [4] This document, attached as an exhibit to plaintiff's complaint, corroborates defendant Ready's and Father Weber's version of the events. Defendant Ready did not intentionally deny plaintiff the opportunity to attend the service on December 7, 2010 because although plaintiff's name was on the call-out list, defendant Ready did not have that list in front of him, [5] and he would not even have been aware that the list existed because it was not delivered to the program area. This one, clearly inadvertent incident, does not rise to the level of a constitutional violation committed by defendant Ready. [6]

In his response to defendants' motion for summary judgment, plaintiff states that the defendants are lying, and that the call-out was delivered to *"all"* program areas. (Pl.'s Mem. ¶ 10) (Dkt. No. 205–1 at 9). Plaintiff states that he reaches this sweeping *conclusion* because "[t]he location where the Jewish Services [are] held (Building # 101) is *aProgram Area,"* and security staff in that area must have had the call-out because they would not have let the thirteen other Jewish inmates in the building. (*Id.*) (emphasis added). If one program area had the call-out, then all the program "areas" must have had the call-out. However, plaintiff's argument misses the point. Defendant Ready was not in Building # 101. He was in Unit 7–2 in Building 7, [7] and the fact that the building in which the religious services were actually held had the call-out, [8] does not "prove" or even raise a question of fact regarding whether the call-out had been sent to the other program areas, in the face of Father Weber's sworn statement that he did not send the call-out to the program areas. Although plaintiff states that Building # 101 is "a" program area, it is not "the" Program Building. [9]

In my prior report, I recommended denying defendants' motion to dismiss on the pleadings, notwithstanding case law holding that missing one religious service does not constitute a substantial burden on the inmate's right to the free exercise of his religion under either under the First Amendment or under RLUIPA. (Dkt. No. 148 at 13) (citing inter alia *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at * 15 (S.D.N.Y. Oct. 15, 1999)). In granting *summary judgment,* the court in *Troy* stated that "courts in the Second Circuit have held that an inmate's right to practice his religion is not substantially burdened if an inmate missed one religious service for *a valid reason."Id.* (emphasis

added). I did not rely on *Troy* in my prior report, because the defendants in this case brought a motion for judgment on the pleadings, and this court was bound by the facts as stated in plaintiff's complaint. Now that defendants have moved for summary judgment, the court may consider material outside the complaint, such as sworn declarations, in determining that, while plaintiff missed one religious service through the actions of defendant Ready, this inadvertent denial did not substantially burden the plaintiff's free exercise of his religion. In denying plaintiff the opportunity to attend his call-out, defendant Ready acted according to the documentation before him. Even if a mistake were made, it was the lack of proper documentation that caused plaintiff to miss his service. [10] Neither the First Amendment, nor RLUIPA was violated by defendant Ready.

## 2. The March 20, 2011 Incident

**\*10** The second incident occurred on March 20, 2011, when plaintiff claims that defendant Ellis intentionally cut short a visit from Lubavitch Rabbis who had come from Brooklyn to see plaintiff [11] at the facility. (Compl.¶ 65). Plaintiff claims that he was scheduled to meet with the Rabbis for one and one half hours in order to celebrate the Purim holiday. (*Id.*) Plaintiff claims that defendant Ellis cut the service to a matter of minutes and sent all of the Jewish inmates back to their housing units.

Defendant Ellis has submitted a declaration in support of defendants' motion for summary judgment. (Ellis Decl.) (Dkt. No. 202–5). Kurt Ellis is employed by DOCCS as a Protestant Reverend, and at the time of the declaration, held the position of Chaplain at Mid–State. (Ellis Decl. ¶¶ 1–2). Defendant Ellis states that on March 20, 2011, Rabbi Theodore Max scheduled a Purim celebration in the small chapel at MidState with some members of the Lubavitch organization.(*Id.* ¶ 5). The call-out was approved for 2:30 p.m. on March 20, 2011. Defendant Ellis spoke with Corrections Officer ("CO") Backer, the Building 101 main console officer and explained that the call-out was for 2:30, but that the Rabbi might be late because he was making Purim rounds at other facilities, and a delay was possible. (*Id.* ¶¶ 6–7).

Defendant Ellis states that at approximately 1:45 p.m., he noticed that plaintiff was working in the Law Library, which is adjacent to the Building 101 console. (*Id.* ¶ 8). Defendant Ellis mentioned to CO Backer that plaintiff was on the Purim call-out, but Ellis was not sure if plaintiff would need to go back to his housing unit at the 2:15 "go back" and then return

for the Purim call-out. (*Id.*) CO Backer told defendant Ellis that plaintiff would have to go back to his housing unit and then return when it was time for the Purim call-out. (*Id.*)

Defendant Ellis told plaintiff that he knew that plaintiff had "an issue" before, and Ellis wanted to make sure that plaintiff did not have any trouble that day. (*Id.* ¶ 9). Ellis told plaintiff that, because he was currently signed out for the Law Library, he would have to go back to his housing unit at 2:15 p.m. and then return "when they call for the service."Plaintiff responded that he did not have to go back and asked the Law Library officer whether plaintiff could go directly to the service from the Law Library at 2:30. CO Ippolito, the Law Library Officer gave plaintiff permission to do so. Defendant Ellis states that he left, but informed CO Backer what CO Ippolito told plaintiff, and CO Backer agreed that CO Ippolito "should not have said that." (*Id* .)

Reverend Ellis states that he has no authority over the procedure for "inmate movement" at the facility because movement is a matter of security. (*Id.* ¶ 10). At approximately 2:30 p.m., defendant Ellis went to the small chapel to see if the Rabbi had arrived, but the Rabbi was not there yet. Defendant Ellis went to check with CO Backer. Plaintiff also approached the "security bubble" to check with CO Backer. Plaintiff was told by CO Backer and by defendant Ellis that the Rabbi had not arrived, and plaintiff went back to the Law Library.(*Id.* ¶ 11).

**\*11** Defendant Ellis then went to see if Rabbi Max had arrived, but was told that the Rabbi had not been seen. Defendant Ellis did his "weekly rounds in the Visitor's Center, signing into the Log Book at 2:45 p.m."(*Id.* ¶ 12). After a brief conversation with a staff member, defendant Ellis saw the Lubavitch volunteers pulling into the parking lot. Defendant Ellis greeted Rabbi Max and continued on his daily rounds, stopping at the Watch Commander's Office to inform him that Rabbi Max had arrived. (*Id.*)

Defendant Ellis states that he was not involved in calling inmates for the Purim Service, nor did he attend the Service on March 20, 2011. [12] Defendant Ellis continued with his daily rounds and did not return to his office until approximately 3:45 p.m ., at which time he noticed the inmates in the small chapel with the Rabbis. (*Id.* ¶ 16). Defendant Ellis states that after the service ended, he spoke to Rabbi Max, who stated that the service went well. (*Id.* ¶ 17). Defendant Ellis states that he was not in charge of the Service, he had no involvement in the time that the Service began or ended, and

he did not order the inmates back to their housing units at the conclusion of the Service. (*Id.* ¶¶ 18–20).

Defendants have also submitted the declaration of Rabbi Theodore Max, [13] who states that he is a Chaplain who is responsible for leading the primary congregational worship and prayer services for Jewish inmates. (Max Decl. ¶¶ 1–3). He is assigned to multiple correctional facilities, including Mid–State. (*Id.* ¶ 4). Rabbi Max states that he coordinated the Purim celebration, and he was advised to schedule the call-out for 2:30, even though he was not scheduled to arrive until 2:45 that day. The Service was scheduled to last approximately one hour. (*Id.* ¶¶ 6–7). Rabbi Max states that he was on a "very tight" schedule on March 20, 2011 because he was scheduled to visit "at least three correctional facilities" before his visit to Mid–State.(*Id.*) When he and the members of the Lubavitch organization arrived at Mid–State, there was a long line of visitors, which delayed their entrance into the facility, causing the Purim celebration to begin later than 2:45 p.m. (*Id.* ¶¶ 10–11). Rabbi Max states that pursuant to facility rules, the inmates were still required to return to their cells at 3:45 p.m., and that the Purim celebration ended at that time. (*Id.* ¶ 12).

Plaintiff does not claim that he missed the celebration, only that the celebration was shorter than originally scheduled. Rabbi Max has explained that he arrived late, causing the service to begin later, and run shorter than anticipated. Defendant Ellis had nothing to do with scheduling the event, with Rabbi Max being late, or with shortening the service.

Plaintiff argues that defendant Ellis sent plaintiff back to the law library and the other Jewish inmates back to their housing units, for the purpose of shortening the service. In his response to the motion for summary judgment plaintiff states that during *his* deposition, the defendants "admitted" that defendant Ellis sent the Jewish inmates back to their cells to shorten the service. (Pl.'s Mem. ¶ 19) (citing Deposition Transcript ("DT") at 49). The deposition transcript is not an "admission" by defendants, and does not state that defendant Ellis sent the inmates back to their cells.

**\*12** During his deposition, plaintiff testified that Reverend Ellis allows *Protestant* inmates to come to the chapel before Ellis is ready to conduct the service, but does not allow Jewish inmates to go to their place of worship and wait if the Rabbi is not there. (DT at 49)."Whenever we go to the Jewish services, he sends us all back. 'Go back to your housing unit.' " (*Id.*) Defense counsel then asked plaintiff a question: "even though the rabbis came a little bit late, and even though they sent

some of the inmates back to their cells, you were able to meet with the rabbis that day and have a short prayer service." (*Id.*) This *question by counsel* is **not** an *admission by a defendant*, and counsel was making the point that "even if" what plaintiff said were true—that someone sent the Jewish inmates back to their cells because Rabbi Max had not arrived—plaintiff still attended the service, notwithstanding that it was shorter than anticipated.

Rabbi Max's declaration shows that **he** was late beginning the service, and the inmates were required to return to their cells at 3:45. Defendant Ellis had nothing to do with the length of the service.[14] Under the appropriate definition, plaintiff's religious rights were not substantially burdened. In order for the defendant's interference to be a "substantial burden" on the inmate's religious exercise, the interference must be more than an inconvenience, and plaintiff must demonstrate that the government's action pressured plaintiff to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

In addition, although plaintiff may disagree, the shortening of his Purim celebration because the Rabbi was late or because plaintiff had to wait for other inmates to come back from their housing units did not amount to a "substantial burden." This delay may certainly have been "an inconvenience." However, plaintiff admits that the Service did occur, that prayers were said, and that the inmates were allowed to eat the food, albeit too quickly for plaintiff's liking. Thus, neither the Constitution, nor RLUIPA were violated by defendant Ellis. Plaintiff's retaliation claim will be discussed below.

## V. *Mail/Access to Courts/Retaliation*

### A. Legal Standards

#### 1. Mail

Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351

(2d Cir.2003))."The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise."*Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996))."The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

*13 Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests."*Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail."*Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown,' outgoing mail can be read' without violating inmates' First Amendment rights."*Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail." *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998)) (Rep't–Rec.), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). To establish a claim for interference with regular, non-legal mail, the plaintiff must show " 'a pattern and practice of interference that is not justified by any legitimate penological concern." *Singleton v. Williams,* No. 12 Civ.2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (quoting *Cancel, supra.*)An isolated incident is

generally insufficient to establish a constitutional violation. *Id.* (citing *Davis,* 320 F.3d at 351).

Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Plaintiff must still show that prison officials " 'regularly and unjustifiably interfered with the ... legal mail.' " *Singleton,* 2014 WL 2095024, at *4 (quoting *Cancel, supra.*)As few as two incidents of mail tampering may constitute an actionable violation if the incidents suggest and ongoing practice of censorship that is unjustified by a substantial governmental interest or if the tampering unjustifiably chilled the inmate's right to access to courts as discussed below or impaired legal representation that plaintiff received.*Vega v. Rell,* No. 3:09–CV–737, 2013 WL 6273283, at *10 (D.Conn. Dec. 4, 2013) (citing *Washington,* 782 F.2d at 1139).

## 2. Access to Courts

**\*14** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828.

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996).*See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

## 3. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants.*Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action.*Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment."*Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371."Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred."*Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

**\*15** The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies

and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at \*3 & n. 11 (N.D.N .Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at \*3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

## B. Application

### 1. Defendant Kupiec

#### a. Relevant Facts—Interference/Retaliation

In his complaint, plaintiff alleged that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendant Kupiec [15] began to lose and/ or destroy plaintiff's packages that were received in the mail room. [16] (Compl.¶¶ 57–64). Plaintiff claims that on January 14, 2011, the same day that the Superintendent rendered a decision on plaintiff's grievance against defendant Ready, plaintiff received a package from Stratford Career Center, to study for his paralegal degree. (Compl.¶ 58). Plaintiff states "Defendant Theda Kupiec 'got word' of the complaint contra the aforesaid officers and started to intentionally lose and destroy the plaintiff's legal packages from said school."(*Id.*) Plaintiff states that the "package" with his text and exams was never recovered, but he did "receive the Paralegal Course from the school on the said date in question." [17] (*Id.* & Ex. M).

Plaintiff states that he "was never once called down to the package room or mail room in the entire month of [J]anuary, 2011."(Compl.¶ 58). He then states that "this only indicates that anytime an inmate (in this case the plaintiff) files a grievance against the defendant's [sic]—retaliation takes place."(*Id.*) Plaintiff speculates that retaliation can take the form of missing packages or "planting weapons on the inmate ... to make sure that the inmates [sic] goes to the box (Special Housing Units) where he is limited to legal materials." [18] (*Id.*)

The complaint also alleges that after he appealed the Superintendent's decision regarding the December 7, 2010 incident against Ready, a "Notice of Intention to File a Claim" ("Notice") was improperly sent "regular" mail, rather than by Certified Mail as is required under New York State Law and notwithstanding that plaintiff paid for certified mail. (Compl.¶¶ 60–63). Plaintiff alleges that on March 15, 2011, his parents sent him a food package that he never received, purportedly due to the retaliation by defendant Kupiec. (Compl.¶ 63). Several paragraphs later, plaintiff states that, on May 17, 2011, defendant Kupiec "slashed open" plaintiff's legal mail, removed the documents outside of his presence, and sent the documents to plaintiff in a coffeestained, "stampless" envelope. (Compl.¶ 82). In plaintiff's response to defendants' motion for summary judgment, he also mentions an incident that is not part of the complaint. Plaintiff alleges that defendant Kupiec opened his mail and ripped up his "law school exam scores." (Dkt. No. 205–1, ¶ 33). This court will not consider this final allegation against defendant Kupiec. [19]

**\*16** Defendants have filed the declaration of defendant Theda Kupiec, Senior Mail Clerk at Mid–State. (Kupiec Decl. ¶¶ 1–2) (Dkt. No. 202–4). Defendant Kupiec states that her responsibilities include sorting outgoing mail and placing the appropriate postage after verification that the inmate has sufficient funds, in addition to sorting incoming mail for distribution to the housing units. (*Id.* ¶ 6). Defendant Kupiec states that she has no responsibility "whatsoever" with respect to "packages" that are received for inmates. She states that the mail room in which she works is located in Building 20 of the Administration Building, which is located outside of the secure fence around the facility. However, the "package room" is located in Building 101, which is located inside the secure fence. (*Id.* ¶¶ 7–8).

Defendant Kupiec states that she was not aware of any grievance plaintiff may have filed against defendant Ready, and that she does "not personally know Correction Officer Ready."(*Id.* ¶¶ 11–12). Defendant Kupiec states that "at some point," she became aware of plaintiff's claim that he did not receive the Stratford Career Institute package, but because defendant Kupiec does not work in the package room, and has no responsibility for packages, she has no knowledge of the result of plaintiff's complaint. (*Id.* ¶ 14).

Defendant Kupiec states that she did inadvertently mail plaintiff's Notice via regular mail. (*Id.* ¶ 15). Plaintiff requested that the envelope be sent Certified, and defendant Kupiec first sent the mail to the Business Office to verify that plaintiff had adequate funds for certified mail. When the mail was returned to her with the authorization, defendant Kupiec inadvertently sent the mail with regular postage. Defendant Kupiec states that she realized her mistake when plaintiff filed

a grievance, to which she responded by admitting her error and reimbursing plaintiff for the difference in the postage. Defendant Kupiec states that the mistake was hers, and no one "told" her to send the mail out via regular mail rather than certified. (*Id.* ¶¶ 15–16 & Ex. A). Exhibit A to defendant Kupiec's declaration is a copy of the memorandum that she sent to plaintiff apologizing for the error and reimbursing him for the cost of the mailing [20] Defendant Kupiec states that she is completely unaware of plaintiff's missing food package because she does not work in the package room. (*Id.* ¶ 17).

Defendant Kupiec also states that on May 18, 2011, she received a manila envelope from the package room with plaintiff's name and DIN number on it, with no indication that it was legal mail. [21] She opened the envelope to record the contents, and when she realized that the mail was from a court, she wrote which court the mail came from on the front of the envelope and send the mail to the Legal Officer. (*Id.* ¶ 19 & Ex. B). Exhibit B is the memorandum that defendant Kupiec wrote to the IGRC, explaining what happened with the manila envelope. [22] (*Id.*) Defendant Kupiec states that she did not open plaintiff's legal mail intentionally or in retaliation for any grievance, but merely in the "normal course of [her] job duties ...." (*Id.* ¶ 20).

**b. Discussion**

**\*17** These incidents do not show constitutional interference with plaintiff's mail, nor do the facts show that defendant Kupiec was retaliating against plaintiff for his grievances. First, it is clear that defendant Kupiec does not work in the package room, and had no personal involvement in, and would not have been responsible for, either plaintiff's alleged text book "loss" or the alleged loss of his kosher food. [23] The court will focus on plaintiff's allegations that defendant Kupiec tampered with his mail on February 25, 2011 (certified mail claim) and on May 17, 2011 (opening of legal mail).

The fact that plaintiff's Notice was sent regular mail, rather than certified is not interference with plaintiff's mail. The mail was sent, it was just sent by a different method of delivery. [24] This mistake shows neither intent, nor a "pattern and practice" of interference. At worst, it shows an error by defendant Kupiec in sending out plaintiff's mail, for which plaintiff was reimbursed. [25] The incident in which defendant Kupiec sent plaintiff documents in a plain manilla envelope after she realized that the documents were sent by a court

also shows an error by facility staff in the package room, that defendant Kupiec attempted to rectify by writing which court the documents came from on the envelope and having it delivered to plaintiff through the proper channels for legal mail. [26] Defendant Kupiec states that the court documents were already in the plain manilla envelope when she received them.

Plaintiff claims that defendant Kupiec was retaliating against plaintiff for the grievances that he filed. Plaintiff first mentions the grievance he filed against defendant Ready after the December 7, 2010 incident, which was denied by the Superintendent on January 14, 2011. [27] Plaintiff's statement that defendant Kupiec was aware of plaintiff's grievance against defendant Ready because an inmate named "Rogers" told defendant Kupiec about the grievance, is completely conclusory. The first time plaintiff ever mentioned inmate Rogers was at plaintiff's deposition. (Pl.'s Dep. at 61). Plaintiff stated that Inmate Rogers worked in the grievance office and knew who was filing grievances against officers, so Inmate Rogers told defendant Kupiec about the decision on plaintiff's grievance against Ready "because [plaintiff] was already putting in paperwork on why my legal mail was being messed with."(Pl.'s Dep. at 62). This statement by plaintiff is not even plausible. *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (no genuine issue of material fact when plaintiff's explanation is not even plausible); *Haust v. United States,* 953 F.Supp.2d 353, 361 (N.D.N.Y.2013) (court may discredit plaintiff's self-serving testimony when it is so replete with inconsistencies and improbabilities that no reasonable fact-finder would undertake the suspension of disbelief necessary to credit the allegations made in his complaint) (quoting *Jeffreys, supra* ).

**\*18** Defendant Kupiec states that she does not know defendant Ready, and that plaintiff's allegation that an inmate named "Rogers" informed Kupiec of the grievance against Ready is untrue. (Kupiec Decl. ¶ 13). Although defendant Kupiec is aware that Inmate Rogers works in the grievance office, she could not identify Rogers, nor has she ever had any contact with him. (*Id.*) The grievance against defendant Ready had to do with religion, not mail. The fact that plaintiff may have begun "putting paperwork together" regarding a grievance about his legal mail against defendant Kupiec, which plaintiff did not file until March or April of 2011, would not support Inmate Rogers deciding to tell defendant Kupiec about a grievance filed against a different defendant, coincidentally on the same day that plaintiff claims a package was delivered for him. [28] As stated above, defendant Kupiec

does not work in the package room and would not have been responsible for the alleged loss of any package delivered to the facility for plaintiff in January of 2011 or any other time.

In addition, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action).*See also Faulk v. Fisher,* 545 F. App'x 56, 58–59 (2d Cir.2013) (temporal proximity to the protected action and excellent disciplinary history prior to the allegedly retaliatory misbehavior reports were insufficient to avoid summary judgment when there was no additional evidence, and neither of the officers were involved in the successful grievance); *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at *2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)).

**\*19** Plaintiff also may be claiming that defendant Kupiec's subsequent actions were in retaliation for the grievance that plaintiff ultimately filed against defendant Kupiec in March or April of 2011. In her declaration, defendant Kupiec denies ever opening plaintiff's legal mail in retaliation for a grievance filed against *her.* [29] (Kupiec Decl. ¶ 18). In any event, plaintiff suffered no adverse action, as defined by the case law, [30] as the result of defendant Kupiec inadvertently opening plaintiff's legal mail that was sent to her from the package room. [31] This action would not deter a similarly situated inmate from exercising his constitutional rights. This action also would not deter a similarly situated inmate

from asserting his rights. [32] It does not show malice or retaliation by defendant Kupiec. Plaintiff's mail interference and retaliation claims may be dismissed.

**b. Access to Courts**

Plaintiff claims that defendant Kupiec's failure to send his Notice by certified mail denied plaintiff access to courts because he was forced to withdraw his action. [33] Plaintiff's allegation has no basis whatsoever. Plaintiff concedes that he withdrew his New York Court of Claims action of his own accord. At his deposition, plaintiff stated "I had to dismiss [the Court of Claims action] because after I found out about these reckless lies, I had to dismiss it."(Pl.'s Dep. at 79). At plaintiff's deposition, the Assistant Attorney General asked why plaintiff did not just send a new Notice if he really believed that his case would be dismissed without a notice sent by certified mail. It was clear that plaintiff would have had time to send a new one, and plaintiff had been reimbursed for the mail that was improperly sent.(*Id.* at 80–82). Plaintiff then stated that the notice covered earlier incidents, and would have been untimely for the "earlier" incidents. (*Id.* at 82).

At the same time, plaintiff stated that he withdrew the action because he "wanted to change his theory" and go to federal court, because plaintiff stated that the "Court of Claims is only [for] negligence and property damage."(*Id.* at 83). Plaintiff then reasserted that the "Court" ***would have*** stricken his "motion" [34] because he did not serve the Attorney General with his Notice by certified mail. Plaintiff cannot "create" an access to courts claim by voluntarily withdrawing his action and then speculating what the court would have done if he had not withdrawn the action.

According to plaintiff, the Notice was required to be served on the Attorney General, not the Court. (T. 81). The court would have no way of knowing that the Notice was not served by certified mail, unless the Attorney General made a motion to dismiss on that basis. Even if the Attorney General made such a motion, plaintiff could have opposed the motion by stating that a mistake was made in mailing the item. There is no way to know that plaintiff's case would have been dismissed. In any event, it is clear from plaintiff's deposition that he would not have stayed in the Court of Claims. At his deposition, he clearly stated that he "wanted to change his theory" and go to Federal Court. (DT at 83). That is not a denial of access to courts "caused" by defendant Kupiec's conduct. Thus, plaintiff's access to courts claim may be dismissed.

## 2. Defendants Ready and Ellis

**\*20** Plaintiff alleges that the actions taken by defendants Ready and Ellis were taken in retaliation for a grievance that plaintiff filed on September 20, 2010 against defendant Ellis and CO Johnston. [35] Defendant Ready states that he did not know about the September 20, 2010 grievance on December 7, 2010, because he was transferred to Mid–State in September of 2010. (Ready Decl. ¶ 13). In his response, plaintiff argues that defendant Ready must have known about the September grievance because "it was not until November 24, 2010 that the Grievance Supervisor disciplined the officers including Ready regarding allowing inmates ... to adhere to Jewish memos and callouts."(Pl.'s Mem. at ¶ 24) (Dkt. No. 205–1 at 18).

First, the court notes that there is no indication the Ready, or any other officer was "disciplined." The Superintendent's response states that the facility policies were reviewed and "corrective action taken." [36] This does not mean "discipline ." The Superintendent's response also states that the "referenced employees were advised and clarification given with regards to this matter."(Pl.'s Ex. N(1) (Dkt. No. 205–1 at 93). Defendant Ready was not one of the employees referenced in the grievance and was not involved in the September incident. [37] Thus, he would not have been disciplined or even "advised" of the incident. The memorandum cited by plaintiff, dated November 24, 2010 was between C. Tapia, the IGP Supervisor and DSP Phillips.

The fact that the defendants work in the same facility, or even on the same unit, is not sufficient to show that defendant Ready was aware of plaintiff's grievance against two other officers or that he would have retaliated against plaintiff for a grievance in which she was not involved. As stated above, generally, it is difficult to show retaliation for actions taken against another officer. *Hare v. Hayden, supra,* 09 Civ. 3135, 2011 WL 1453789, at \*4.

Further, the court finds that neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an "adverse action" under the case law. Keeping plaintiff out of one service because defendant Ready did not have the correct call-out list, is not an action that would deter a "similarly situated" individual from exercising his rights. With respect to defendant Ellis, even assuming that he had anything to do with shortening the Purim service (which this court has found that he did not), this action would certainly not deter someone similarly situated

to plaintiff from asserting his rights. [38] Additionally, plaintiff claims that defendant Ellis was responsible for sending *all* the inmates back to their housing unit to wait for the Rabbis. Clearly, even if that were true, plaintiff concedes that he did not return to his housing unit, and defendant Ellis could not have been retaliating against plaintiff by taking action against other inmates. [39] Therefore, any retaliation claims against defendants Ellis and Ready may be dismissed.

## VII. *Personal Involvement*

### A. Legal Standards

**\*21** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.*Id. See also Iqbal v. Hasty,* 490 F .3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The mere receipt of a letter or similar complaint is insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. (*Id.*) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). However, personal action does *not*

include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

**B. Application**

In my April 3, 2013 recommendation, I noted that in Judge D'Agostino's initial order, the allegations of personal involvement against defendants Fischer and Boll were "rather sparse." (Dkt. No. 148 at 24). Notwithstanding these "sparse" allegations, Judge D'Agostino allowed the case to continue as against these supervisory defendants. (*Id.*) In a conclusory fashion, plaintiff claimed that he had so many documents from these two defendants, he could "flood the docket." (*Id.*) (citing Dkt. No. 129 at 22). Plaintiff's response to the defendants' motion for judgment on the pleadings implied that he could make the appropriate showing, perhaps by amending his complaint. Because at that time, I was recommending that this action proceed at least to a properly supported motion for summary judgment, I did not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. (*Id.*)

**\*22** Plaintiff did not amend his complaint, and he later stipulated to dismissing the action as against Fischer. However, in his response to the motion for summary judgment, he maintains that defendant Boll was personally involved in the alleged constitutional violations because she stated in her response to interrogatories that her "office" became aware of plaintiff's September 9, 2010 grievance when a copy of plaintiff's correspondence to a Deputy Commissioner of Program Services was "forwarded to my office." (Dkt. No. 205–3 at 355). Defendant Boll states that she had no personal knowledge or recollection of the grievance itself because the Office of Counsel is not the appropriate department to file a grievance. (*Id* . at 355–56). Defendant Boll also states that "upon receipt of your letter, the matter was investigated by the Office of Counsel, and I responded to you on December 2, 2010. (Exhibit B attached hereto)."(*Id.* at 356). Plaintiff seizes upon this statement, and accuses defendant Boll of lying to the court because she "admits" that she responded to plaintiff.

First, it is unclear whether plaintiff's September 9, 2011 grievance against defendant Ellis has anything to do with the facts of this case. [40] Plaintiff has seen fit not to include the letter that defendant Boll said that she wrote to him in response. [41] However, defendant Boll has included the letter as an attachment to her declaration in support of the

summary judgment motion. (Boll Decl. Ex. A) (Dkt. No. 202–6). In her declaration, defendant Boll states that as Deputy Commissioner and Counsel for DOCCS, she serves as legal counsel for the Commissioner of DOCCS and oversees DOCCS Office of Legal Counsel which is responsible for all of the legal services necessary for the day-to-day operation of the DOCCS Central Office and the correctional institutions that make up the department. (Boll Decl. ¶ 5).

Defendant Boll states that her office routinely received hundreds of letters per year from inmates or on behalf of inmates. (*Id.* ¶ 6). When the Office receives one of these letters, one of the defendant's support staff reads it and determines which of the attorneys on her staff or other staff person should address the issues in the letter. The letter is then forwarded to the attorney or other staff person to investigate and prepare a response, if warranted. The response may be prepared for the attorney's signature, a Deputy Counsel's signature, or defendant Boll's signature "depending on the circumstances." (*Id.*)

Contrary to plaintiff's accusations that defendant Boll is somehow trying to hide her involvement, defendant Boll admits responding to three letters received from the plaintiff. (*Id.* ¶ 7). The letter that plaintiff apparently believes is the "smoking gun" which shows that defendant Boll was personally involved in whatever constitutional violation the plaintiff alleged, is actually a letter reminding plaintiff that he had filed a grievance, and that his grievance had been appealed to the Central Office Review Committee ("CORC"), and a decision was pending. (*Id.* ¶ 8). In the letter, plaintiff was advised that the CORC would conduct a thorough investigation, and that plaintiff would be notified of its decision. (*Id.* & Ex. A). Defendant Boll states that she did not take any action to "investigate the claims contained in plaintiff's Inmate Grievance Complaint that [she] referenced in [her] December 2, 2010 letter to plaintiff." [42] (*Id.* ¶ 9).

**\*23** A reading of defendant Boll's letter supports her declaration. Her office's "investigation" was not an investigation of the "merits" of the grievance, it was merely an "investigation" of the status of plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours."(*Id.* Ex. A). Defendant Boll was reporting to plaintiff that an investigation had been conducted by other officials of DOCCS. Defendant Boll then stated:

The CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is still pending, it is recommended that you await the decision.

(*Id.*) If an individual were able to create "personal involvement" by simply writing a letter to a superior, who was good enough to answer with an explanation such as this, it would eviscerate the well-settled principle that respondeat superior does not apply in civil rights cases. Clearly, defendant Boll did not conduct a "personal investigation" of the religious issue outlined in plaintiff's grievance.

Defendant Boll wrote another letter, dated January 28, 2011, in response to a new letter from plaintiff, dated December 20, 2011. (Boll Decl. ¶ 10 & Ex. B). Defendant Boll's letter merely stated that she had already written to plaintiff on December 2, 2010, and noted that the CORC had completed its review by correspondence dated December 8, 2010, accepting plaintiff's grievance in part. (Boll Decl. Ex. B). Defendant Boll further stated that plaintiff had been told "to bring further concerns to the attention of area supervisory staff, at [his] facility, at the time of the incident, for any remedial action deemed necessary."(*Id.*)

By the time of plaintiff's second letter to defendant Boll, the December 7th incident had occurred, and defendant Boll noted the "reoccurrence," stating that Superintendent William Hulihan had investigated the incident, "and advised you of his findings and actions on January 14, 2011."(*Id.*) Defendant Boll's explanatory letter does not create personal involvement as it is clear from the letter that she did not have anything to do with investigating the incident. She just determined that an investigation had taken place and was advising the plaintiff that he "should continue to follow the Directive for any further incidences that [h]e may have."(*Id.*)

Finally, plaintiff wrote to defendant Boll again, and she responded on March 3, 2011. (Boll Decl. ¶ 12 & Ex. C). Plaintiff claimed that no corrective action had been taken with regard to one of his grievances, and defendant Boll

merely advised plaintiff that her office had contacted the staff at the correctional facility, who advised defendant Boll that plaintiff's claims had been properly investigated and corrective action had been taken. Defendant Boll took no further action. (Boll Decl. ¶¶ 12, 14). Defendant Boll states that she took no investigative action on any of plaintiff's letters. (Boll Decl. ¶ 15). She merely inquired into the status of plaintiff's grievances and reported her findings to plaintiff. Defendant Boll's letters support her assertions, and plaintiff's attempt to create personal involvement by citing portions of one of the defendant's letters, without the entire letter must fail.

**\*24** Plaintiff may not understand the above-cited law and may be under the misapprehension that the simple fact that defendant Boll responded to his letters made her personally involved in the subject matter of the letter. The cases cited above show that this is not the law. Plaintiff is confusing the difference between a letter, telling him that someone else did an investigation, with a personal investigation of the merits after receipt of the letter. The former is not personal involvement, while the latter is personal involvement. Thus, the complaint may also be dismissed as against defendant Boll on this basis as well.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 202) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.***Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 23, 2014.

**All Citations**

Slip Copy, 2014 WL 4365274

Footnotes

1   Plaintiff then attempted to appeal the Second Circuit decision to the United States Supreme Court. (Dkt. No. 130) (Notice of Appeal).

2   Plaintiff's response seems to take issue with the fact that defendants have now filed a motion for summary judgment because the case survived a prior motion for summary judgment, filed by plaintiff and a motion for judgment on the pleadings, filed by defendants. (Pl.'s Mem. at ¶ ¶ 1–7) (Dkt. No. 205–1). Plaintiff faults the court for allowing defendants to respond to plaintiff's motion for summary judgment with a letter. (*Id.* ¶ 5). The court would point out that the lack of a "formal" response from the defendants did not prejudice plaintiff. The defendants did not, as plaintiff put it, "[get] away" with anything. *See* Pl.'s Mem. at 5. I noted in the Report–Recommendation that defendants had not formally responded to the motion for summary judgment. (Dkt. No. 54 at 8–9). The standard for summary judgment places the burden on the party moving for summary judgment to show that no question of material fact exists.*Celotex Corp. v. Catrett,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Unless that initial burden is met, the non-moving party need not make any showing. *See Salahuddin v. Goord,* 467 F.3d at 272–73. Only if the moving party satisfies this burden, is the non-moving party required to move forward with specific facts showing that there is a genuine issue for trial. *Id.* The fact that the court found, based upon the documents submitted by plaintiff, that a genuine issue of fact existed does not preclude a subsequent motion for *summary judgment* by defendants. The defendants' interim motion for judgment on the pleadings was denied because, based upon the facts stated in the complaint, plaintiff's claims had been stated. The summary judgment motion contains additional facts in the form of affidavits and deposition testimony. *See*Fed.R.Civ.P. 56(c). Even if the defendants had made a prior motion for summary judgment, the court has the discretion to consider multiple motions for summary judgment if the successive motion is supported by new material. *Robinson v.. Henschel,* No. 10 Civ. 6212, 2014 WL 1257287, at *8 (S.D.N.Y. March 26, 2014) (citing inter alia *Wechsler v. Hunt Health Sys., Ltd.,* 198 F.Supp.2d 508, 514 (S.D.N.Y.2002)).*See also Rodriguez v. It's Just Lunch, Internat'l,* No. 07 Civ. 9227, 2013 WL 1749590, at *1 (S.D.N.Y. April 23, 2013) (considering cross-motions for summary judgment "[f]ollowing discovery proceedings and multiple motions to dismiss.")

3   Father Weber is not a defendant in this action.

4   Unless otherwise specified, the pages associated with a docket number will be the pages assigned to the document by the court's electronic filing system. (CM/ECF).

5   Plaintiff was deposed on October 8, 2013, and a copy of his deposition transcript has been included in defendants' summary judgment motion. (Dkt. No. 202–2). During his deposition, plaintiff testified that defendant Ready "had the call-out on his desk."(Dkt. No. 202–2 at 22). While defendant Ready may have had a call-out or call-outs on his desk, he did not have one with the plaintiff's name on it.

6   Plaintiff has also alleged a retaliation claim based on this incident, and the court will discuss that claim below.

7   (Ready Decl. ¶¶ 5).

8   This court makes no such finding.

9   Plaintiff's own exhibits confirm this finding. (Pl.'s Ex. G) (Dkt. No. 205–3 at 26). In his grievance documents, plaintiff states that "I signed out of Mr. Gruen's class and informed him that I had a call-out per DSP Phillips to **report to Bldg # 101** to attend Jewish Services. I subsequently attempted to sign out @ the 7–2 security desk whereby Correctional Officer Ready ... asked me where I was going."(*Id.*) Clearly, Building # 101 is not the same as Building # 7. Thus, whether an officer in Building # 101 has a document does not prove that someone in Building # 7 was given the same document.

10   To the extent that the failure to provide the appropriate call-out sheet was negligent or simply a mistake, defendant Ready was not responsible for that omission, and in any event, negligence is not actionable under section 1983. *Riehl v. Martin,* No. 13–CV–439, 2014 WL 1289601 at *8 n. 14 (N.D.N.Y. March 31, 2014). In his response to the motion for summary judgment, plaintiff asks why, even if defendant Ready did not have the call-out, "did he fail to pick up the phone and just call the Chaplain's Office to verify that the [plaintiff] was on the call-out?"(Pl.'s Mem. at 15). The fact that defendant Ready may or may not have acted correctly or logically, at worst, could constitute negligent action, which is not actionable under section 1983 or under RLUIPA. *Id. See also Booker v. Maly,* No. 9:12–CV–246, 2014 WL 1289579, at *25 (N.D.N.Y. March 31, 2014) (mistakes not actionable under the U.S. Constitution) (citations omitted); *Scott v. Shansiddeen,* No.2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (negligent actions that 'impinge to some degree on an inmate's religious practices' are insufficient to support a claim under RLIUPA (citing 42 U.S.C. § 2000cc, et seq.; *Carter v. Washington Dep't of Corr.,* No. C11–5626, 2013 WL 1090753, at *14 (W.D.Wash. Feb. 27, 2013); *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006) (simple negligence does not suffice to meet the fault requirement under section 3 of RLUIPA)).

11   Although the complaint initially states that the Rabbis came to see "the plaintiff," it is clear that there were other Jewish inmates who were scheduled to participate in the Purim Services.

12    The declaration says "March 20, 2011." Although plaintiff refers to this as the March 30, 2011 incident, Purim was actually March 19–20, 2011. The discrepancy in the dates is not relevant to this court's decision because it is clear that all parties are referring to the same incident.

13    Rabbi Max is not a defendant in this action.

14    In his response to defendants' motion for summary judgment, plaintiff has submitted his grievance and the Superintendent's response to plaintiff's grievance regarding this incident. (Dkt. No. 205–3, Pl.'s Exs. R–Z). In this grievance, plaintiff alleged that defendant Ellis "felt the need to answer for the officers in the bubble by stating ...'The Rabbi is not here so go back to the law library.'" (Pl.'s Ex. R at 2; CM/ECF p. 123). Plaintiff claimed that he complied, after the other officer repeated that plaintiff should go back to the law library. (*Id.*) Plaintiff asked to use the bathroom, and while using the bathroom, "he overheard the 'voice over the mic [sic]' direct the other Jewish inmates back to their housing units because the Rabbis had not arrived."(*Id.* & Ex. Z). The issue in the grievance appeared to be that the inmates were not allowed to enter the chapel and wait for the Rabbis. Plaintiff complained that "the Rabbis arrived at approximately 2:43 p.m., and by the time the inmates who were sent back to their units arrived for the second time; the services did not start until 3:15 p.m. *As a result, the Jewish Services were shortened* and they were dismissed at 3:45 p.m." (Pl.'s Ex. Z) (emphasis added). The fact that the inmates were not allowed to enter the chapel prior to the Rabbi's arrival, has nothing do with shortening the service (which would have been cut short anyway, because it is clear that the Rabbis were late in arriving). Plaintiff seems to speculate that Ellis was responsible for the other officer ordering the inmates back to their units. (Pl.'s Ex. R, Dkt. No. 205–3 at 123). In his declaration, defendant Ellis states that he disagreed that plaintiff should have been allowed to return to the library to wait for the Rabbis, but this did not affect plaintiff's attendance at the Purim celebration.

15    Plaintiff originally named Sheila Marlenga, the "Facility Steward," as a defendant in connection with plaintiff's mail claims. The complaint was dismissed with prejudice as against Ms. Marlenga by stipulation, dated January 8, 2014. (Dkt. No. 197). Thus, the complaint has proceeded only as against defendant Kupiec with regard to the remaining issues.

16    The court notes that the allegations in plaintiff's complaint relate more to retaliation than simply interference with his mail. However, in his memorandum of law in opposition to defendants' summary judgment motion he has one paragraph in which he discusses both interference and retaliation separately. (Dkt. No. 205–1 at ¶ 34). Because interference with mail may be a separate and independent claim from retaliation, the court will discuss all possible claims that plaintiff may have regarding the alleged interference with his mail.

17    The allegations in the complaint are a little unclear. In his deposition, plaintiff states that he ultimately received the package. (DT at 107). A reading of plaintiff's grievance documents indicates that he may have received a replacement package after plaintiff's father contacted the school to explain that plaintiff did not receive the January 2011 package. (Pl.'s Ex. Z(12), Dkt. No. 205–3 at 223). The court also notes that materials relating to a paralegal "course" do not constitute "legal mail." Legal mail is included in the definition of "Privileged Correspondence" and is defined, in relevant part, as correspondence with attorneys, legal representatives, and legal services organizations. *See* DOCCS Directive 4421(II) (A)(2) (citing 7 NYCRR § 721.2).

18    The court notes that plaintiff's statement about "planting weapons" is irrelevant because there is no such claim in this case.

19    A plaintiff may not amend his complaint in a memorandum of law or other filing. *Bryant v. Greater New Haven Transit Dist.,* No. 3:12–CV–71, 2014 WL 2993754, at *7 (D.Conn. July 2, 2014) (citation omitted). The court notes that this final incident could not have been included in the complaint because it occurred after plaintiff filed this action, and plaintiff was still exhausting administrative remedies regarding this allegation, long after this complaint was filed. (*See* Pl.'s Ex. Z(16), Dkt. No. 205–3 at 250) (IGRC's September 22, 2011 response to plaintiff's grievance—this action was filed on May 31, 2011). Plaintiff will not be prejudiced by this court's failure to consider this allegation against defendant Kupiec because he has raised the same claim in a subsequent action that has been assigned to Senior Judge Lawrence E. Kahn and Magistrate Judge Treece. *Guillory v. Fischer,* No. 9:12–CV–280.Magistrate Judge Treece declined to recommend dismissal of this allegation in a Report–Recommendation, noting that notwithstanding my consideration of the issue in recommending denial of plaintiff's motion for summary judgment, the claim was more properly before him. *See id.* at 13– 16 (Dkt. No. 46 in 12–CV–280). It is more appropriate for Judge Treece to consider the allegations regarding plaintiff's test scores along with another factual allegation against defendant Kupiec that has not been mentioned in any part of this action and that occurred after the filing of this case.

20    A review of plaintiff's exhibits shows that, at the time plaintiff filed this action in May of 2011, he had not completed the exhaustion of administrative remedies as to his certified mail claim. He did not receive the CORC denial of his grievance until July 27, 2011. (Pl.'s Ex. Z(24), Dkt. No. 205–3 at 275). Although defendants raised failure to exhaust as a defense in their answer (Dkt. No. 46, ¶ 12), they have not argued failure to exhaust in their motion for summary judgment. While

defendants would not have had the opportunity to argue non-exhaustion for claims that had not been raised prior to the motion for summary judgment (the test score claim discussed above), they would have had the opportunity to argue non-exhaustion as to claims that were in the complaint. Technically defendants have not waived the exhaustion requirement by raising it in their answer. *Castillo v. Rodas,* No. 09 Civ. 9919, 2014 WL 1257274, at *15 (S.D.N.Y. March 25, 2014). This court finds that it may recommend dismissal on the merits and will do so, rather that finding only that administrative remedies were not exhausted because defendants did not argue this in their motion.

21    A review of plaintiff's exhibits also shows that when he filed this action, he had not exhausted his administrative remedies regarding the allegation that defendant Kupiec "destroyed" his legal mail. The document, purporting to be a "grievance," in addition to various other things, was dated May 23, 2011. (Pl.'s Ex. Z(32), Dkt. No. 205–3 at 291–302, 293). It was addressed not only to the "Complaint Department" at Mid–State, but also to District Court Judge Mordue, Ruth Goldway from the Postal Regulatory Commission, and Anne Gallaudet from the U.S. Postal Service.(*Id.* at 291). The Superintendent's decision was dated June 16, 2011, after plaintiff filed this action. (Pl.'s Ex. Z(33), Dkt. No. 205–3 at 304). However, defendants have not argued non-exhaustion in their motion, and as stated in footnote 20 above, the court will consider the merits of the claim.

22    The memorandum explains that the envelope must have been delivered inadvertently to the package room. (Kupiec Decl. Ex. B). An individual working in the package room (defendant Kupiec speculated that it might have been a "fill in"), opened the envelope, realized it was legal mail, put it in a plain manila envelope with plaintiff's name and number on it, and then sent it "over to the Mailroom for processing."(*Id.*) She noted that this was the "normal procedure for mail received in packages."(*Id.*) The court also notes that this memorandum is further support for defendant Kupiec's statement that the mail room and the package room are in two different locations.

23    Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

24    Contrary to plaintiff's implication, there is no indication that defendant Kupiec would have been aware of the effect of her action. Defendant Kupiec is the senior mail room clerk. There is no indication that defendant Kupiec has any legal training or would have known the possible effect of sending plaintiff's Notice by regular mail.

25    To the extent that defendant Kupiec's actions could be considered negligent, as stated above, negligence is not actionable under section 1983. *See* n. 10, *supra.*

26    Plaintiff's response makes much of the fact that the "package" went to defendant Kupiec's office when she stated that she had nothing to do with packages. Plaintiff believes that this "admission" proves that defendant Kupiec was also tampering with his packages. Clearly, the item was not a "package," and that is why the package office sent it to defendant Kupiec. Unfortunately someone in the package office had already made a mistake in opening the envelope, placing the documents in another envelope with plaintiff's name and prison number on it. The only contact that defendant Kupiec states that she had with this mail was to place the name of the court on the envelope and have it delivered to plaintiff through the proper channels. This statement is not, as plaintiff claims, inconsistent with defendant Kupiec's statement that she does not work in the package room and has nothing to do with the packages that are delivered for inmates.

27    (Dkt. No. 1 at 50) (Superintendent's Decision dated 1/14/11). The September 2010 grievance is mentioned in this decision, but that grievance was against defendant Ellis. (*Id.*)

28    It is also unclear how inmate Rogers would know that plaintiff was contemplating a grievance against Kupiec because plaintiff only stated that he was "putting paperwork together" for a grievance about his mail, not that such a grievance had been filed. The connection between defendant Kupiec and defendant Ready is non-existent.

29    Plaintiff filed a grievance against defendant Kupiec on April 22, 2011. (Compl.Ex. Z(23)). The only actions that could have conceivably been in retaliation for grievances against defendant Kupiec herself would have been the May 17, 2011 incident involving the manilla envelope with court documents inside and the inadvertent tearing of plaintiff's test scores (which is not part of this action and apparently occurred in August of 2011, based on the August 22, 2011 memorandum of apology from defendant Kupiec). None of defendant Kupiec's other actions took place subsequent to the March or April grievance against her. (Pl.'s Ex. Z(19), Dkt. No. 205–3 at 256). Plaintiff filed a grievance about his test scores on September 1, 2011. (Pl.'s Ex. Z(18), Dkt. No. 205–3 at 254) (CORC decision dated January 18, 2012). At his deposition, plaintiff testified that he did not think he had filed any prior grievances against defendant Kupiec, and there are no documents in the record reflecting grievances prior to April 22, 2011. (DT at 111).

30    *Gill, supra.*

31    Contrary to plaintiff's assertion, this action by an employee in the package room does not prove that all packages go through defendant Kupiec. The legal mail was delivered to the package room in error, someone opened it, determined that it was ***not*** a "package," placed the documents in a plain manila envelope with plaintiff's name and DIN number on it,

and sent it to the mail room where defendant Kupiec works. She determined that the documents were from a court, placed them back in the manilla envelope, together with writing the name of the court from which they came, and sent them through the proper channels for legal mail. (Pl.'s Exs. Z(36); Z(35), Dkt. No. 205–3 at 316, 318) (CORC Determination dated 10/15/11; Memorandum from defendant Kupiec to DSP Phillips). Although plaintiff claimed that his legal mail was "destroyed," that is clearly not true, only the envelope was missing, and defendant Kupiec had nothing to do with that. *See* Pl.'s Ex. Z(32), Dkt. No. 205–3 at 293).

32    Even if the court were considering the test score incident, the court would find no adverse action because in a letter, dated November 14, 2011, Acting Commissioner for Program Services Catherine M. Jacobsen wrote to plaintiff, explaining the facility's response to the test tearing incident. (Pl.'s Ex. Z(31)) (Dkt. No. 205–3 at 289). The facility informed Acting Commissioner Jacobsen that "the mail was taped and placed into an envelope with a note of apology explaining the error."(*Id.*)

33    Plaintiff claims that the withdrawal of his action constitutes the "actual injury" he needs to establish an access to courts claim.

34    It is not clear what "motion" would have been stricken.

35    CO Johnston is a former defendant who was dismissed from this action pursuant to Judge D'Agostino's September 27, 2011 Order. (Dkt. No. 19).

36    The September incident was only tangentially related to the exercise of plaintiff's religious rights. Plaintiff had attended a religious service in the morning of September 9, 2010, and because of the religious holiday, he was excused from all programming on that day. Plaintiff chose to attend the law library in the afternoon because he had been excused from his other program, based upon a memorandum written by DSP Phillips. Plaintiff was prevented from doing so, but the grievance was resolved in his favor. However, plaintiff did not miss a religious service, he was only prevented from spending his free afternoon, pursuing non-religious activities the way he wished.

37    In fact, plaintiff was convinced that no "corrective action" was taken. However, he has included a memorandum from Christopher Tapia (IGP Supervisor) to Julie Dennis, dated December 7, 2010, stating that, after receiving a telephone call from DSP Phillips, Director Tapia spoke with CO Johnson the day that Director Tapia received the plaintiff's complaint. (Pl.'s Ex. Z(42), Dkt. No. 205–3 at 341). Director Tapia explained the proper procedure and "clarified" the memo. "The corrective action was that the memo was clarified. All referenced staff are now aware and no other complaints received."(*Id.*) No "discipline" was involved, and there is no reference to defendant Ready in this memorandum and no reason that he would have been advised of the issue because he was not involved in the incident.

38    In fact, the only adverse action alleged in plaintiff's grievance (aside from the shorter service) was that the inmates were not allowed to wait in the chapel for the rabbi or rabbis to arrive. Clearly, this is not "adverse" within the meaning of a retaliation claim.

39    During his deposition, plaintiff testified that Ellis was "taking it out" on all the other Jewish inmates because of a grievance written by plaintiff against him. (Pl.'s Dep. at 54). Plaintiff's complaint was that "Ellis won't even open the door until the last minute, so we all just hanging out outside the chapel because Ellis won't open the door."(*Id.* at 55). Failure to open a door before services are about to start can hardly be categorized as "adverse action." Once again, the court does not make any findings against defendant Ellis. The court is assuming the facts, hypothetically, for purposes of this particular discussion.

40    Plaintiff's interrogatory asks when defendant Boll became "aware" of plaintiff's September 9, 2010 grievance against defendant Ellis. (Dkt. No. 205–3 ¶ 7). However, none of the claims in this law suit relating to defendant Ellis occurred in September of 2010. Thus, any information in the September 9, 2010 grievance would not have even made defendant Boll aware of the claims in this action.

41    Clearly plaintiff received a copy of the letter as indicated in the response to the interrogatory. The letter is not supportive of plaintiff's claim, and it is disingenuous of plaintiff to omit the letter and cite only parts of defendant Boll's response to the interrogatories. Plaintiff's accusations that defendant is "lying" to the court are completely unfounded, and apparently plaintiff did not read the defendant's affidavit or see the letter that was attached. Plaintiff is constantly accusing others of nefarious conduct, while omitting important facts himself.

42    The court must point out that the incident with defendant Ready did not occur until December 7, 2010, and the incident with defendant Ellis did not occur until March of 2011, so the plaintiff's first letter and defendant Boll's December 2nd response could not have been related to an incident that had not yet occurred and could not have "created" any personal involvement in any event.

**Westlaw**Next © 2015 Thomson Reuters. No claim to original U.S. Government Works.    

2012 WL 4093792
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gregory HARVEY, Plaintiff,
v.
David HARDER, et al., Defendants.

No. 9:09–CV–154 (TJM/ATB).  |  July 31, 2012.

**Attorneys and Law Firms**

Gregory Harvey, pro se.

Aaron Marcus, Asst. Broome County Atty., for Defendants.

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrtate Judge.

 *1 This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights amended complaint, plaintiff alleges that defendants violated his rights to due process and equal protection [1] when they kept him in "segregated housing" for approximately one month, without any disciplinary incident or hearing. (Am, Compl .; Dkt. No. 33). Plaintiff also alleges that defendant Shear improperly ordered plaintiff to be put in restraints whenever he left his cell. (Id.) Plaintiff seeks substantial monetary relief.

Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 47). Plaintiff has responded in opposition to the motion. (Dkt. No. 50). For the following reasons, this court agrees with defendants and will recommend dismissal of the amended complaint.

### DISCUSSION

**I. *Facts and Procedural History* [2]**
Plaintiff alleges that he was improperly placed in "segregated housing" at Broome County Correctional Facility ("BCCF") from January 12, 2007 until he was transferred out of the facility on February 13, 2007. Plaintiff claims that defendants violated his rights to due process and equal protection because they did not afford him a hearing prior to his confinement in the Special Housing Unit ("SHU"). Plaintiff's original complaint named only the Broome County Sheriff, David Harder. (Dkt. No. 1). In his amended complaint, plaintiff added the names of five more defendants, who plaintiff believes are responsible for his improper confinement: (1) Sergeant Robert E. Buholski; (2) Sergeant Jon C. Gillette; (3) Lieutenant Wesley C. Shear; (4) Corrections Officer ("CO") David B. Thompson; and (5) Lieutenant William Lillie. [3]

Plaintiff claims that on January 12, 2007, when plaintiff was transferred from Herkimer County Correctional Facility ("HCCF"), defendant Harder "ordered his staff to wrongfully imprison and put restraints upon plaintiff by housing him illegally in segragated [sic] housing without any record of a disciplinary incident report or any record of a disciplinary hearing."(Am. Compl. ¶ 6; Facts). Plaintiff also alleges that, beginning on January 17, 2007, "restraints were put on him," and that defendant Harder and his staff violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment with their "deliberate indifference." (Am. Compl. ¶ 6; CM/ECF pp. 6–7). Plaintiff states that he became paranoid "from the loss of liberty enjoyed by other prisoners."(Id. at p. 7) Plaintiff alleges that each of the five new defendants "signed an order" wrongfully housing plaintiff in SHU; defendant Thompson signed two orders; and defendant Shear also signed an order "to place Plaintiff in restraints whenever he left his cell."(Am. Compl. ¶ 7; Causes of Action; CM/ECF pp. 6–7).

There is no dispute in this case that plaintiff was housed in "segregated housing" for the entire time that he was incarcerated in BCCF. Defendants state that plaintiff was in Administrative Segregation ("Ad Seg"), rather than *disciplinary* segregation. In support of the motion for summary judgment, each defendant has submitted an affidavit, explaining the circumstances under which plaintiff was confined to Ad Seg for the period between January 12th and February 13t' of 2007. (Dkt.Nos.47–19–47–26). An affidavit was submitted by Sergeant Edward J. Cermak, who is not a defendant, but states that it was he, (not defendant Gillette), [4] who reviewed the Order placing plaintiff in Ad Seg in the facility's SHU (D–Pod). (Dkt. No. 47–20; Cermak Aff. ¶ 12; Gillette Aff. ¶ 11). Affidavits were also submitted by CO Franklin Sherman, the Classification Officer at BCCF; and Mark Smolinsky, the Jail Administrator at BCCF. (Dkt.Nos.47–24, 47–25).

 *2 Defendants' affidavits all state that plaintiff was transferred from HCCF to BCCF on January 12, 2007. Prior

to the transfer, defendants state that, on January 11, 2007, a " 'Custodial Transfer Information' sheet" was created at HCCF, evidencing plaintiff's transfer. (Buholski Aff. ¶ 2; Cermak Aff. ¶ 2; Gillette Aff. ¶ 2; Shear Aff. ¶ 2; Sherman Aff. ¶ 3; Smolinsky Aff. ¶ 5; Thompson Aff. ¶ 3).[5] This information, prepared by Lieutenant John Coddington at HCCF, indicated that plaintiff had known mental health problems, was on medication, had been assaultive toward staff and inmates at HCCF, and had poor adjustment to confinement. (*Id.* & Ex. F)

Accompanying the custodial transfer information, was a letter from HCCF Lieutenant Coddington, further explaining that plaintiff had an "extensive psychiatric history"; had been assaultive toward staff at HCCF; had very long fingernails, which he refused to cut and had threatened to use as weapons against the staff; had a long history of threat-related activity, including threats to the President of the United States;[6] had been housed in HCCF Ad Seg due to continued outbursts and threats toward staff; had not been housed in general population due to unstable behavior and continued to be housed "alone"; was very paranoid, and was subject to "drastic mood swings." (Smolinsky Aff. ¶ 6 & Ex. G). The court notes that while incarcerated in HCCF, on October 8, 2006, plaintiff was notified that his "classification level" was "Maximum."[7] (Def.s' Ex. D).

Plaintiff arrived at BCCF on Friday, January 12, 2007 at approximately 12:49 p.m. (*Id.* ¶ 7). He was screened by CO Joe Spaziano, who noted that the plaintiff had a "chronic psychiatric history with mental health treatment" and referred him to the forensic unit for evaluation. (*Id.*) Plaintiff was taken to the Ad Seg area of the forensic/medical unit at 5:29 p.m. on January 12. Until that time, plaintiff had been housed in cell number 5 of the "admissions unit," where all inmates are housed as part of the facility's admission procedures.[8] (*Id.* & Def.s' Ex.H; Housing History Sheet). The forensic referral sheet is Defendants' Exhibit I. On January 14, 2007, plaintiff was cleared by forensics, medical, and corrections to leave the medical unit, and he was then taken to A–Pod, another housing unit used for classification purposes. (*Id.* ¶ 15 & Def.s' Ex. H). CO Sherman is the facility's Classification Officer, and was charged with completing plaintiff's classification. (Sherman Aff. ¶ 2).

Prior to the completion of plaintiff's classification, on January 17, 2007, there was an incident in A–Pod, in which plaintiff allegedly directed threats toward the President of the United States as well as other individuals. (Smolinsky Aff. ¶ 16; Sherman Aff. ¶ 8). Because of this incident, plaintiff was returned to the medical unit at 2:00 p.m. on January 17th. (*Id.* & Def.s' Ex. H). Another Ad Seg order was drafted by CO Thompson, who noted that plaintiff was being admitted to Ad Seg as part of the facility admission procedure, but also noted that the staff perceived a serious threat to the inmate's safety, although he had not requested protection. (Shear Aff. ¶ 10 & Def.s' Ex. M). Sergeant Cermak reviewed the Order and directed plaintiff's placement in Ad Seg in SHU. (Shear Aff. ¶ 12). At the same time, defendant Shear states that he signed a "Restraint Order" which meant that plaintiff would have a "two officer escort" anytime that he was out of his cell. (Shear Aff. ¶ 13). Defendant Shear states that "[n]o physical restraints, e.g. handcuffs, shackles, etc., were made part of this Order, or placed on the plaintiff."(*Id.*). When plaintiff was released from the medical unit on January 18, 2007 he, was placed in Ad Seg in D–Pod, the SHU of BCCF to finish out his classification period.[9] (*Id.*) Defendant Shear states that he had no control over plaintiff's ultimate classification. (Shear Aff. ¶ 16).

**\*3** Plaintiff's classification was completed on Friday, January 19, 2007. He was determined to be a "maximum" security inmate, and his assignment to D–Pod was continued. (*Id.* ¶ 18). CO Sherman states that he conducted the classification pursuant to the facility's "Classification of Inmates" and the "Special Security Classification" policy. (Sherman Aff. ¶ 9). The "Special Security Classification" policy allows the facility to assign inmates to SHU if they have exhibited violent behavior during periods of incarceration. (Sherman Aff. ¶ 10). CO Sherman states that in making his classification determination, he considered the transfer papers sent by HCCF. In addition, he noted that plaintiff's current charges included Rape in the first and second degree, both violent felonies; he had exhibited assaultive behavior at HCCF; had an extensive psychiatric history; had a history of substance abuse; and had threatened the President of the United States. (Sherman Aff. ¶ 10). CO Sherman used a "Classification Point Scale" and determined that plaintiff was a "maximum" security inmate, not eligible for general population. (*Id.* ¶ 11). CO Sherman states that this classification was not made for punitive reasons, but for the safety and the security of the facility, its staff, and other inmates. (*Id.*) Plaintiff was notified of his classification on Monday, January 22, 2007. (Smolinsky Aff. ¶ 19).

Plaintiff was transferred out of BCCF on February 13, 2007. (Def .s' Ex. H). Defendants do not dispute that plaintiff was confined in "segregated housing" for his entire stay at BCCF.

## II. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990)."Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment."*Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); Fed.R.Civ.P. 56(c)(1)(A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

## III. *Exhaustion of Administrative Remedies*

### A. Legal Standards

**\*4** The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

In order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

Generally, exhaustion of administrative remedies involves utilizing the facility's grievance process, however, when an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing or confinement, he exhausts his administrative remedies by presenting his objections in the administrative appeals process. *Sweet v. Wende Correctional Facility,* 514 F.Supp.2d 411, 413 (W.D.N.Y.2007) (citing *Rosales v. Bennett,* 297 F.Supp.2d 637, 639 (W.D.N.Y.2004) (discussing the difference between the grievance process and the administrative appeals process for disciplinary or administrative segregation appeals).

The Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004)). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

### B. Application

Plaintiff in this case did not challenge his classification or the administrative segregation decision. In his response to the summary judgment motion, plaintiff argues that he asked a corrections officer about challenging the decision. (Pl.'s Br. at 14). The corrections officer told plaintiff that BCCF did not have a grievance committee, "you write a sergeant if that doesn't work you write a lieutenant."(*Id.*) Plaintiff claims that he wrote to both a sergeant and a lieutenant, who told plaintiff that he "is on administrative segregation and there is nothing anyone can do about it."(*Id.*) In support of his argument, plaintiff cites Jail Administrator Smolinsky's affidavit, which confirms that an administrative segregation decision is not "grievable." (*Id.* & Smolinsky Aff. ¶ 21).

**\*5** Plaintiff may be attempting to claim that the officers prevented him from challenging the decision by "misleading" him about the proper procedural vehicle for the challenge. The corrections officer who told plaintiff that the decision was not grievable was not misleading. While defendants agree that an administrative segregation decision is not subject to the "grievance" process, the defendants assert that the Ad Seg decision is subject to challenge by appealing to the Facility Administrator. (Def.s' Ex. P). Defendants' Exhibit P is a page from the Inmate Handbook, specifically referencing "Administrative Segregation/Protective Custody." The handbook states that "[y]ou have the option to appeal administrative segregation decisions to the Facility Administrator."(*Id.*)

Plaintiff in this case concedes that he did not appeal to the Facility Administrator when he states that he wrote to a sergeant and a lieutenant. There is no indication, and he does not allege, that he was not given an inmate handbook. The "corrections officer" was correct in telling plaintiff that an administrative segregation determination was not grievable because the proper method of appeal is through the Jail Administrator.

The court understands that plaintiff's incarceration at BCCF was quite short, and one of the exceptions noted above involves whether the administrative remedies were actually "available" to the plaintiff. The administrative segregation decision was ultimately made on January 19, 2007, and plaintiff was transferred to another facility on February 13, 2007. It is unclear how long it would have taken to appeal the decision. There may have been very little time to appeal the decision. It has been held that transfer to other custody does not eliminate the plaintiff's duty to exhaust his administrative remedies, "at least where an inmate has

sufficient time to pursue administrative remedies in the facility where the incident complained of took place."*Flowers v. City of New York,* 668 F.Supp.2d 574, 578 (S.D.N.Y.2009). If there were insufficient time to appeal, an exception to the exhaustion requirement might be available to plaintiff. While, the court could recommend dismissal for failure to exhaust, because the case may also be dismissed on the merits, and there could be an argument that plaintiff did not have sufficient time to appeal the decision, I will not recommend dismissing the action based solely upon plaintiff's failure to exhaust administrative remedies.

## IV. *Due Process*

### A. Legal Standards

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."*Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

**\*6** The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed.*Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*"*Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

"SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.,* 30 days-and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).*See also Arce v. Walker,* 139 F.3d 329, 334–35 (2d Cir.1998) (the *Sandin* analysis is properly applied to determine whether non-punitive, administrative segregation implicates a state-created liberty interest).

**B. Application**

Plaintiff was in Ad Seg at BCCF from January 12, 2007 until February 13, 2007, a total of 32 days. The first eleven days, [10] however, were spent in Ad Seg due to the admissions/classification procedure at the facility. New York regulations governing county jails provide that the chief administrative officer of each facility shall "establish, implement and maintain a formal and objective system for the consistent classification of all inmates."N.Y. COMP. CODES R. & REGS. tit. 9, § 7013.1 (N.Y.CRR)). The regulations are quite detailed and provide specific requirements for such policies and procedures. *Id.*9 NYCRR § § 7013.1–7013.9.

In accordance with these regulations, BCCF policy provides that, upon transfer into the facility, all inmates must go through initial screening and classification procedures. (Def.'s Ex. N; Broome County Sheriff's Correction Division Policy Statement). The policy statement provides that "[u]pon completion of the initial screening and risk assessment the inmate will be placed in Ad Seg for classification."(*Id.* ¶ 3). Classification may last up to five business days. [11] (*Id.*) If records are not available, the Jail Administrator may extend the classification time to ten business days.

**\*7** The policy statement also provides detailed factors that the classification officer must consider when determining how to classify an inmate for housing purposes. (*Id.* ¶ 6(a)–6(j)). Those factors include criminal history; propensity for victimization or violence; history of medical or mental illness; history of hostile relationships with other inmates; and any other information that "may affect the safety and welfare of the inmate or facility staff."(*Id.*) After the primary

classification interview is completed, the interviewing officer recommends appropriate housing for the inmate. (*Id.* ¶ 10). This paragraph also provides a procedure for challenges to primary housing assignments, and any changes in primary housing relating to custody level will be discussed with the inmate by the classification officer and tour supervisor. (*Id.* ¶ 10(b), 10(c)). The classification officer competes a "Classification Sheet," containing a numerical value assigned to the various factors considered. (Def.s' Ex. O).

"The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safely,* 482 U.S. 78, 84 (1987)). The overarching consideration is that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely,* 482 U.S. at 89. In *Turner,* the Supreme Court held that the court should determine whether the government objective is legitimate and neutral, and then whether there is a valid, rational connection between the prison regulation or the official action and the legitimate governmental interest that justifies that action. *Id.* Finally, the court determines whether there are alternative means for the inmate to exercise that constitutional right. *Id.* at 90.

In this case, the regulations cited above, together with the policy of allowing temporary segregation of inmates upon transfer into a facility are unquestionably related to the safety and security of the facility. Until an inmate is screened for prior violence; propensity for victimization; possible enemies; behavior; and adjustment, the facility administrators have no way of knowing where the best place to house the inmate will be. Thus, a short classification period in administrative segregation in order to complete this objective is a completely reasonable restriction on an inmate's liberty. The regulations provide for notice to the inmate and for a challenge to the classification. Thus, the regulations are valid under *Turner,* and no due process right is violated. [12]

As shown by the plaintiff's housing history report, he spent part of his classification time in the mental health area of the medical unit. (Def.'s Ex. H). Although he complains that the administrative segregation damaged his mental health and that defendants were deliberately indifferent to his mental condition, it appears that the defendants were very concerned

about his mental condition, and according to his housing record, placed him in the medical unit three times prior to his final classification. [13] Defendants could not ignore the transfer papers indicating that plaintiff was a safety risk. [14] They could not ignore plaintiff's unusual behavior and statements to the screening officer, and the progress notes written during his stay in the medical unit show that the concern for his mental health was justified. [15] (Def.s' Ex. L).

**\*8** In addition, plaintiff's relatively brief Ad Seg placement did not implicate a liberty interest under *Sandin.*Plaintiff's classification was completed on Friday January 19, 2007, and he was notified of his classification on Monday January 22, 2007, one business day after the determination was made. [16] He was entitled to a review of this classification, but did not take the opportunity to challenge it. Plaintiff spent the last 21 days of his stay at BCCF in Ad Seg. Based on *Sandin,* a period of 30 days segregation does not create a liberty interest, particularly when plaintiff has not made any assertion that the conditions of confinement (other than the separation from other inmates) was in any way atypical or significant. Even if the court were to count the entire time that plaintiff was in administrative segregation (32 days), he still would not have had a liberty interest that is protected by due process. [17]

Finally, even if plaintiff had a liberty interest, he received all the process he was due. It is clear that his confinement was administrative, not disciplinary. Plaintiff confuses the two types of confinement. He continues to argue that he was entitled to notice of "charges." There were no "charges" of which to receive notice. Instead, he got notice of the *classification determination* and an opportunity to challenge the determination as required by the regulations involving classification and housing assignments. The fact that he did not challenge the determination does not change the result. Thus, for all of the above procedural and substantive reasons, plaintiff's due process claim may be dismissed.

## V. *Conditions of Confinement*

Plaintiff hints that certain of his conditions of confinement were unconstitutional. Plaintiff states that defendants were deliberately indifferent to his mental health by keeping him in "isolation." Plaintiff also states that defendants issued a "restraint order," and he was placed in restraints whenever he left the cell.

## A. Medical Care

## 1. Legal Standards

The defendants never actually mention the date of plaintiff's conviction. The reason the court mentions this is simply to clarify the standard under which conditions of confinement are analyzed. Allegations of mistreatment of pretrial detainees in state custody are brought under the Due Process Clause of the Fourteenth Amendment. *See Caiozzo v. Korman,* 581 F.3d 63, 69 (2d Cir.2009). It has been held that because a pretrial detainee has not been "convicted," the proper inquiry is whether the conditions of confinement amount to punishment under the Due Process Clause, not whether the "punishment" is cruel and unusual under the Eighth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979) (contrasting sentenced prisoners with pretrial detainees). Sentenced prisoners are protected by the Eighth Amendment prohibition against cruel and unusual punishment. However, the same standard applies to claims of deliberate indifference to a serious threat to the health or safety of a person in custody, regardless of whether they are brought under the Eighth Amendment, relating to convicted prisoners, or under the Fourteenth Amendment for pretrial detainees. [18] *See Caiozzo v. Korman,* 581 F.3d at 72. Thus, the date of plaintiff's conviction is not relevant to any discussion because the standard would be the same whether plaintiff were still a pretrial detainee or whether he had been convicted of the charges.

**\*9** In order to state a claim based on constitutionally inadequate medical treatment, plaintiffs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."*Estelle v. Gamble,* 429 U.S. at 106. There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

## 2. Application

Plaintiff in this case claims that the isolation made him depressed and harmed his mental health. However, plaintiff spent several days in the mental health unit, and was examined by Dr. Rahmon, according to the progress notes submitted by both plaintiff and defendants. (Def.s' Ex. L). Plaintiff was monitored and his medications were regulated. There is absolutely no indication that the defendants, none of whom are medical personnel, were deliberately indifferent

to plaintiff's medical needs, because it is clear that, when a concern arose regarding plaintiff's mental health, he was transferred to the medical unit for observation. Plaintiff's conclusory allegation that the "isolation" made his mental status worse is baseless.

## B. Restraints

### 1. Legal Standards

In order to show that conditions of confinement violate the Eighth Amendment, the plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Whitley v. Albers,* 475 U.S. 312, 319–20 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)). The placement of restraints such as handcuffs on an inmate does not, by itself, amount to excessive force or cruel and unusual punishment. *See Bridgeforth v. County of Rensselaer,* No. 1:08–CV–779, 2012 WL 2873361, at *6 (N.D.N.Y. July 12, 2012) (absent some allegation beyond forceful cuffing, the claim against defendant was insufficient as a matter of law).

In this case, defendant Shear states that he did sign a "Restraint Order," but the order only called for plaintiff to have a two-officer escort or "double team" anytime that he left his cell. (Shear Aff. ¶ 13). Defendant Shear further states that "[n]o physical restraints" such as handcuffs or shackles were made a part of the order, "or placed on plaintiff." (*Id.*) Plaintiff himself submits the Order in question, and it supports defendant Shear's affirmation. (Pl.'s Ex. C; Dkt. No. 50–1 at 6). The order is signed by defendant Shear. Although the typewritten portion of the order states that, due to plaintiff's involvement in the January 17t' incident, he would be placed in "full restraints" when he left the housing unit for a period of seven days, above the typewritten material, is a handwritten note by defendant Shear that reads: "Double Team only." (*Id.*)

The order was reviewed and continued on two occasions: "1/26/07 ... 2/2/07."(*Id.*)

**\*10** Plaintiff's own exhibits support defendant Shear's statement that no physical restraints were placed on plaintiff. (Pl.'s Ex. C, G). The "restraint" only involved assigning two officers to plaintiff when he left the housing unit. This order does not come anywhere near the level of a constitutional violation, particularly given plaintiff's behavior during the time in question. Thus, to the extent that plaintiff's amended complaint can be read as alleging an Eighth Amendment or Substantive Due Process claim regarding his conditions of confinement, it may be dismissed. [19]

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED,** and plaintiff's amended complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS,** and it is further

**ORDERED,** that plaintiff's request to amend the amended complaint to remove defendant Gillette and add defendant Cermak (Dkt. No. 50) is **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.***Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 4093792

---

Footnotes

1   The amended complaint refers only to "due process," however, the plaintiff's response to defendants' summary judgment motion mentions "equal protection." The court will consider both claims in this recommendation.

2   The court must note that plaintiff has filed eight cases in the Northern District of New York, only three of which are currently pending. *Harvey v. Farber, et al.,* 9:09–CV–152 (MAD/TWD); *Harvey v. Corrections Officers 1 through 6, et al.,* 9:09–CV–154 (LEK/TWD); and this case, *Harvey v. Harder,* 9:09–CV–154 (TJM/ATB). The cases that are closed are the following: *Harvey v. Grow, et al.,* 9:09–CV–518 (GTS/RFT); *Harvey v. Sawyer, et al.,* 9:09–CV–598 (FJS/DRH); *Harvey v. Luther, et al.,* 9:09–CV–599 (DNH/GJD); *Harvey v. City of Utica Police Officers, et al.,* 9:09–CV–644 (TJM/

GHL); and *Harvey v. Law,* 9:10–CV–1468 (LEK/DEP). The court understands that at the time plaintiff filed his original complaint in this action, many of the above cases had not yet been filed; however, by the time plaintiff filed his amended complaint in March of 2011, *all* of the other cases had been filed, but plaintiff continued to list only one case on the amended complaint form. (Am.Compl.¶ 5).

3    Defendant Lillie has not been served in this case. After the first attempt at service was unsuccessful for various defendants, the court reissued summonses on March 31, 2011. (Dkt. No. 34). Service on four of the five new defendants was successful, and they all join in the motion for summary judgment. Another summons for defendant Lillie was reissued on October 14, 2011, but the summons was returned "unexecuted" on October 26, 2011. (Dkt.Nos.40, 42). The "Process Receipt" states that defendant Lillie is no longer employed at BCCF. Defendant Lillie has not been served in this action, and defense counsel requests dismissal of the case against defendant Lillie for lack of service under [Fed.R.Civ.P. 4(m)](link). (Dkt. No. 47–28; Def. s' Br. at 11) (page assigned by defense counsel to his brief, not the CM/ECF page). Because this court is recommending dismissal with prejudice, both procedurally and on the merits of this action, the court need not address lack of service, which would normally result in a dismissal without prejudice.

4    Based on this admission by Sergeant Cermak, plaintiff has requested in his response to the motion for summary judgment, that the court allow plaintiff to amend his amended complaint to remove defendant Gillette as a defendant and replace him with Sergeant Cermak. Generally, the court would allow such an amendment. However, because the court is recommending dismissal on the merits of this case, it would be futile to add Sergeant Cermak at this time. The court would still recommend dismissal notwithstanding the addition of Sergeant Cermak. The court will consider his affidavit.

5    Many of the affidavits contain similar paragraphs regarding the background of this case. The court will cite to the affidavit of Mark Smolinsky, Jail Administrator, for ease of citation, even though the same information is contained in other affidavits. Mr. Smolinsky is *not* a defendant in this case, and his affidavit contains additional information that is relevant to the motion. I will cite to other affidavits as noted for additional information that is not contained in Administrator Smolinsky's statement.

6    Defendants have also filed the June 6, 2006 letter of Timothy M. Kirk, Resident Agent in Charge of the Syracuse office of the United States Secret Service. (Def.s' Ex. B). The letter requests that the Secret Service be notified in the event the plaintiff was released from custody for any reason, due to plaintiff's long history of threat-related activity.(*Id.*) The reason for this request was so that, if plaintiff were released, the Secret Service could assess whether he posed a danger to "any of our protectees." (*Id.*)

7    Plaintiff was incarcerated in HCCF, pending his prosecution for First Degree Rape; Third Degree Assault; Second Degree Unlawful Imprisonment; and Criminal Mischief. (*See* Def. s' Ex. E; Herkimer County Court commitment, dated October 30, 2006—indicating no bail pending trial). Plaintiff was clearly incarcerated in HFFC prior to October 30th because his classification notice is dated October 8, 2006. (Def. s' Ex. D).

8    An Ad Seg Order was drafted on January 12, 2007 by defendant Thompson. (Def. s' Ex. J). There were three reasons marked with an "X" for why plaintiff was being placed in Ad Seg. The first reason was due to "facility admission procedures." The second and third reasons were that the staff perceived a serious threat to the inmate's safety (although no request for protection had been made) and the inmate was exhibiting unusual behavior and could threaten to, or cause injury to himself or others.(*Id.* & Buholski Aff. ¶ 8). Defendant Buholski reviewed the order and placed plaintiff in Ad Seg within the medical unit. (Buholski Aff. ¶ 10). The order was approved by defendant Lillie. (*Id.* & Def.s' Ex. J).

9    Defendant Shear states that inmates may be placed in D–Pod without a hearing for reasons other than disciplinary. (Shear Aff. ¶ 15).

10    January 12, 2007 until January 22, 2007 (counting the first day that he was brought to BCCF as "one" and the day he was notified of his classification).

11    Although it appears that the defendants complied with state regulations, providing for particular time limits, the violation of a state law or regulation alone would not necessarily rise to the level of a constitutional violation. *Dixon v. Goord,* 224 F.Supp.2d 739, 744–45 (S.D.N.Y.2002).See *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990)).

12    The court would also point out that the regulations do not violate equal protection because all inmates are subject to the same regulations governing classification. Plaintiff does not mention equal protection in his amended complaint, however, in his response the motion for summary judgment, he mentions equal protection for the first time. Even assuming that plaintiff could raise a new claim in his response, this claim has no merit. In order to state a claim for an equal protection violation, plaintiff would have to allege that other similarly situated inmates were treated differently that he was. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (the Equal Protection Clause provides that the government shall treat all similarly-situated people alike). Plaintiff in this case has not alleged that any other inmates, similarly situated to plaintiff, were treated differently regarding classification.

13    Plaintiff's own exhibits show that on January 19, 2007, plaintiff was brought back to the medical unit for a physical problem, unrelated to his mental status. (Pl.'s Ex. F). The exhibit also shows that the progress note for January 18, 2007 states that the inmate was "seen and cleared by forensics today. [L]eft unit for general population." *Id.* Plaintiff argues that Dr. Rahmon "increased his medication and cleared him for general population on January 14th. (Pl.'s Br. at 7). Plaintiff cites his Exhibit B as support for this, however, Exhibit B only states that Dr. Rahmon increased plaintiff's medication. Exhibit D is the exhibit to which plaintiff may be referring, however, the note only states that plaintiff left the unit for general population on January 18th, not that plaintiff was "cleared" for general population. In any event, plaintiff was still in his classification period on January 14th and could not have gone back to general population because his classification was not completed until January 19.th

14    As part of plaintiff's "equal protection" claim, he argues that the defendants cannot "prove" that they ordered other inmates into Ad Seg, based upon letters from another county. The burden is on plaintiff to show that he was treated differently than other "similarly situated" inmates. He makes absolutely no claim that other inmates who had such a history of violence and threats were treated differently and makes no claim that other inmates were not placed in Ad Seg as part of the admission/classification procedures.

15    On January 14, 2007, the progress notes indicate that Dr. Rahmon was "in to see inmate." (Def.s' Ex. H). The note states that plaintiff's speech was "rushed," his thoughts were racing, he stated that he was a producer from Los Angeles, who spoke to a Fox news reporter about "the CIA issues," and "spoke to himself "most of the day." (*Id.*) On January 17, 2007, plaintiff was involved in an incident whereby plaintiff allegedly threatened the President of the United States, resulting in his second transfer to the mental health unit. Based upon plaintiff's history and behavior, he cannot seriously argue that defendants had no reason to be concerned about the security of the facility.

16    The New York Regulations provide for notice of the classification determination in "one business day" after the determination is made. 9 NYCRR § 7013.8(f).

17    *See, e.g., Brown v. Graham,* 9:07–CV–1353 (FJS/ATB), 2010 WL 6428251, at *9 (N.D.N.Y. Mar. 30, 2010) ("The federal district courts in New York, applying *Sandin,* have been consistent in holding that terms of SITU or "keeplock" of approximately 30 days or less do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.") (Report–Recommendation), adopted, 2011 WL 1213482 (N.D.N.Y. Mar. 31, 2011); *Rivera v. Goord,* 9:05–CV–1379, 2008 WL 5378372 at *2–*3 (N.D.N.Y. Dec. 22, 2008) (granting summary judgment on the issue that 40 days in room confinement did not constitute a cognizable liberty deprivation under *Sandin* ); *Smith v. Taylor,* 149 F. App'x 12, 2005 WL 2019547 at *1 (2d Cir.2005) (affirming grant of summary judgment dismissing plaintiff's claims of defects in an administrative hearing that resulted in his disciplinary confinement for 45 days in the SITU; plaintiff did not offer evidence that his confinement was more onerous that those generally present in the SITU and thus did not have a protected liberty interest in avoiding the 45–day confinement).

18    Because the due process rights of pretrial detainees are "at least as great as the Eighth Amendment protections available to a convicted prisoner," and the same standard applies, cases cited that refer to the Eighth Amendment are thus applicable to the conditions of confinement claims of a pretrial detainee. *Revere v.. Mass Gen. Hosp.,* 463 U.S. 239, 244 (1983).

19    Defendant Harder also argues that he had no contact with plaintiff and bore no personal responsibility for his housing assignment or any other problem that plaintiff might have had at BCCF. (Harder Aff. ¶ 2). Because the court is recommending dismissal on the merits and on procedural grounds, defendant Harder's involvement is not critical to the court's recommendation. The court would just note that personal involvement is required for the assessment of damages in a section 1983 action. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). The same is true for defendant Jon Gillette who was mistakenly named by plaintiff instead of Edward J. Cermak.

---

**End of Document**        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by **Arnett v. Shojaie**, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/
GHL).   |   March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants'

witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."*Porter v. Nussle*, 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures."*Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency much more because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration."*Woodford, 548 U .S. at 89.*"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."*Porter, 534 U.S. at 532.*

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the

alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to

the next level, including CORC, to complete the grievance process. [4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative. [6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill*

*v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), accord, *Ruggiero,* 467 F.3d at 175.First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."*Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."*Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."*Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). [7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, [8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. [9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [10] (b) the inmate was specifically informed that the claim in question was grievable, [11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, [12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, [13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC. [14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not

subsequently investigate that claim, [15] and/or (b) the inmate did not appeal his disciplinary hearing conviction. [16]

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, \*4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court. [18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury. [19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law. [20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation."*Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,*--- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh

Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003),* and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88.For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies."*Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available."*Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ."(Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin

Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70;*see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

### C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him."*Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped

from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was

being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is *DISMISSED* **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

Footnotes

1    *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3    *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y.

Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5   *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6   *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7   The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8   *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380

*F.3d at 696-98* (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007)* (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007)* (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006],overruled*Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10    *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,*238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,*552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11    *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12    *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13    *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14    *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,*No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15    *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16    *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that

process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

17    *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

18    *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.'Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19    *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20    *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003)"[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21    *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying

the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007)* (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is a question of law for the Court to determine.").

22   *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,*540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,*--- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23   The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24   In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.; see also* Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject).(*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25   For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.)Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.)In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26   *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v.*

*Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274845, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27    *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28    The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480. | April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of New York, Kelly L. Munkwitz, Esq., Asst. Attorney General, of Counsel, Department of Law, Albany, NY, for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

 *1 Plaintiff, Jeff Smith, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated March 17, 2006, the Honorable George H. Lowe, United States Magistrate Judge, recommended that defendants' motion for summary judgment be granted, and that plaintiff's motion for partial summary judgment be denied. (Docket No. 51). The plaintiff has filed objections to the Report-Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of the report and recommendations to which the plaintiff has objected, the Report-Recommendation is accepted and adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly, it is ORDERED that
1. Defendants' motion for summary judgment is GRANTED;

Plaintiff's motion for partial summary judgment is DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Rules of Practice for this Court. In this *pro se* civil rights action brought under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges that five employees of Upstate Correctional Facility-Deputy Superintendent Robert K. Woods, Captain Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service Administrator Richard Antonelli, and Correction Officer Wayne Holt ("Defendants")-violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments by (1) retaliating against him for having previously filed a complaint, (2) subjecting him to an unreasonable search and seizure, (3) subjecting him to a damaged bunk bed while he was housed in the Upstate Correctional Facility Special Housing Unit, and (4) taking away his "good time" credits without affording him due process. (Dkt. No. 5 [Plf.'s Am. Compl.].) [1]

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6)

whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)(*per curiam*) (*pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those

facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs"*and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds."*Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,*603 F.2d 214 (2d Cir.1979).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally,

because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a] [2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

## Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

 **\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

## Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. [22]

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. [23] In pertinent part, the letter stated,

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't

already told both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court*... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. [24]

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. [25]

 **\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. [26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." [27] In addition, the last page of the letter states:

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. [28]

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. [29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

### Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. [30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." [31]

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. [32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." [33]

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [34]

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself. [36]

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods. [45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F. [46]

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002. [47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family member without the consent or approval of the Superintendent or his designee. [51]

*8 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses

at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

### Meetings Between Defendants
### Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

### Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of

the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

 **\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second,

prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

 **\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent

Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

## B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise)

over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. [76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. [77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube")."[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

## C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment

claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...."*Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence."*Id.* at 835."Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Id.* at 837.

## 1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis" [85] in September of 2002 as a result of sleeping on a defective bed. [86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need. [87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint, [88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need. [89]

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

**\*13** More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

not mandate "comfortable" bunk beds. [95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

**2. Deliberate Indifference**

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

*14 In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

**D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim**

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."*Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants'

own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."*Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."*Id.* (citations and internal quotations omitted).

**1. Availability of Administrative Remedies**

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances."(Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]."*Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,*"the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]."*See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff

that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

## 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

## 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement

that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

## E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

**F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy**

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

 **\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.)The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered *no evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

**G. Whether Defendants Are Protected by Qualified Immunity**

 **\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's

clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized. *Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

## H. Plaintiff's Motion for Partial Summary Judgment

Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does

contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) (*"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.***Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

Footnotes

1    Given my duty to liberally construe a *pro se* plaintiff's civil rights complaint, I construe Plaintiff's Amended Complaint as including a claim that various Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [the plaintiff] has raised. In so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings.") [citations omitted].*(See also*Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment[ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

2    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

3    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

4    *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

5    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Rule 7.1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

6    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,*536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated

as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7   Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], cert. denied sub nom, Ferrante v. U.S., 516 U.S. 806 (1995).

8   See Patterson, 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'...[Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); Sellers v. M .C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge or upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); Applegate v. Top Assoc., Inc., 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); Spence v. Maryland Cas. Co., 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), aff'd,995 F.2d 1147 (2d Cir.1993).

9   SeeFed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); Patterson, 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; Applegate, 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10   See, e.g., Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; West-Fair Elec. Contractors v. Aetna Cas. & Sur., 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), cert. denied,474 U.S. 829 (1985); Applegate, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11   See, e.g., Jeffreys v. City of New York, 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); Allah v. Greiner, 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); Olle v. Columbia Univ., 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

12   (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13   (See, e.g.,Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff **"stuck with them** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting

that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same down as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"];* Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint"* in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself" [emphasis added].)

14   (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

15   (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

16   (Dkt. No. 5, ¶ 12 [Am. Compl.].)

17   (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

18   (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ ¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

19   (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

20   (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

21   (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

22   (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

23   (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

24   (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

25   (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

26   (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

27   (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

28   (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

29   (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

30   (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

31   (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

32   (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

33   (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

**34** (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

**35** (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

**36** (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**37** (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

**38** (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

**39** (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

**40** (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

**41** (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

**42** (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

**43** (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

**44** (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

**45** (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

**46** (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

**47** (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

**48** (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

**49** (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

**50** (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14] [v].

**51** (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**52** (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

**53** (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

**54** (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching its decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

**55** (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

**56** (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

**57** (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

**58** (*Id.*)

**59** (*Id.*)

**60** (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

**61** (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

**62** (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3,

¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

64    (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

65    (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

66    (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

67    (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

68    (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

69    *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at *7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

70    (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

71    (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

72    (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73    (Dkt. No. 42, Part 1 ¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74    *(See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

**75** (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

**76** *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights", ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

**77** (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

**78** (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**79** *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

**80** *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at *5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

**81** (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

**82** (Dkt. No. 5, ¶ 12 [Am. Compl.].)

**83** I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

**84** *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

**85** "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

**86** (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

**87** *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at *4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.);

*Rowland,*1993 U.S. Dist. LEXIS 10233, at *13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

88 (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89 (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff were deliberately indifferent to a serious medical need].)

90 (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

91 *(See, supra,* Statement of Fact No. 29.)

92 (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

93 *(Compare*Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02**, after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with*Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02**, and that the date of diagnosis was **9/20/02**]*and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**]*and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02**, or three days after his admission to SHU].)

94 (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.**l request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

95 *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable.

96 (Dkt. No. 5, ¶ 38 [Am. Compl.].)

97 *(See, e.g.,*Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare*Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with*Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

98 (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare*Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with*Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

99 *(Compare*Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with*Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

100 (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

101 *(See, supra,* Statement of Fact No. 24.)

102 (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

103 *(See, e.g.,*Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff

alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

104    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

105    (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

106    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

107    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

108    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

109    *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

110    *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at *7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at *7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

111    *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

112    *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

113    *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

---

**End of Document**                                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4626490
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Timothy A. VAIL, Plaintiff,
v.
Amber LASHWAY, Nurse Practitioner,
Clinton Corr. Facility; Vonda Johnson,
M.D., Facility Health Servs. Dir., Clinton
Corr. Facility; and Dr. Marco Berard, M.D.,
Surgeon Alice Hyde Med. Ctr., Defendants.

No. 9:12–CV–1245 (GTS/
RFT). | Signed Sept. 15, 2014.

**Attorneys and Law Firms**

Timothy A. Vail, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Gregory J. Rodriquez, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**Opinion**

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Timothy A. Vail ("Plaintiff") against the three above-captioned Defendants, are Defendants' motion for summary judgment and United States Magistrate Judge Randolph F. Treece's ReportRecommendation recommending that Defendants' motion be granted and that Plaintiff's Complaint be dismissed. (Dkt.Nos.37, 43, 51.) Plaintiff has not filed an Objection to the Report–Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) For the reasons set forth below, the Report–Recommendation is adopted in its entirety, Defendants' motion is granted, and Plaintiff's Complaint is dismissed.

Generally, in his Report–Recommendation, Magistrate Judge Treece rendered the following conclusions: (1) Plaintiff has failed to establish an Eighth Amendment medicalindifference claim against (a) Defendants Lashway, Johnson, and Berard for failing to administer pain medication, (b) Defendants Lashway and Johnson for failing to address Plaintiff's withdrawal symptoms after his Ultram prescription was discontinued, (c) Defendants Lashway and Johnson for failing to properly and timely treat Plaintiff's dislocated shoulder and knee injury, (d) Defendant Berard for failing to timely treat Plaintiff's shoulder injury, and (e) Defendants Lashway, Johnson and Berard with respect to a "handful" of missed appointments during Plaintiff's treatment period; (2) Plaintiff has failed to establish a First Amendment retaliation claim alleging that Defendants conspired to deny him medical care as a result of Plaintiff's filing grievances concerning his medical treatment; and (3) Plaintiff has failed to establish a supervisory-liability claim against Defendant Johnson with regard to any constitutional violations (allegedly) committed by Defendants Lashway and/or Berard. (Dkt. No. 51, at Parts II.B. to II.D.) Familiarity with the factual findings supporting these conclusions is assumed in this Decision and Order, which is intended primarily for review by the parties.

Where, as here, *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.; see also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After carefully reviewing the relevant filings in this action, the Court can find no clear error in the Report–Recommendation: Magistrate Judge Treece employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein. (Dkt. No. 51.)

**\*2 ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–Recommendation (Dkt. No. 51) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED.***

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Timothy Vail brings this Complaint, pursuant to 42 U.S.C. § 1983, alleging that Defendants failed to provide him with constitutionally adequate medical care and retaliated against him for exercising his First Amendment right to file grievances. *See generally* Dkt. No. 1, Compl. Defendants now move, pursuant to Fed.R.Civ.P. 56, for summary judgment. Dkt. No. 37, Defs.' Summ. J. Mot. Plaintiff opposes the Motion. Dkt. No. 43. For the reasons that follow, we recommend that the Defendants' Motion be **GRANTED**.

## I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [FED. R. CIV. P. 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty

of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Background

**\*3** Except where noted, the following facts are undisputed.

On July 6, 2003, while attempting to escape from Elmira Correctional Facility, Plaintiff fell thirty to forty feet off of an exterior wall, causing him to injure, *inter alia,* his left shoulder. Dkt. No. 37–1, Defs.' Statement of Material Facts Pursuant to Local Rule 7.1(a)(3) (hereinafter "Defs.' 7.1 Statement"), at Ex. 1, Elmira Escape R., dated Mar. 19, 2004; Compl. at ¶¶ 1 & 2.[1] Subsequently, while he was incarcerated at Clinton Correctional Facility ("CCF") where nurse practitioner Defendant Amber Lashway acted as Plaintiff's primary care provider ("PCP") from June of 2005 through May of 2010. Dkt. No. 37–5, Amber Lashway Decl., dated Dec. 19, 2013, at ¶¶ 3 & 6.

On December 15, 2006, in response to Plaintiff's complaints about shoulder pain, Defendant Berard, an orthopedic surgeon at Alice Hyde Medical Center ("AHMC"), ordered an x-ray, MRI, and other diagnostic tests. Dkt. No. 39, Portions of Pl.'s AHMC Med. R., at p. 000026; Dkt. No. 37–7, Marco R. Berard Decl., dated Dec. 23, 2013, at ¶¶ 2 & 5–6. On May 18, 2007, after reviewing the results of Plaintiff's diagnostic tests, Defendant Berard concluded that Plaintiff had a "partial thickness tear of the supraspinatus tendon ."Defendant Berard recommended that Plaintiff receive physical therapy ("PT") for his left shoulder three times a week for two months. Berard Decl. at ¶ 7; AHMC Med. R. at p. 000028.

On May 22, 2007, Defendant Lashway prescribed Motrin for Plaintiff. On May 24, Plaintiff reported that he was unable to take the Motrin because it hurt his stomach, and Defendant Lashway prescribed Celebrex. On July 10, at Plaintiff's request, Defendant Lashway discontinued Plaintiff's Celebrex prescription and prescribed Tylenol. On August 9, Defendant Lashway prescribed Ultram, in crushed form, for treatment of Plaintiff's shoulder pain. Lashway Decl. at ¶¶ 9–12; Dkt. No. 38, Portions of Pl.'s CCF Med. R., at pp. 7–9.[2] On September 14, Defendant Berard recommended that Plaintiff undergo surgery on his left shoulder, and Plaintiff consented. Berard Decl. at ¶ 10; AHMC Med. R. at pp. 000029–30; Compl. at ¶ 13. In his report, Defendant Berard noted that Plaintiff's pain was a "6 to 7 out of 10" and that he was suffering from "daily pain." AHMC Med. R. at p. 000029. "Thereafter, Plaintiff ... participated in a number of ongoing sessions of physical therapy ... until ... October 31, 2008."Compl. at ¶ 15.

On September 20, 2007, Plaintiff was accused of hoarding a dose of Ultram. Nonetheless, on November 5, Defendant Lashway renewed Plaintiff's Ultram prescription. Lashway Decl. at ¶¶ 14–15; CCF Med. R. at pp. 5–6. On December 20, Defendant Berard performed surgery on Plaintiff's left shoulder; in his discharge directions, Dr. Berard recommended that Plaintiff receive Tylenol # 3[3] every four hours as needed for pain. Berard Decl. at ¶ 12; AHMC Med. R. at pp. 000031–35. On January 30, 2008, Defendant Lashway renewed Plaintiff's Ultram prescription. Lashway Decl. at ¶ 19; CCF Med. R. at p. 3.

**\*4** On August 14, 2008, Plaintiff complained to a nurse about right knee pain; it was noted that he was already taking Ultram. On August 22, Plaintiff's prescription for acetaminophen (the generic for Tylenol) was renewed to be taken every six hours as needed. On September 23, Plaintiff's

prescription for Ultram was renewed. Lashway Decl. at ¶¶ 20–22; CCF Med. R. at pp. 92–94.

On October 2, 2008, Defendant Lashway requested a consultation with an orthopedic surgeon in response to Plaintiff's complaints of pain in his left shoulder. Lashway Decl. at ¶ 23; CCF Med. R. at p. 91. On January 30, 2009, Defendant Berard recommended surgery after examining Plaintiff's left shoulder and Plaintiff consented. Berard Decl. at ¶ 13; AHMC Med. R. at pp. 000035–38. Defendant Berard performed the surgery on March 10, 2009; in his discharge instructions Defendant Berard recommended that Plaintiff be given Tylenol # 3 every four hours as needed for pain. Berard Decl. at ¶ 14; AHMC Med. R. at pp. 000039–41. On March 11, Defendant Doctor Johnson, the Facility Health Services Director at CCF, examined Plaintiff and prescribed Ultram during the two weeks following the surgery. Dkt. No. 37–6, Vonda Johnson Decl., dated Dec. 18, 2013, at ¶¶ 2 & 8; CCF Med. R. at p. 89.

On March 3, 2009, an MRI of Plaintiff's right knee revealed a medial meniscus tear. Lashway Decl. at ¶ 24; CCF Med. R. at p. 90.

On April 10, 2009, Plaintiff was seen by Defendant Berard's colleague Dr. Macelaru,[4] who initially recommended that Plaintiff undergo a third surgery; however, Plaintiff was weary of more surgery and elected PT instead. Compl. at ¶ 17. Dr. Macelaru recommended that Plaintiff "start/continue physical therapy for shoulder instability and to follow up in two months for possible additional therapy if there was no improvement."Berard Decl. at ¶ 15; CCF Med. R. at p. 62. On April 7, Defendant Lashway renewed Plaintiff's Ultram prescription for thirty days. Lashway Decl. at ¶ 28; CCF Med. R. at p. 88. On April 14, Defendant Lashway submitted a request for PT for Plaintiff's left shoulder due to instability and pain. Lashway Decl. at ¶ 29; CCF Med. R. at pp. 62 & 64. On April 30, Plaintiff saw the physical therapist who recommended PT twice a week for six weeks. Lashway Decl. at ¶ 31; CCF Med. R. at p. 62; Compl. at ¶ 19.

On May 5, 2009, Plaintiff was caught hoarding a dose of Ultram. Compl. at ¶¶ 20–22; Lashway Decl. at ¶ 32; CCF Med. R. at p. 87. On May 7, Defendant Lashway ordered that Plaintiff's Ultram prescription be discontinued. Lashway Decl. at ¶ 32; CCF Med. R. at p. 87. Plaintiff received his last dose of Ultram on the evening of May 7. Compl. at ¶ 26. On the morning of May 8, 2009, Nurse Badger[5] came to Plaintiff's cell in the morning and explained that

his Ultram Prescription had been discontinued. Plaintiff told Nurse Badger that if he did not receive a dose of Ultram he would begin to go through withdrawal; Nurse Badger agreed to speak with Defendant Johnson regarding the situation. Compl. at ¶¶ 27–28.

**\*5** Plaintiff also submitted a sick call request on May 8, 2009, claiming that he was still in pain due to his shoulder, but making no mention of withdrawal symptoms. *Id.* at ¶ 28; Dkt. No. 1–1, Pl.'s Exs. to Compl. (hereinafter "Pl.'s Exs."), at p. 13. [6] Additionally, Plaintiff wrote a letter to Nurse Practitioner Lashway, in which he noted that his Ultram had been taken away and requested that it be reinstated; the letter did not mention withdrawal. Compl. at ¶ 29; Pl.'s Exs. at pp 14–1'. On the morning of May 9, Nurse Badger told Plaintiff that she had spoken to Defendant Johnson about "his situation," but that she would not be reinstating his Ultram and any concerns about medication should be made to Plaintiffs PCP; withdrawal was not mentioned. Compl. at ¶ 31.

On May 9, 2009, Plaintiff submitted another sick call request, which stated "Need to see FNP Ms. Lashway—Provider—To address Shoulder and Knee Issues."Compl. at ¶ 31; Pl.'s Exs. at p. 17. Plaintiff submitted an additional request on May 11, 2009, which stated: "Need to see FNP Ms. Lashway—Provider—cannot move due to pain in [sic] pressure on area with tear."Compl. at ¶ 32; Pl.'s Exs. at p. 18. Neither request mentioned withdrawal symptoms. Plaintiff alleges that Defendant Lashway wrote to Plaintiff on May 12 that his Ultram had been discontinued due to the fact that the drug was not medically necessary two months post-surgery, and because he had been caught hoarding the medication. Compl. at ¶ 33; Pl.'s Exs. at p. 19. Contrariwise, Defendant claims that she actually met with Plaintiff on May 12. Lashway Decl. at ¶ 34. [7] Defendant Lashway noted in Plaintiff's medical record that Plaintiff was two months post-surgery, had no future need for Ultram and had been caught hoarding the drug on May 5. She prescribed Motrin as needed for seven days. Lashway Decl. at ¶ 34; CCF Med. R. at p. 85.

On May 13, 2009, Plaintiff wrote a letter to Nurse Administrator B. Lecuyer [8] expressing his desire to reinstate his Ultram prescription. The letter mentions that Plaintiff was experiencing pain and discomfort, trouble sleeping, and that he was not weaned off of Ultram. Plaintiff also explained that his knee problem had not been addressed by anyone, and taking ibuprofen caused him to experience side effects, including "rapid heart beat, dizziness, [and] burning in [his]

stomach, to name a few."Compl. at ¶ 37; Pl.'s Exs. at pp. 21–22. On May 14, Plaintiff filed a grievance, which noted that his Ultram prescription had been discontinued but does not mention that he was suffering from symptoms of withdrawal. Compl. at ¶ 38; Pl.'s Exs. at pp. 23–24.

On May 15, 2009, Plaintiff received a response from Nurse Administrator B. Lecuyer noting that his medical records revealed his Ultram prescription was discontinued due to the fact that he was caught "cheeking" his pill. Compl. at ¶ 39; Pl.'s Exs. at p. 25. Plaintiff also received a note from Defendant Lashway on May 15, noting that she had advised him on May 12 that his Ultram prescription had been discontinued, and that the Motrin she prescribed would be effective for his knee pain. Compl. at ¶ 39; Pl.'s Exs. at p. 26.

**\*6** On May 16, 2009, Plaintiff wrote a letter to a friend, Shireen Dunlop, asking her to intervene on his behalf by writing letters to "the head dept." and Dr. Lester Wright, [9] "the director of health services, central office."Compl. at ¶ 43; Pl.'s Exs. at pp. 28–29. Although Plaintiff relayed to Dunlop that he was in constant pain and experiencing side effects from the new medication, he failed to mention withdrawal at all. *Id.* On May 20, Mrs. Dunlop, wrote to Superintendent of CCF, Dale Artus, [10] and Dr. Wright, noting that Plaintiff should not have been taken off of his medication "abruptly ... due to the withdrawals." Compl. at ¶ 47; Pl.'s Exs. at p. 34; Pl.'s Exs. at pp. 85–89, Shireen M. Dunlop Aff., dated April 19, 2012, at ¶ 10. There is no evidence to suggest that this letter was ever seen by Defendants.

On May 18, 2009, Plaintiff submitted a sick call request, noting that his "meds" were discontinued on May 7, that he was experiencing difficulty sleeping, pain in his right knee and shoulder, and that he could not take the medicine that was provided due to side effects. Compl. at ¶ 44; Pl.'s Exs. at p. 30. This request did not mention symptoms of withdrawal. That same day, Plaintiff wrote to Superintendent Artus complaining about being taken off of his Ultram medication abruptly, the side effects he was experiencing from the Motrin and ibuprofen, the pain in his shoulder, and his inability to participate in PT; however, Plaintiff failed to mention any symptoms of withdrawal. Compl. at ¶ 45; CCF Med. R. at pp. 74–75. On May 19, Plaintiff's letter to the Superintendent was forwarded to First Deputy Superintendent Thomas LaValley, [11] for his review and action. Compl. at ¶ 46; CCF Med. R. at p. 73.

On May 22, 2009, Defendant Johnson responded to the letter Plaintiff wrote to Superintendent Artus, noting:

> You were found to be misusing/ abusing your prescribed medication, to which you admit. It was your provider's decision to discontinue that medicine because she is not obligated nor comfortable continuing to prescribe medication for you to misuse or abuse. If the ibuprofen is upsetting your stomach, you can try taking it with an acid reducer. You can discuss this with Ms. Lashway when you see her—you have been scheduled to see her next week. Until then I have prescribed acetaminophen for you to use ... for pain.

Compl. at ¶ 49; CCF Med. R. at pp. 72 & 78 (noting that T. LaValley forwarded Plaintiff's letter to Defendant Johnson).

Although Plaintiff reported to PT for his shoulder on April 30 and May 13, 2009, he refused to participate on May 15, 20, and 22. CCF Med. R. at pp. 58–62; Compl. at ¶¶ 19 & 42; Lashway Decl. at ¶ 37. On May 22, Plaintiff's physical therapist recommended that Plaintiff's PT be discontinued due to his consistent refusal to attend. Lashway Decl. at ¶ 37; CCF Med. R. at p. 58. Plaintiff's PT was discontinued on May 26. Lashway Decl. at ¶ 38; CCF Med. R. at p. 57. On May 27, Plaintiff requested an appointment with a specialist regarding his left shoulder. Compl. at ¶ 50; Pl.'s Exs. at p. 36.

**\*7** On May 28, 2009, Defendant Lashway saw Plaintiff. Defendant Lashway explained that Plaintiff was discharged from PT by the provider. Defendant Lashway further advised Plaintiff that she was aware of the results of the MRI on his right knee, and that Motrin was adequate for pain control. Plaintiff requested that his Ultram prescription be reinstated, and told Defendant Lashway that he could not take either Motrin or Tylenol. When Defendant Lashway asked why Plaintiff could not take either drug Plaintiff responded "you know, I just can't, I don't need to tell you."Lashway Decl. at ¶ 39; CCF Med. R. at p. 83. Contrariwise, Plaintiff argues that at this appointment he reminded Defendant Lashway of all the drugs she had prescribed in the past and his history of issues with those drugs. Compl. at ¶ 51. Nonetheless, it is uncontested that after this appointment, Defendant Lashway requested an orthopedic consultation for Plaintiff's right knee. Lashway Decl. at ¶ 39; Compl. at ¶ 51.

On May 28, 2009, after meeting with Defendant Lashway, Plaintiff wrote to Nurse Administrator B. Lecuyer, noting that he attempted to speak to Defendant Lashway about his shoulder but was informed that due to his failure to participate in PT his concerns with his shoulder would not be addressed, and Defendant Lashway would only address Plaintiff's concerns regarding his knee. Additionally, Plaintiff informed B. Lecuyer that "[he] was discontinued on all [his] pain medications by FNP Lashway without acknowledging any protocol procedures in weaning a person off the medication [he] was taking for more than 2yrs continuously [sic], thus [he] had to endure the suffering of withdraw [al.]" Compl. at ¶ 52; Pl.'s Exs. at pp. 38–39. That same day Plaintiff also wrote to Lester Wright, reiterating his concerns regarding his shoulder, his issues with taking Motrin and ibuprofen, and —without describing them—noting that after his Ultram was discontinued, he suffered "serious" symptoms of withdrawal. Compl. at ¶ 53; Pl.'s Exs. at pp. 40–42.

On May 29, 2009, Plaintiff requested an additional appointment with Defendant Lashway regarding his shoulder pain. Compl. at ¶ 55; Pl.'s Exs. at p. 43. On June 1, Nurse Administrator B. Lecuyer responded to Plaintiff's May 28 letter, noting that Nurse Lashway had already submitted a consultation request for a visit with an outside specialist. Compl. at ¶ 56; Pl.'s Exs. at p. 44. Plaintiff maintains that this referral was for treatment of his knee injury only. Compl. at ¶ 56.

On June 2, Plaintiff submitted a grievance complaining that his shoulder issues were being ignored. Compl. at ¶ 57; Pl.'s Exs. at p. 45. That same day, Plaintiff requested an appointment with a specialist. Compl. at ¶ 58; Pl.'s Exs. at p. 46. On June 8, Plaintiff submitted a sick call request noting that he required attention for his shoulder and that he had not received any medication except for twelve to fourteen Tylenol per day. Compl. at ¶ 60; Pl.'s Exs. at p. 48; Lashway Decl. at ¶ 40; CCF Med. R. at pp. 81–82.

**\*8** On June 11, the Inmate Grievance Resolution Committee ("IGRC") denied Plaintiff's May 14 and June 2, 2009 grievances, noting that his medication had been discontinued due to misuse, and that Plaintiff had been seen by an orthopedic specialist who recommended PT, but that PT was discontinued due to Plaintiff's repeated refusals to attend. Compl. at ¶ 61; Pl.'s Exs. at pp. 49–50. On June 18, Plaintiff complained of his inability to receive care for his shoulder to Thomas LaValley. Compl. at ¶ 64. On June

19, the Superintendent's Office upheld the IGRC's findings with regard to Plaintiff's grievances, noting that Plaintiff had been seen for his left shoulder injury, had been prescribed PT, which was ultimately discontinued due to his failure to participate, and that he had been prescribed Motrin and Tylenol for pain management. Compl. at ¶ 65; Pl.'s Exs. at pp. 54–55.

On June 19, Plaintiff wrote to Nurse Administrator B. Lecuyer asking for additional care for his shoulder, and noting that "I have only [T]ylenol, which I have to take 10–12 for a couple hr. [sic] relief."Compl. at ¶ 67; Pl.'s Exs. at p. 57. On June 23, 2009, Nurse Administrator B. Lecuyer responded to Plaintiff's June 19 letter, noting that the nurse practitioner had advised that he had been prescribed PT, but that it was discontinued due to his own non-compliance. Compl. at ¶ 68; Pl.'s Exs. at p. 58.

On June 25, 2009, Plaintiff received a letter from Superintendent Artus informing him that the Superintendent had spoken to Defendant Johnson regarding his medication issues, and that Defendant Johnson assured him that after his upcoming orthopedic appointment, his need for PT and medication would be evaluated. Compl. at ¶ 70; Pl.'s Exs. at p. 60. On June 26, Defendant Johnson wrote to Plaintiff and informed him that "I believe Ms. Lashway has spoken to you recently re: plans to address your orthopedic issue. You will be seeing the orthopedist very soon and we will devise a plan from that point."Johnson Decl. at ¶ 15; CCF Med. R. at p. 71; Compl. at ¶ 71.

On July 3, 2009, Plaintiff was seen by Defendant Berard, who evaluated his right knee and recommended surgery, but refused to examine Plaintiff's shoulder. Compl. at ¶ 72; Pl.'s Exs. at p. 62; CCF Med. R. at pp. 40–42. On July 13, Plaintiff filed a grievance complaining that he had been told by Corrections Officer Martin [12] that he would be seen by his provider on June 9, but that callouts were cancelled due to an emergency, and that he was told he would be seen on July 13, but that no one came to get him. Compl. at ¶ 74; Pl.'s Exs. at p. 64. On July 29, Plaintiff was informed that "a call out with the Physical therapist to address shoulder issues has been scheduled in the near future. On 7/21/09 the Facility Nurse Practitioner ordered Tylenol medication to help the discomfort. A callout with the facility Nurse Practitioner to address the shoulder issue is scheduled in the very near future."Compl. at ¶ 76; Pl.'s Exs. at p. 67.

**\*9** On July 21, 2009, Defendant Lashway submitted a new request for PT for Plaintiff's left shoulder. Lashway Decl. at ¶ 41; CCF Med. R. at pp. 55–56. Under the section entitled "REASON FOR CONSULTATION," Defendant Lashway noted that "IN PAST HE REFUSED [PHYSICAL THERAPY] SERVICES ... HE HAS SINCE AGREED TO ATTEND PHYSICAL THERAPY SERVICES AND FOLLOW THEIR RECOMMENDATIONS."CCF Med. R. at p. 54. On July 30, 2009, Plaintiff met with a physical therapist, regarding his left shoulder, who recommended that Plaintiff undergo PT twice a week for six weeks. *Id.* Plaintiff received PT for his left shoulder on August 11, 14, 18, and 21. *Id .* at pp. 47 & 49–51; Lashway Decl. at ¶ 42.

On August 25, 2009, Dr. Berard performed surgery on Plaintiff's right knee. In his discharge instructions, Defendant Berard recommended that Plaintiff be given Tylenol # 3 post-operation for pain. Berard Decl. at ¶ 17; AHMC Med. R. at pp. 000044–47. Plaintiff received Tylenol # 3 every four hours, the day after the surgery. Thereafter, Plaintiff was provided with a thirty-day supply of ibuprofen for pain management. [13] Compl. at ¶¶ 81–84. On August 26, 2009, Plaintiff was referred for PT on his right knee. CCF Med. R. at p. 48. Thereafter, Plaintiff received PT on his left shoulder and/or right knee on September 1, 3, 8, 11, 15, 22, 24, and October 1, 2009. *Id.* at pp. 23–25, 27–30, 34, & 38; Lashway Decl. at ¶ 42. On October 8, all of Plaintiff's PT was discontinued by his therapist. Lashway Decl. at 44; CCF Med. R. at p. 22.

On January 7, 2010, Defendant Lashway referred Plaintiff for an orthopedic consultation for his left shoulder and an MRI for his right knee based on his complaints that he had fallen and reinjured his knee. Lashway Decl. at ¶ 46; CCF Med. R. at p. 21. On February 9, 2010, Plaintiff was referred for PT on his right knee. CCF Med. R. at p. 20. On February 18 and March 4, Plaintiff refused to participate in PT for his right knee. *Id.* at pp. 18–19. Nonetheless, Plaintiff was provided PT for his right knee on March 25. *Id.* at p. 16. On March 22, Plaintiff's physical therapist noted that Plaintiff had no new complaints, and that he was making "slow progress" and should continue PT twice a week. Pl.'s Exs. at p. 82. Per Defendant Lashway's January 7 consultation request, Defendant Berard met with Plaintiff regarding his left shoulder on March 26. Defendant Berard found no remaining instability in Plaintiff's shoulder and recommended that he receive PT twice a week for one more month and continue PT on his own thereafter. *Id.* at pp. 17 & 78; Berard Decl. at ¶ 18.

Plaintiff received PT on his right knee on April 6, 2010. CCF Med. R. at pp. 15. On April 9, 13, and 16, Plaintiff refused to participate in PT sessions for his left shoulder, prompting Plaintiff's physical therapist to request that his PT be discontinued on April 16. *Id.* at pp. 12–14. [14] On May 19, 2010, Plaintiff was transferred from CCF to Shawangunk Correctional Facility. *Id.* at p. 76; Compl. at ¶ 96.

### B. Deliberate Medical Indifference

**\*10** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs."*Estelle v. Gamble,* 429 U.S. 97, 104 (1976)."[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,*970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994).

The seriousness element is an objective test, to determine whether the deprivation of care is sufficiently serious "entails two inquiries." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citations omitted). First, courts must determine "whether the prisoner was actually deprived of adequate medical care."*Id.* Medical care is "adequate" where the care provided is a "reasonable" response in light of the "health risk" the inmate faces. *Id.* at pp. 279–80. The second inquiry requires a determination of "whether the inadequacy in medical care is sufficiently serious."*Id.* at p. 280. In cases where medical care is denied, courts focus on the seriousness of the underlying medical condition. *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). Some of the factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain."*Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is at the limit of human ability to bear, nor [does the court] require a showing

that his or her condition will degenerate into a life threatening one").

Whereas, the "seriousness inquiry is narrower" in cases where "the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment."*Salahuddin v. Goord,* 467 F.3d at 280 (citing *Smith v. Carpenter,* 316 F.3d at 185)). In such cases, courts "focus [ ] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone."*Id.* The question becomes whether delaying treatment subjected Plaintiff to any serious risk of harm. To that end, the Second Circuit has instructed us that "the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances."*Smith v. Carpenter,* 316 F.3d at 187. In this regard, "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."*Id.* Determining whether the inadequacy/delay presents a sufficiently serious risk "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."*Id.* (citing *Helling, v. McKinney,* 509 U.S. 25, 32–33 (1993)).

**\*11** The second element, deliberate indifference, is based on a subjective standard. To establish deliberate indifference a plaintiff must demonstrate that the defendant acted with a culpable mental state, similar to criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."*Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted). Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in

which, for example, officials deliberately delayed care as a form of punishment; ignored a lifethreatening and fast degenerating condition for three days; or delayed major surgery for over two years." *Freeman v. Stack,*2000 WL 1459782, at *6 (S.D.N.Y. Sep. 29, 2000).

Construed liberally, Plaintiff's Complaint alleges that Defendants provided constitutionally inadequate care for his shoulder, knee, and withdrawal symptoms.

### 1. Denial of Care

#### a. Withdrawal

Plaintiff alleges that Defendants Lashway and Johnson denied him treatment for the symptoms of withdrawal that he experienced after his Ultram medication was discontinued by Defendant Lashway on May 7, 2009. *See* Compl. at ¶¶ 26, 28, & 102–103. According to Plaintiff, for a week and a half to two weeks after the Ultram was discontinued he suffered from withdrawal symptoms, which included: stomach cramps, diarrhea, lack of sleep, aches all over his body, and a migraine headache that would not go away. Compl. at ¶ 35. However, as explained below, even if we accept, *arguendo,* that these injuries were sufficiently serious for purposes of the Eighth Amendment, there is no evidence to suggest that Defendants Lashway and Johnson were aware of Plaintiff's withdrawal symptoms until after they subsided.

As noted above, Plaintiff's Ultram medication was discontinued by Defendant Lashway on May 7, 2009, based on her belief that Plaintiff had been misusing/abusing the drug, and her medical belief that Ultram was no longer necessary to treat Plaintiff's pain two months after his surgery. On May 8, upon being notified that his Ultram prescription had been discontinued, Plaintiff informed Nurse Badger that he would begin to suffer from withdrawal if he did not get his pills; Nurse Badger agreed to speak with Defendant Johnson about Plaintiff's Ultram prescription. Compl. at ¶¶ 26–28. It is unclear whether Defendant Badger actually mentioned Plaintiff's fear of impending withdrawal to Defendant Johnson. However, even if Nurse Badger had told Defendant Johnson that Plaintiff believed he would start to experience symptoms of withdrawal if he did not receive more Ultram, Defendant Johnson cannot be found to have been deliberately indifferent toward a purely speculative condition. *See Alston v. Bendheim,* 672 F.Supp.2d 378, 386 (S.D.N.Y.2009). Even where the doctor allegedly knows

that the medication contains addictive attributes and that the patient has been taking it for an extended period of time, the failure by the doctor to predict the patient's addiction and withdrawal amounts to nothing more than negligence or malpractice; tortious conduct which is not actionable under § 1983. *Id.*

**\*12** Moreover, although Plaintiff and Mrs. Dunlop wrote numerous letters and made multiple sick call requests between May 7 and May 21, 2009, these letters and requests either did not mention withdrawal or Plaintiff's symptoms, or, in the case of the letter written on Plaintiff's behalf by Mrs. Dunlop, were not addressed to Defendants. CCF Med. R. at pp. 74–75; Pl.'s Exs. at pp. 13–15, 17–18, 21–24, 28–30, 34, & 36. At the earliest, Defendants Johnson and Lashway received notice that Plaintiff was suffering severe symptoms of withdrawal on May 28, 2009. On that day, Plaintiff alleges that he met with Defendant Lashway and discussed his medication issues with her; furthermore, the record reflects that he also sent letters to Lester Wright and Nurse Administrator B. Lecuyer in which he mentioned that he had been forced to suffer "severe" symptoms of withdrawal. Lashway Decl. at ¶ 39; CCF Med. R. at p. 83; Compl. at ¶¶ 52–53; Pl.'s Exs. at pp. 38–39 & 40–42.

Crucially, by his own admission, Plaintiff's withdrawal symptoms only lasted between a week and a half and two weeks, and therefore, would have already subsided by May 28, 2009. Compl. at ¶ 35. Thus, it cannot be established that either Defendant Lashway or Johnson knew of, let alone consciously disregarded, Plaintiff's severe symptoms of withdrawal. *See Hathaway v. Coughlin,* 37 F.3d at 66 (to establish deliberate indifference, the defendant must "know[ ] of and disregard [ ] an excessive risk to inmate health or safety").

Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims that Defendants Johnson and Lashway denied him treatment for his symptoms of withdrawal.

#### b. Shoulder

Plaintiff's shoulder injury caused him to suffer from severe pain on a daily basis and interfered with his ability to use his left arm. Moreover, as noted above, Plaintiff's shoulder injury was sufficiently serious enough to warrant, *inter alia,* an MRI and x-ray, visits with specialists, PT, pain killers, and

multiple surgeries. *See supra* Part II. A. Thus, Plaintiff has established that his shoulder injury is an objectively serious medical condition for purposes of the Eighth Amendment. *See Chance v. Armstrong,* 143 F.3d at 702.

Yet, as noted above, Defendants provided or recommended a host of treatments including: consultations with outside specialists, x-rays, MRIs, PT, three surgeries, and pain medications such as cortisone shots, Tylenol, Celebrex, Motrin, Ultram, and Tylenol # 3, *see supra* Part II.A. Documented evidence of such extensive, frequent, and appropriate treatments are in and of themselves sufficient to dispel any notion that these Defendants outright denied Plaintiff adequate medical care for his shoulder. *Cf. Buffaloe v. Fein,* 2013 WL 5815371, *8 (S.D.N.Y. Oct. 24, 2013) (collecting cases in support of the proposition that "the high frequency of care could reasonably have assured Dr. Bernstein that there was no denial or delay of care"); *see also Harrington v. Mid–State Corr. Facility,* 2010 WL 3522520 (N.D.N.Y. May 21, 2010) (finding that defendant doctors' "actions of referring [plaintiff's] care to a specialist, more familiar with the intricacies of [plaintiff's] subjective symptoms, belies any claims of deliberate indifference. Referring for specialist care, explaining the specialist's findings, and referring for further diagnostic follow-up are all appropriate treatment actions.") (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).

**\*13** Nonetheless, Plaintiff alleges that he was denied medical care for his shoulder: (i) by Defendants Johnson, [15] Lashway, and Berard for their failure to administer proper pain medication to Plaintiff; and (ii) when Defendant Berard refused to look at Plaintiff's left shoulder during a consultative examination of his right knee on July 3, 2009.

### *i. Pain Medication*

Plaintiff's claims that he was denied adequate treatment for his knee and shoulder injuries because each of the Defendants failed to provide him with proper pain medication are unavailing. *See* Compl. at ¶¶ 102–106. Neither Defendant Lashway's decision to discontinue Plaintiff's Ultram prescription on May 7, 2009, nor her or Defendant Johnson's subsequent refusals to reinstate his Ultram prescription, constituted deliberate indifference. *See Wright v. Genovese,* 694 F.Supp.2d 137, 160 (N.D.N.Y.2010) ("Differences in opinion between a doctor and an inmate patient as to the appropriate pain medication clearly do not

support a claim that the doctor was deliberately indifferent to the inmate's serious medical needs."). This is particularly true in the instant case where Defendants' decisions were supported by Defendant Lashway's medical judgment that Ultram was no longer medically necessary two months post-surgery, and the fact that Plaintiff had been disciplined for misusing the medication. *See, e.g.,* Lashway Decl. at ¶¶ 32 & 34; CCF Med. R. at pp. 72 & 87; Pl.'s Exs. at pp. 19, 25, 49, and 69; *see also Josey v. Rock,* 2013 WL 1500435, at *9 (N.D.N.Y. Mar. 19, 2013) (finding no deliberate indifference where doctors discontinued Ultram prescription based on their concerns that plaintiff was seeking Ultram for non-medical reasons and Ultram was not the best treatment for patient's pain); *see also Cole v. Pang Lay Kooi,* 2013 WL 4026842, at *5 (N.D.N.Y. Aug. 6, 2013) (finding a lack of deliberate indifference where prisoner's Ultram prescription was discontinued after he was caught hoarding doses of the drug); *Scott v. Perio,* 2005 WL 711884, at *6 (W.D.N.Y. Mar. 25, 2005) (finding that in the absence of evidence that stronger medication was withheld for non-medical reasons, "[i]t is not for the Court to second guess plaintiff's medical providers as to what medicine or what dosage should have been prescribed to treat the plaintiff.").

Likewise, Plaintiff's claim that Defendant Lashway was deliberately indifferent because she refused to prescribe any pain medication other than NSAID pain relievers, which she allegedly knew he could not tolerate, is patently untrue. Countless entries in the record establish that Plaintiff was continuously provided with Tylenol, a non-NSAID pain medication, that he had tolerated in the past and admits provided him some relief with regard to his present claims. *See, e.g.,* Lashway Decl. at ¶ 21; CCF Med. R. at pp. 53, 72, & 93; Pl.'s Exs. at pp. 48, 50, 55, 57, & 67. Thus, Plaintiff had access to pain medication other than NSAIDs. [16]

**\*14** Moreover, even if Defendants Lashway and/or Johnson had decided to prescribe Motrin or some other NSAID, the decision to choose one form of pain medication over another, even if the medication causes side effects, is not indicative of deliberate indifference. *See Rush v. Fischer,* 2011 WL 6747392, at *3 (S.D.N.Y. Dec. 23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs.") (citing, *inter alia, Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011), & *Reyes v. Gardener,* 93 F. App'x 283, 285 (2d Cir.2004) (summary order)); *Perez v. Cnty. of Monroe,* 945 F.Supp.2d 413, 415 (W.D.N.Y.2013) (finding that, "at most" plaintiff's allegation that the medicine

prescribed by his doctor caused joint pain and arthritis as side effects was a " 'mere disagreement over [his] proper treatment,' which does not give rise to a constitutional violation") (quoting and citing *Chance v.. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)); *see also Idowu v. Middleton,* 2012 WL 6040742, at *6 (S.D.N.Y. Dec. 4, 2012) (finding no Eighth Amendment claim stated where nurse ignored plaintiff's complaints, on three separate occasions, that he was experiencing side effects from the medication he was prescribed which included: "stomach pains, vomiting, dizziness, insomnia and other conditions").[17]

Furthermore, with respect to Plaintiff's allegations that Defendant Berard failed to provide adequate pain medication, *see* Compl. at ¶ 106, it is clear from the medical records that after each of Plaintiff's surgeries Defendant Berard provided pain medication to Plaintiff while he remained within the Defendant's care at AHMC. Berard Decl. at ¶¶ 12, 14, & 17; AHMC Med. R. at pp. 000031–34, 000034–38, & 000044–46. Additionally, it is undisputed that Defendant Berard was not Defendant Lashway's nor Defendant Johnson's supervisor, nor possessed the authority to prescribe pain medication to Plaintiff once he left AHMC and returned to CCF. Berard Decl. at ¶ 8, 7, & 19; *also cf.* Compl. at ¶ 72.

### ii. July 3, 2009

Plaintiff maintains that he went to see Defendant Berard on July 3, 2009, for treatment of his right knee. At that appointment Plaintiff also requested that Defendant Berard examine his left shoulder. "Defendant Dr. Berard advised Plaintiff he was there to be seen about whether or not he would like to have his R-knee surgically repaired—he had not been told by anyone that he was supposed to examine Plaintiff's L-shoulder, and he said there was nothing written in the file he had for the consult."Compl. at ¶ 72. Dr. Berard's refusal to examine Plaintiff's left shoulder because it was outside of the scope of what care he was authorized to provide does not evince deliberate indifference.[18] Indeed, Plaintiff had been told prior to his July 3 appointment that his shoulder issues would be dealt with after his July 3 appointment for his knee issue. *See* Compl. at ¶¶ 70–71; Pl.'s Exs. at p. 60; CCF Med. R. at p. 71.

**\*15** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims that he was ever denied care for his left shoulder.

### 2. Delay in Care

At best, affording Plaintiff all of the special solicitude and liberality owed to a *pro se* Plaintiff, Plaintiff's remaining allegations are best interpreted as claims that care for his knee and shoulder was unconstitutionally delayed. Specifically, Plaintiff has alleged that: (i) his requests for sick call were not always timely followed; (ii) between May 26 and July 21, 2009, Defendant Lashway discontinued PT on his shoulder, refused his requests for an appointment with a specialist, and provided only pain medication for his shoulder injury; and (iii) that he was provided only pain medication for treatment of his right knee between March 22, 2009, when the injury was discovered, and August 25, 2009, when Dr. Berard performed surgery on his knee. *See generally* Compl.

### a. Sick Call

According to Plaintiff, despite submitting sick call requests on May 8, 9, and 11, 2009, "on the callouts for May 14, 2009 he was not seen when Defendant FNP Lashway came to the SHU, nor did she make a round, as was normal protocol;" furthermore despite submitting a sick call request on May 18, Plaintiff was not seen until May 28, 2009. Compl. at ¶ 57. Plaintiff also alleges that "on July 13, 2009, Plaintiff was supposed to be seen by his provider, but he was not seen at that time[.]"*Id.* at ¶ 74.

Typically, delays that constitute deliberate indifference occur when " 'officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Washington v. Farooki,* 2013 WL 3328240, at *6 (N.D.N .Y. July 2, 2013) (quoting *Brunskill v. Cnty. of Suffolk,* 2012 WL 2921180, at *3 (E.D.N.Y. July 11, 2012)). As noted above, Plaintiff's shoulder injury was an objectively sufficiently serious injury. Contrariwise, with respect to Plaintiff's knee injury, courts within our Circuit have repeatedly held that a torn medial meniscus is not an objectively sufficiently serious condition for purposes of the Eight Amendment. *See Moody v. Pickles,* 2006 WL 2645124, at *6 (N.D.N.Y. Sept. 13, 2006) (surveying cases). However, even if both conditions constituted serious injuries, there is no evidence in the record before us to suggest that either injury was life threatening or fast degenerating, or that these appointments were deliberately delayed as a form of punishment. Moreover, it is clear from our discussion

of the facts above that Plaintiff received near constant care from Defendant Lashway during the several month period surrounding these incidents including, *inter alia,* pain medication, PT, appointments with specialists, and multiple surgeries. *See supra,* Part II.A.

Accordingly, we recommend that Defendants' Motion be **GRANTED** to the extent that Plaintiff alleges that a handful of missed appointments during a period in which he received near continuous care constituted an unconstitutional delay in treatment. *See Morrison v. Mamis,* 2008 WL 5451639, at *9 nn. 8 & 23 (S.D.N.Y. Dec. 18, 2008) (surveying cases in support of a similar conclusion).

### b. Delay in Shoulder Treatment

**\*16** Plaintiff alleges that, after his physical therapist recommended that his PT for his leftshoulder be discontinued based on his consistent refusals to attend, Defendants Lashway and Johnson refused to permit him to see a specialist for his shoulder until and unless he completed the twelve sessions of PT which they had prescribed. *See, e.g.,* Pl.'s Opp'n at pp. 9–10 ("Prior to May 2009, Plaintiff had not been refused any requests by Defendants Lashway or Berard, and, Johnson, too, on the one time she seen [sic] me after a surgery. After May 2009, Plaintiff could not get anything for his [shoulder] except the 12 [physical therapy] sessions Defendant Lashway and Johnson told Plaintiff he had to go to in order to receive any further treatment for his shoulder."); *see also* Compl. at ¶ 114 ("Defendants FNP Lashway and Dr. Johnson ... refused to see [him], and no longer would make available adequate treatment for [his] ongoing l-shoulder by discontinuing requests for followup care, then telling [him] that once he took Pt sessions, and seen the orthopedic Doctor, he would be considered for treatment and pain medication.").

Ironically, it was due to Plaintiff's own reluctance to accept a third surgery on April 10, 2009, that Plaintiff was prescribed the twelve PT sessions in the first place. Indeed, Plaintiff declined a third shoulder surgery and elected instead to continue with PT, noting that "he became hesitant because his shoulder seemed more of an experiment, than actual remedies to fix his problem."Compl. at ¶ 17. Accordingly, Dr. Macelaru recommended that Plaintiff undergo two months of PT and then be re-evaluated. Berard Decl. at ¶ 15; CCF Med. R. at p. 62. And, although Plaintiff initially reported for PT on April 30 and May 13, 2009, he failed to report on May 15, 20, and 22, at which time his therapist requested that PT be

discontinued. CCF Med. R. at pp. 57–60 & 62. During the so called period of delay, Defendants Lashway and Johnson, as well as other prison officials repeatedly explained to Plaintiff that treatment for his left shoulder was denied during this period because of his own refusal to participate in the PT that had been prescribed for him. CCF Med. R. at pp. 57–60 & 62; Compl. at ¶¶ 61 & 68; Pl.'s Exs. at pp. 55 & 58. Crucially, the record reflects that once Plaintiff agreed to complete PT, PT was re-instated. *See* CCF Med. R. at p. 54.

Plaintiff's allegation that Defendants Lashway and Johnson refused to provide further treatment for his shoulder until he completed the two months of PT that was prescribed does not evince deliberate indifference. Rather, it reflects a reasonable response to Plaintiff's ongoing refusal to adhere to the course of treatment that they prescribed. Stated simply, Plaintiff cannot on the one hand refuse to participate in the treatments prescribed by his doctors, and on the other claim that the course of treatment was inadequate. *See Buffaloe v. Fein,* 2013 WL 5815371, at *9 (surveying cases for the proposition that in light of plaintiff's "ongoing medication treatment and his history of refusing physical therapy and medication," defendants denial of care did not constitute deliberate indifference); *see also Snyder v. Law,* 2010 WL 5572768, at *3 (N.D.N.Y. Dec. 21, 2010) (surveying cases for the proposition that the "*fait de compli*" in plaintiff's deliberate medical indifference case was his failure to adhere to the course of treatment prescribed by his doctors). Plaintiff's desire to see an orthopedic specialist before completing the course of PT prescribed by Defendants is nothing more than an in-actionable disagreement between a prisoner and his doctors as to the appropriate form of treatment. [19] *Demata v. New York State Corr. Dep't of Health Servs.,* 198 F.3d 233 (2d Cir.1999) (citing *Chance v. Armstrong,* 143 F.3d at 703, for the proposition that "strengthening exercises are in fact a form of medical care. Demata's mere disagreement with this form of treatment does not establish deliberate indifference.").

**\*17** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's claims that Defendants Lashway and Johnson unconstitutionally delayed his shoulder treatment.

### c. Delay in Knee Treatment

On March 3, 2009, Plaintiff was diagnosed with a "medial miniscus tear" in his right knee. Lashway Decl. at ¶ 24; CCF Med. R. at p. 90. However, Plaintiff did not receive

surgery until August 25, 2009. Compl. at ¶ 39; Pl.'s Exs. at p. 26. Berard Decl. at ¶ 17; AHMC Med. R. at pp. 000044–46. Additionally, it is clear that Plaintiff was receiving pain medication during the interval between his diagnosis and surgery. At the time of his diagnosis, and up until the medication was discontinued by Defendant Lashway on May 7, Plaintiff was receiving Ultram for pain. Johnson Decl. at ¶ 2 & 8; Lashway Decl. at ¶ 24; CCF Med. R. at pp. 88–89. After the Ultram was discontinued, Plaintiff was informed that the pain medications he had been prescribed, including Tylenol and Motrin were sufficient to manage his knee pain. Compl. at ¶ 39; Pl.'s Exs. at p. 26; Lashway Decl. at ¶ 39. Where such ongoing treatment is evident, it has been held that delaying surgery for the same injury for as long as a year does not amount to deliberate indifference. *See Moody v. Pickles,* 2006 WL 2645124, at *6 (N.D .N.Y. Sept. 13, 2006) (citing *Culp v. Koenigsmann,* 2000 WL 995495, at *4, *9–*10 (S.D.N.Y. July 19, 2000) for the proposition that there was no "Eighth Amendment violation where plaintiff suffered from a torn medial meniscus and experienced a one-year delay from injury to surgery")).

Accordingly, because there are no genuine issues of material fact with respect to whether Defendants Lashway, Johnson, or Berard provided Plaintiff with constitutionally adequate medical care for his knee and shoulder we recommend that Defendants' Motion for Summary Judgment be **GRANTED** with regard to all of Plaintiff's deliberate medical indifference claims.

## C. Retaliation

Plaintiff alleges that Defendants conspired with one another to deprive him of constitutionally adequate medical care in retaliation for grievances and complaints he filed regarding his medical treatment. *See* Compl. at ¶¶ 109–113.

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise

of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act."(citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*18** To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. To satisfy the second prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v.. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded)."Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."*Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection."

*Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action."*Id.* at 492 (internal quotation marks and citations omitted) (cited in *Davis,* 320 F.3d at 353).

In situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15,1997)); *see also Gayle v. Gonyea,* 313 F.3d at 682 (defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report" (internal quotation marks and citations omitted)).

 **\*19** There is no question that filing grievances is a protected activity. Likewise, "it is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor."*Burton v. Lynch,* 664 F.Supp.2d 349, 367 (S.D.N.Y.2009); *Benitez v. Parmer,* 2013 WL 5310245, at *8 (N.D.N .Y. July 8, 2013) (GTS/DEP) (citing *Burton v. Lynch* ). However, as noted above, here there is no evidence that Plaintiff was ever deprived of adequate medical care. *See infra* Part II.B. Indeed, between May 7, 2009 (when Plaintiff's Ultram prescription was discontinued and he began filing grievances and complaints about his treatment), and May 2010 (when Plaintiff was transferred to Shawangunk), Plaintiff received near continuous treatment, including: four visits with Defendant Lashway who made no less than six referrals for Plaintiff to see specialists, CCF Med. R. at pp. 10, 20, 64, 77–79 & 83; two visits and knee surgery with Defendant Berard, *id.* at p. 17, & AHMC Med. R. at pp. 000041–46; and, twenty-four scheduled appointments for PT for his knee and/or shoulder, CCF Med. R. at pp. 11–16, 18–19, 22–30, 34, 36, 47, 49–51, & 54. Our conclusion in this regard is, on its own, likely sufficient to grant summary judgment against Plaintiff's medical retaliation claims. *See Cole v. Levitt,* 2009 WL 4571828, at *10 (W.D.N.Y. Dec. 4, 2009) (citing *Goros v. Pearlman,* 2007 WL 1423718, *3 (N.D.N.Y.2007), for the proposition that no medical

retaliation occurred where there was no evidence of medical deliberate indifference); *Tatta v. Wright,* 616 F.Supp.2d 308, 320 (N.D.N.Y.2007) (denying plaintiff's claim that he was denied adequate medical care in retaliation for filing grievances where plaintiff failed to establish the denial of adequate medical care).

However, here additional reasons for dismissal also exist. Construed liberally, Plaintiff alleges that Defendants took the following adverse actions: (1) they discontinued and/or refused to reinstate his Ultram prescription; (2) they prescribed ineffective pain medications; (3) refused to provide him with a follow-up appointment with a specialist after he refused to participate in PT; and (4) Defendant Lashway verbally threatened him. *See* Compl. at ¶¶ 109–113.

With respect to the first three alleged adverse actions, Defendants have clearly established that they had legitimate non-retaliatory reasons for taking such actions—*i.e.,* Plaintiff's lack of medical need and history of abusing/ misusing Ultram, and his refusal to participate in PT. *See Graham v. Henderson,* 89 F.3d at 79.

Additionally, Plaintiff alleges that "almost immediately after ... [he] filed grievances against the Defendant [Lashway,] Plaintiff was warned by the Defendant that if he continued with complaints and grievances they would only get worse for him concerning his treatment."Compl. at ¶ 109. In some cases, verbal threats have been held to constitute adverse action. *See Mateo v. Fischer,* 682 F.Supp.2d 423, 434 (S.D.N.Y.2010) (surveying cases in support of the proposition that "some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action"). However, Plaintiff's allegation is deficient in numerous ways. To begin with, Plaintiff does not identify when or where this allegation was made nor which grievance brought about the alleged threats. More importantly, the allegation is too non-specific and indirect to have a chilling effect on a prisoner of ordinary firmness. *See id.*(surveying cases for the proposition that "[t]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance ... do not give rise to a First Amendment retaliation claim").

**\*20** Accordingly, we recommend that Defendants' Motion be **GRANTED** with respect to Plaintiff's retaliation claims against Defendants. Likewise, because we have found no evidence of any constitutional violations, to the extent that Plaintiff alleges that the Defendants conspired with one another to deny him adequate medical care in retaliation for exercising his First Amendment rights, we recommend that such claim also be **DISMISSED.** *See Benitez v. Partner,* 2013 WL 5310245, at \* 10 (surveying cases for the proposition that in the absence of any underlying constitutional violations, a plaintiff cannot sustain a § 1983 conspiracy claim).

**D. Supervisory Liability**

To the extent that Plaintiff has argued that Defendant Johnson was liable in her supervisory capacity for the alleged underlying constitutional violations committed by Defendant Lashaway and/or Berard, we recommend that such claims be **DISMISSED** in light of the fact that we have found no evidence of any underlying constitutional violations. *See, e.g.,* Compl. at ¶ 105; *see also Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N .Y.2011) (collecting cases for the proposition that "because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability").

**III. CONCLUSION**

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 37) be **GRANTED,** and that the Complaint be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.****Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also*28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Filed July 16, 2014.

**All Citations**

Slip Copy, 2014 WL 4626490

Footnotes

1   Plaintiff's Complaint is comprised of a *pro forma*§ 1983 complaint and a handwritten section, both of which contain numbered paragraphs. When referencing the handwritten portion of Plaintiff's Complaint we refer to the paragraphs as numbered by Plaintiff; when referring to the *pro forma* portion of Plaintiff's Complaint we refer to the page numbers automatically assigned by the Court's Case Management Electronic Case Filing system.

2   Plaintiff's CCF Medical Record is comprised of documents from multiple non-sequentially numbered sources. Accordingly, we refer to the page numbers automatically assigned by the Court's Case Management Electronic Case Filing system.

3   Tylenol # 3 is a narcotic pain reliever which contains codeine, an opioid.

4   Dr. Macelaru is not a Defendant in this action.

5   Nurse Badger is not a Defendant in this action.

6   Although Plaintiff provided a detailed index of the Exhibits attached to his Complaint, he failed to label each individual Exhibit. Therefore, the Court refers to the page numbers automatically assigned by the Court's Case Management Electronic Case Filing system

7   Regardless of whether a visit occurred, neither party contends that Plaintiff complained of symptoms of withdrawal on May 12. *See* Compl. at ¶ 33; Lashway Decl. at ¶ 34; CCF Med. R. at p. 85.

8   B. Lecuyer is not a Defendant in this action.

9   Dr. Wright is not a Defendant in this action.

10   Superintendent Artus is not a Defendant in this action.

11   Deputy Superintendent LaValley is not a Defendant in this action.

12   Officer Martin is not a Defendant in this action.

**13**   It is unclear who prescribed Plaintiff ibuprofen after his surgery.

**14**   Defendants claim that Plaintiff refused PT for his knee on April 9, 13, & 16, 2010. However, it is not readily apparent from the documents cited by Defendants that these therapy sessions were for anything other than Plaintiff's left shoulder. *See* Pl.'s 7.1 Statement at ¶¶ 66–67 & 69–70; *see also* CCF Med. R. at pp. 12–14.

**15**   In addition to allegations that can plausibly be interpreted as alleging that Defendant Johnson was liable for the care she personally provided to Plaintiff, Plaintiff has also alleged that Defendant Johnson was liable in her supervisory capacity for violations, of which she was allegedly aware, committed by Defendants Lashway and/or Berard. *Compare* Compl. at ¶ 105, *with id.* at ¶ 114. We deal first with Plaintiff's direct allegations against Defendant Johnson, and consider his supervisory claims against her last. *See infra* at Part II.D.

**16**   Moreover, to the extent that Plaintiff claims Defendant Johnson was deliberately indifferent to his intolerance for NSAIDs, such a claim is unsupported by the record. *See* Compl. at ¶ 105. Indeed, when Defendant Johnson learned about Plaintiff's inability to tolerate the drug *via* his May 18 letter to Superintendent Artus, she advised him to try taking the medication with an acid reducer and prescribed Tylenol as well. Compl. at ¶ 49; CCF Med. R. at p. 72.

**17**   Furthermore, Plaintiff's failure to abide by Defendants' instructions, including their instructions to take Motrin and ibuprofen further belie his claims. *See Snyder v. Law,* 2010 WL 5572768, at *3 (concluding that plaintiff's failure to take the medication prescribed by his doctors—regardless of the fact that the drugs allegedly caused side effects—was fatal to his deliberate medical indifference claim).

**18**   However, even if Defendant Berard's alleged refusal to provide Plaintiff with treatment for his shoulder on July 3, 2009 did constitute deliberate indifference, Plaintiff is barred by the statute of limitations from bringing an action against Defendant Berard based on this incident. In a § 1983 action, the applicable statute of limitations is the "general or residual statute for personal injury actions," of the state in which the federal court is located. *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249–50 (1989)) (alterations omitted).

   In New York, a three-year statute of limitations applies for personal injury actions, and thus to § 1983 actions as well. *Id.; see also* N.Y.C.P.L.R. § 214(5). "While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues. The claim accrues when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) (citation omitted).

   Plaintiff signed his Complaint in the instant action on July 26, 2012. *See* Compl. Thus, Plaintiff is barred from raising any claim against Defendant Berard which he knew or should have known of prior to July 26, 2009. Moreover, and notwithstanding Plaintiff's argument to the contrary, Defendants properly preserved the statute of limitations as an affirmative defense by timely raising it in their Answer. *See* Dkt. No. 15, Answer, at ¶ 15; *see also* Pl.'s Opp'n at pp. 13–14. Defendants did not raise the statute of limitations with regard to any of Plaintiff's other claims.

**19**   The instant case does not compare to that of *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000), where it was held "that (1) outright refusal of any treatment for a degenerative condition that tends to cause acute infection and pain if left untreated *and* (2) imposition of a seriously unreasonable condition on such treatment, both constitute deliberate indifference on the part of prison officials." Unlike that case, here Plaintiff continued to receive pain medication and was asked merely to complete a reasonable, if conservative, form of treatment prior to being evaluated for further surgery.